**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division**

| | |
|---|---|
| THOMAS D. DOMONOSKE, individually and on behalf of all those similarly situated,<br><br>                Plaintiff,<br><br>     v.<br><br>BANK OF AMERICA, N.A., a national banking association,<br><br>              Defendant. | Civil Action No. 5:08-cv-00066 |
| VICTOR RIVERA, individually and on behalf of all those similarly situated,<br><br>                Plaintiff,<br>     v.<br><br>BANK OF AMERICA, N.A., a national banking association,<br><br>              Defendant. | Civil Action No. 5:09-cv-00080 |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM AND SUBMISSION
IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Pursuant to the Court's request on November 25, 2009, and subsequent Orders entered on December 2, 2009 and December 9, 2009, Plaintiffs hereby submit the following Supplemental Memorandum and Submission in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, filed September 30, 2009 (Docket Entry 68), and Bank of America, N.A.'s Joinder in Support of Plaintiffs' Motion, filed October 30, 2009 (Docket Entry 75).

**I.      PLAINTIFFS' ATTORNEYS FEES STATEMENT.**

The negotiated proposed Stipulation of Settlement would permit Plaintiffs' counsel to petition the Court for attorneys fees and costs up to 25% of $ 9.4 million without Defendant's objection.   The Court has ordered the parties to provide billing statements evidencing the time

and expenses incurred in the case.

The records of Plaintiffs' counsel conservatively evidence no less than 1,948.44 hours of attorney work.  Declaration of Leonard Bennett, "Exhibit 1"; Declaration of Ian Lyngklip, "Exhibit 2".  Declaration of Timothy Cupp, "Exhibit 3".  It is also estimated that the case will continue to require significant work through and then after a final Fairness hearing as counsel remains responsible for protecting the class, responding to inquiries from class members and prosecuting the case through final approval, distribution, possible appeal and dismissal.  Further, these statements of hours are subject to additional caveats. While the data provided evidences the hours as stated above, the statements do not reflect all of the time and expense actually incurred in the case.  Plaintiffs' counsel have maintained records – including time slips – in varied manners depending upon the law firm.   They have not billed paralegal time and have limited billings for email to 0.1 hourly increments even when many such exchanges required significantly more work that that increment conveys.  Mr. Lyngklip did not include his time for travel to and from San Francisco for the mediation.   And only Mr. Cupp has demonstrated expenses for copying or mailing.   The objective of this effort was to provide an "estimate" of the work performed as a possible "cross-check" against the percentage of fund calculation. MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.724 (In common fund cases, "judges frequently call for an estimate of the number of hours spent on the litigation and a statement of the hourly rates for all attorneys and paralegals who worked on the litigation. Such information can serve as a "cross-check" on the determination of the percentage of the common fund that should be awarded to counsel.")

This case – an action for a monetary recovery common fund – was not a case in which conventional time records were maintained in the same exacting detail otherwise required for a

straight hourly matter. In the Fourth Circuit, attorneys' fees in common fund cases such as this one are generally awarded on a percentage-of-the-recovery basis. *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) ("Although the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").  *See also Smith v. Krispy Kreme Doughnut Corp*., No. 1:05CV00187, 2007 WL 119157, at *1 (M.D.N.C. Jan. 10, 2007); *see DeLoach v. Philip Morris Cos*., No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)).

Percentage-fee awards are what the name suggests—class counsel fees are determined as a percentage of the total settlement fund.  The focus of a fee determination in a class settlement is the actual benefit obtained for the class. MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.71 ("Compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The "fundamental focus is the result actually achieved for class members." That approach is premised on finding a tangible benefit actually obtained by the class members. In comparing the fees sought by the lawyers to the benefits conferred on the class, the court's task is easiest when class members are all provided cash benefits that are distributed.")

Courts across the country typically award fees of a least twenty-five percent or more in cases where class counsel generates a common fund for the benefit of the class.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (explaining that "the vast majority of courts now permit or direct district courts to use the percentage-fee method" and "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund"); *see also In re RJR Nabisco*, No. 88 Civ. 7905, 1992 WL 210138, at *6 (S.D.N.Y. Aug. 24, 1992) (recognizing that

courts increasingly use the percentage of the fund method over the loadstar method in awarding fees). In fact, a comprehensive study of attorneys fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. OF EMPIRICAL LEGAL STUDIES 27, 31, 33 (2004). This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See, e.g.*, *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 295 (1st Cir. 1995) (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million).

Courts generally award fees of between twenty-five and thirty-three percent of the common fund notwithstanding the amount of the fund. *In re US Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, 159 F.3d 1346, 1346 (2d Cir. 1998) (affirming district court's award of 25% of $1 million common fund); *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 631 (concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97CV69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n

award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).

As two of the five largest FCRA class settlements were litigated and approved in Virginia, the Court is in a position to compare the potential attorneys' fees in this case with those approved in two recent Virginia FCRA cases settled on a class basis.   *Williams v. Lexis Nexis Risk Management*, Civ. No. (E.D. Va. June 2008)(Payne) (Approving percentage of fund fee 27.5% of $ 22 million settlement fund with cross-check at 3.0+ multiplier); *Beverly v. Wal-Mart Stores, Inc*, 3:07-cv-00469 (E.D. Va.  May 1, 2009) (Williams) (Approving percentage of fund fee 27.5% of $ 6.89 million settlement fund without cross-check).  Prior to the first of these settlements, the largest FCRA class settlement was *Clark v. Experian, et al.,* 2004 WL 256433 (D.S.C. 2004)[1], a settlement in which no money was paid to the class with attorneys fees requested (after four depositions in the amount of $15,000,000).  The benefit to justify such a fee was simply the injunctive relief and remedial changes to the manner in which each national consumer reporting agency would furnish class member credit reports.[2]  In contrast, despite the greater success for the Class in this case, Plaintiffs' counsel would be bound to seek only a proportionate recovery and a percentage below each of these previous cases.[3]

The maximum fee to which (in accordance with the Stipulation of Settlement) the

---

[1]*Clark* involved the improper reporting of "included in bankruptcy" account notations on the credit reports of co-obligors who had not filed for bankruptcy themselves.

[2] Present Class counsel, Mr. Bennett, appeared in the case as lead objectors' counsel.  He was successful in forcing some changes to the settlement, but despite objection, he was unable to prevent the payment of such a large fee to the attorneys to the exclusion of the class.

[3] While the attorneys' fee contract with Mr. Domonoske authorized a percentage of common fund request, it required Plaintiffs' counsel to commit to seek a percentage of recovery no greater than 25%.

Defendant would not object is $2,350,000.00, which is 25% of $ 9.4 million, 23.74% of the actual cash common fund of $9.9 million, and less than 20.7% of the gross minimum cash common fund of $11.35 million if including costs of notice and administration.  It is directly proportionate to the success of the work performed by Class Counsel.[4]

If approved, this settlement would be the fourth largest FCRA class settlement obtained to date, anywhere in the country.  Present Plaintiffs' counsel will have litigated and negotiated three of these.   The Court's December 2, 2009 Order stated that, "Given the amounts at stake in this case, however, it is difficult to characterize the discovery taken as being extensive." December 2, 2009 Order, p. 2.  This conclusion, if a concern, would overlook the significant FCRA class action knowledge base already possessed by Plaintiffs' counsel team.   For example, two of Plaintiffs' attorneys literally wrote the book on FCRA litigation, the National Consumer Law Center's, *Fair Credit Reporting* treatise.  Mr. Lyngklip personally wrote the chapter on the FCRA provisions and industry compliance with same that were alleged in these cases.  Plaintiffs' counsel includes a 2009 Virginia Leaders in the Law, two Board members on the National Association of Consumer Advocates, attorneys who have been called to testify before Congress and the Federal Trade Commission on multiple occasions, and who have collectively taught an estimated 75 or more Continuing Legal Education programs or sessions in Virginia, for the Army and Navy Judge Advocate schools and nationally for the American Bar Association, various state Bars and for different national consumer advocacy organizations.   Defendant was aware of the background and previous litigation and appellate success of Plaintiffs' counsel.

---

[4] In fact, Plaintiffs' lead counsel, Mr. Bennett, has remained consistent in his fee requests in other class settlements, including at least one in the Eastern District of Virginia this year in which he submitted a fee request of less than $7,000 (27.5% of the gross class recovery) in a class case in which the class size discovered was much lower than initially estimated.

Further, to reach a point where Plaintiffs' counsel could fairly value the case, they needed to discover only three things: (a.) Bank of America's disclosure procedures; (b.) its efforts to comply with the FCRA's disclosure requirements (relevant to willfulness); and (c.) class size. All of this information was discovered and known to counsel before settlement. The value produced by counsel in this proposed settlement was not fortuitous, nor was it achieved due to years of protracted litigation used in order to bleed a Defendant to the point of settlement. This settlement was obtained through the unique and specialized skill and knowledge base of Plaintiffs' counsel. An attorneys' fee exactly proportionate to the result obtained – 20.7 ¢ for each actual dollar recovered for the class - would be a reasonable fee award.

## II.      CLASS DEFINITION DATES AND DATES OF DISCLOSURE

The Court has requested additional information and the parties' positions regarding the basis for the opening and closing dates in the class definition and regarding the timing of the Domonoske and Rivera credit disclosures.

Domonoske received a Bank of America credit score disclosure a number of days after his equity line closing on December 12, 2007. His credit score was used by Bank of America on November 2, 2007 when he applied for a new equity line. Additionally, Domonoske had applied for an increase in a previously existing equity line during the first week of October 2007 for which he never received a credit score disclosure. Declaration of Thomas D. Domonoske, "Exhibit 4". Rivera did not receive a Bank of America credit score disclosure. His loan closed on May 2, 2006. He first discovered the use of his credit score and the subject FCRA violation in April 2008. Declaration of Victor Rivera, "Exhibit 5" ¶3.

The proposed settlement class is defined as:

> All natural persons who applied to Bank of America for a loan
> subject to 15 U.S.C. § 1681g(g): (1) whose loan application was
> processed on the ACAPS platform between August 8, 2006, and
> September 12, 2008, where the Credit Score Disclosure was
> triggered more than three days after receipt of the application, or
> (2) whose loan application was processed and booked on the
> Legacy Bank of America platforms between May 28, 2006, and
> July 11, 2009.

(Settlement Agreement, § 3.1.)    In contrast, the original class definitions in the initial *Rivera*

and *Domonoske* Class Complaints were, respectively:

> All persons (a) who applied for a consumer loan at Bank of America under either
> closed-end or open-end credit which was to be secured by 1 to 4 units of
> residential property, (b) beginning two years prior to the filing of this action, and
> (c) who were the subject of a credit score used by Bank of America in connection
> with that application.

*Domonoske v. Bank of America, N.A.*, Complaint, Docket No. 1, ¶ 22.

> All natural persons residing in the United States who were the subject of a
> consumer credit score used by Defendant on or after December 1, 2004 in
> connection with its evaluation of an application initiated or sought by such natural
> person for a consumer mortgage loan secured by 1 to 4 units of residential
> property, and who also are members of one of the following subclasses:
>
> a)      the class member was never provided with a disclosure that contained
> each credit score used by the Defendant, each key reason factor associated with
> each score, the name, address, and telephone number of each credit reporting
> agency that provided a credit score that was used, and the Notice to Home Loan
> Applicants as found at 15 U.S.C. § 1681g(g)(1)(D); or
>
> b)      the class member was provided with a disclosure that contained each
> credit score used by the Defendant, each key reason factor associated with each
> score, the name, address and telephone number of each credit reporting agency
> that provided a credit score that was used, and the Notice to Home Loan
> Applicants as found at 15 U.S.C. § 1681g(g)(1)(D), but to whom the notice was
> not provided prior to the closing date of the loan transaction.

*Rivera v. Bank of America, N.A.*, First Amended Complaint, ¶ 11.

There was nearly complete overlap with the classes. Though the start dates of the *Rivera*

original definition was earlier (the *Domonoske* start date remains 2 years from the filing of his suit), Domonoske could have therein represented nearly all of the *Rivera* putative class and Rivera nearly all of the *Domonoske* putative class.  And each still could do so if the Court decided that it was appropriate to modify the proposed class definition.  The current division of the single claim into the ACAPS and Legacy platforms did not arise until after settlement negotiations had begun.

Though the start dates of the Plaintiffs' original definitions were earlier, the start dates in the settlement class definition were set two years before the filing of each respective Complaint. Each end date reflects the day before Bank of America acknowledges that it changed the respective loan platforms to trigger the provision of credit score disclosures under 15 U.S.C. § 1681g(g) three business days from receipt of a loan application.

The start dates in the proposed settlement class definitions relate to Bank of America's reserved affirmative statute of limitations defense.   The statute of limitations for a FCRA claim is "5 years after the date on which the violation that is the basis for such liability occurs" unless the Defendant can establish an earlier date of discovery of the violation by the Plaintiff.  15 U.S.C. §1681p.   In such circumstance, the Plaintiff must file his or her Complaint within two years of discovery.  *Id.*

Rivera discovered the FCRA violation in his case in April 2008.  Bank of America's lone argument as to its "two year" statute of limitations defense was that a consumer should have understood that his credit score would be used when his loan closed and, somehow, this consumer should also have known of his right to a credit score disclosure from Bank of America. On April 28, 2009, this exact argument was rejected in another Eastern District of Virginia case also involving an alleged violation of 15 U.S.C. §1681g(g), in which Judge Hudson held:

Finally, Downey claims that Plaintiffs' claim is time-barred because they received inquiry notice of their claim no later than June 24, 2005, when they closed on their loan. In support of this argument, Downey attached two documents Plaintiffs signed at their closing authorizing Downey to obtain consumer credit reports to verify their credit. While the Court's review of Downey's Motion is limited to the four corners of the Complaint, these documents do not establish that Plaintiffs knew or should have known of their claim. The documents contain no reference to Downey's [credit score] disclosure requirements under the FCRA; they merely notify Plaintiffs that Downey may obtain a consumer credit report in connection with their loan. Even if properly presented to support the Motion, the documents do not bolster Downey's argument that the limitations period commenced more than two years before Plaintiffs filed their Complaint.

*Yarish v. Downey Financial Corp.*, 2009 WL 1208178 (E.D.Va. April 28, 2009) (Hudson).[5] This case and decision was discussed in settlement discussions thereafter.

The evidence and circumstances in the Rivera transaction eliminated any reasonable risk of a statute of limitations defense – Rivera clearly brought his action within two years of discovery and in less than five years after the violation.   However, Bank of America continued to press the possibility that some putative class members may have actually learned of the FCRA violation prior to closing.   The parties strongly disagree as to whether the possibility of such a defense would pose manageability (superiority) problems for certification under Rule 23(b)(3). However, in settlement, the proposed class definition would eliminate that issue entirely.[6]  With *Domonoske*, the start date had not changed from the initial proposed contested definition.

The proposed class definition does raise an additional issue that, while not problematic,

---

[5] *Yarish* ultimately settled on an individual basis.  Downey Financial Corporation failed and was taken over by the Federal Deposit Insurance Corporation.

[6] While the parties remain committed to their respective pre-certification positions concerning the application of the statute of limitations, this issue is not before the Court for resolution.  Rather, at the certification phase Courts are precluded from resolving such substantive disputes. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974).  The resolution of that dispute does not bear upon the propriety of certification or the appropriateness of the proposed class settlement.

should be peremptorily addressed.   Rivera's loan closed on May 2, 2006 and the proposed

settlement class definition only otherwise compensates from the common fund persons whose

loan closed and was booked on or after May 28, 2006.   Despite that variance, Rivera remains a

proper representative for this component of the settlement class.   The question as to whether a

person may represent the class or is a "member of the class" is answered not by technical

conformity within a class definition, but instead by two substantive questions:  (1.) does the

consumer have individual standing to individually bring the alleged claim at issue; and (2.) does

that person meet the requirements of Rule 23 required under the rule – specifically typicality.

As NEWBERG summarized:

> Apart from threshold individual standing requirements and the typicality of claims
> standard of Rule 23(a), it is now settled that Rule 23 does not contain any separate
> "membership in the class" requirement. Once standing to raise an issue common
> to a class has been established by the plaintiff, any supposed test of membership
> in the class is automatically satisfied, and whether the plaintiff should be
> permitted to maintain a class action and whether in fact the issues are common to
> a class depend on the application of Rule 23 criteria. Most cases utilizing the
> rubric of membership in the class properly interpret this requirement as a matter
> of meeting threshold individual standing requirements.

1 NEWBERG ON CLASS ACTIONS § 2:10 (4th ed.). *See e.g. Foster v. Sparks*, 506 F.2d 805, 807-

809 (5th Cir. 1975).  Rivera has individual standing.  His claim was timely filed within two years

of his discovery of the violation, and his claim is typical of the defined class for the reasons

previously stated in Plaintiff's Motion for Preliminary Approval. Typicality refers to the "nature

of the claim or defense of the class representative, and not to the specific facts from which it

arose." NEWBERG ON CLASS ACTIONS § 3:15 (4th ed.); citing *Fuentes v. Shevin*, 407 U.S. 67

(1972). "Factual differences will not render a claim atypical if the claim arises from the same

event or practice or course of conduct that gives rise to the claims of the class members, and if it

is based on the same legal theory." *Id.* The same Bank of America processes, procedures and

computer platforms were used.  The same statutory violation was suffered.  The same willfulness

evidence is likewise material.[7]

### III.   POTENTIAL CONFLICT FROM JOINT REPRESENTATION OF SUBCLASSES.

In its order dated December 2, 2009, this Court requested a memorandum concerning

potential conflicts of interest presented by the proposed class settlement.  Specifically, the Court

requested that Plaintiffs address the potential for conflict raised by class counsel representing

both of the proposed subclasses that are proposed to share in the settlement of this case:

> 2.  Plaintiffs shall file a memorandum regarding whether proposed class counsel
> may represent both of the proposed subclasses, including whether a conflict of
> interest exists which would preclude counsel from representing both subclasses,
> See Fed.R.Civ.P. 23(c)(5).

Order dated December 2, 2009 (Docket # 80).

### A.   Rule 23 permits the creation of subclasses as a tool to address a variety of concerns which may arise in certification.

The current version of Rule 23 permits a court to divide a class into subclasses where

appropriate:[8]

> (5) Subclasses. When appropriate, a class may be divided into subclasses that are
> each treated as a class under this rule.

Fed.R.Civ.P.  23(c)(5).    A  court  may  employ  the  use  of  subclasses  in  order  to  ameliorate

---

[7] Independently, given the similarity in degree and nature of the alleged FCRA violation, there are no significant facts or legal issues that separate Domonoske and Rivera.  The use of different closing platforms is not a material difference with respect to either claim.  Defendant's obligations and willfulness exposure is typical between all applicants.  The two components to the proposed class definition arose merely from two separate litigation paths and evolved claims between the two separate cases.  Domonoske could thus represent the entire class of consumers without the delineation of platforms added to the settlement definition.  Further, Bank of America's counsel has stated to Plaintiff's counsel its lack of objection to a modification of the class definition to include all loans closed on or after May 2, 2006.

[8] In prior versions of Rule 23, this provision was found in Rule 23(c)(4).

manageability issues. *Dore v. Kleppe*, 522 F.2d 1369, 1375 (5th Cir. 1975). See e.g. *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 230 F.R.D. 61, 83 (D.Mass.,2005). Additionally, a court may use the formation of subclasses to resolve potential conflicts of interest that may arise within a larger class of Plaintiffs. *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002). See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997). But see, *In re Simon II Litigation*, 211 F.R.D. 86, 182 (E.D.N.Y.,2002)(recognizing concerns over "Balkanization" of subclasses within a single action).

Properly construed, the use of 23(c)(5) subclasses represents one management tool available to the Court to address a variety of concerns that arise in the context of certification. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2nd Cir.2001)(management tools include bifurcating liability and damage trials, appointing a magistrate judge or special master to oversee individual damages proceedings, decertifying the class after a liability trial and providing notice to class members, creating subclasses, or amending the class). *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3rd Cir.2005)(decision whether to certify a subclass requires a balancing of costs and benefits committed to the sound discretion of trial court).

**B.**   **Hypothetical and speculative conflicts do not constitute grounds for rejecting a proposed settlement, disqualifying counsel, or finding of an impermissible conflict.**

While courts may employ subclasses to address conflicts among class members or class counsel, nothing within the formation of subclasses inherently gives rise to such conflicts of interests for counsel representing more than one of those subclasses. To the contrary, theoretical or speculative conflicts of interest do not require sub-classification, disqualification of the named parties and class counsel, or disapproval of the settlement. *Reynolds v. National Football League*, 584 F.2d 280 (8th Cir. 1978)(detailed analysis of potential conflicts.) *In re BearingPoint, Inc. Securities Litigation*, 232 F.R.D. 534, 541 (E.D.Va.2006); *Williams v. Empire*

*Funding Corp.*, 183 F.R.D. 428, 440 (E.D.Pa.1998) (holding that "merely speculative and hypothetical" conflicts of class counsel will not bar class certification); *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 296 (E.D.N.Y.1998) (same).See *Mungin v. Florida East Coast Railway Co.*, 318 F.Supp. 720 (M.D.Fla. 1970), Aff'd mem. 441 F.2d 728 (5th Cir.), Cert. denied, 404 U.S. 897, 92 S.Ct. 203, 30 L.Ed.2d 175 (1971).

Such conflicts arise from representation of multiple subclasses where the fundamental interests in the outcome of the litigation differ between the members of the class. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626-27, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)(a class divided between holders of present and future claims may require division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel). See also, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856-858 119 S.Ct. 2295 (1999). The guiding principle behind this rule is that the court must examine the facts of each case to determine if the proposed arrangement presents such a conflict. More importantly, the fact that a conflict may exist as a result of the representation of more than one class does not of itself require the Court to disqualify counsel or otherwise modify the settlement. Rather, the Court's determination should include consideration of other procedural safeguards available to protect the interests of the individual class members, including its own oversight of the settlement process. *Sheftelman v. Jones*, 667 F.Supp. 859, 865 (N.D.Ga.1987) (holding that any conflicts presented by class counsel representing two classes against the same defendant are speculative and can be cured by procedural safeguards).

Other procedural safeguards include objections, intervention, and the ability of the Court to "decertify" the class in the event that problems with the settlement become evident. See, e.g., *North American Acceptance v. Arnall, Golden & Gregory*, 593 F.2d 642, 645 (5th Cir.1979);

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 896 (7th Cir.1981) ("If the certification of the class is later deemed to be improvident, the court may decertify, subclassify, alter the certification or permit intervention.").

Finally, where the difference in individual damages is low, the potential conflict does not require action by the Court. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) (prospects for irreparable conflict of interest are minimal where relatively small differences in damages and potential remedies exist). *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002)(modest stakes at issue for each of the subclasses does not warrant finding of conflict).

**C.    The litigation and settlement of this matter does not present any cognizable conflict of interest for class counsel which would require rejection or modification of the proposed settlement.**

In this case, the proposed settlement does not give rise to any impermissible conflict of interest on the part of the proposed class counsel.

• Mr. Domonoske and Mr. Rivera initially retained independent class counsel. While these actions have now been consolidated, Class counsel for each Plaintiff zealously represented the interests of their own respective classes until the mediation process revealed that a global settlement of both potential classes was required.

• The interests of each of the classes in the overall damage recovery are closely – if not identically – aligned.  Each of the classes and class members proposed suffered the same damage and violation as the others.  None of the individual members may reasonably be expected to have suffered any actual damage beyond the denial of their credit score.  And those class members who have suffered such individual damage may opt out.  As such, class counsel has no interest in preferring recovery for one class over the other.

• The initial class definitions reflected the fact that the damages of the combined class were

identical.

- The initial class definitions in each case included all loan platforms.

- The segregation of the overall class into two subclasses represents a simple management tool in this case allowing Bank of America and the Court to more narrowly define the class and more precisely define the requirements of the proposed injunctive relief that will differ according to the current technologies available to Bank of America.   These subclass definitions do not suggest or otherwise require any specialized injury or remedy apart from the injunctive relief.

- None of the remedies sought directly conflicts among the class members.  Put another way, there is no relief for either class which of necessity would preclude some form of relief to the other, as in the case of conflicting injunctive relief.

- Within the range of the anticipated outcomes for this case, class counsel were not competing for a limited pool of resources.  Rather, Bank of America remains a viable entity at this time and there are no external caps on the funds available as in a limited liquidation value for the company or insurance policy. As such, no conflict arose to obtain competing shares of limited resources.

- The opt out process provides a procedural safeguard which will insure that class members with individualized damages need not be subject to any perceived infirmities of the settlement.

- The hybrid claims process offers another procedural safeguard, insuring that only those persons who believe themselves to be aggrieved may participate.

An examination of these factors reveals that no actual or even apparent conflict exists.

IV.    **PLAINTIFFS' SATISFACTION WITH THE SETTLEMENT AND CERTIFIACTION THAT THERE ARE NO ADDITIONAL OR UNDISCLOSED AGREEMENTS.**

Since the Court's December 2, 2009 Order requesting Declarations from Mssrs. Domonoske and Rivera, the Settlement Agreement has again been discussed with each client by Mr. Cupp and Mr. Erausquin respectively.  Mr. Rivera has confirmed his full satisfaction with the proposed settlement.  Declaration of Victor Rivera, "Exhibit 5", ¶ 6.  He has also confirmed that there are no other agreements proposed or reached beyond the settlement agreement now before the Court.  *Id*.  Mr. Domonoske has also confirmed his agreement with the Settlement. However, Mr. Domonoske expressed his continued dissatisfaction with the language of the proposed Injunction, preferring that it require the credit score disclosures in a still shorter period than stated therein.  Declaration of Thomas Domonoske, "Exhibit 4", ¶ 23.  Mr. Domonoske has also confirmed that there are no other agreements proposed or reached beyond the settlement agreement now before the Court.  *Id*., ¶¶ 20-21.

V.    **OTHER §1681g CASES AGAINST BANK OF AMERICA.**

The Court has asked the Parties to state whether or not there are any "overlapping or competing class actions pending elsewhere." While Bank of America will be better placed to provide the most complete response, Plaintiffs' counsel – Mr. Bennett - has reviewed PACER, Westlaw and the network of other attorneys in the National Association of Consumer Advocates and has been unable to discover any similar (or overlapping or competing) class actions against Bank of America, pending now or at any time.  Plaintiffs' counsel each certify that they are not aware of any overlapping or competing class actions pending elsewhere.  Further, each Plaintiff has himself also confirmed that they are unaware of any such actions.

## CONCLUSION

Plaintiffs and their counsel would be glad to address any additional questions the Court may have regarding the parties' joint motion for preliminary approval of this settlement.

December 18, 2009

Respectfully Submitted,
LEONARD A. BENNETT

By:   /s/ Leonard A. Bennett
Leonard A. Bennett (VSB # 27523)
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Blvd, Suite 100
Newport News, VA 23606
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

Timothy E. Cupp (VSB # 23017)
CUPP & CUPP, P.C.
P.O. BOX 589
Harrisonburg, VA 22801
Telephone:  540-432-9988
Fax: 540-432-9557
Email: cupplaw@comcast.net

Matthew J. Erausquin (VSB #65434)
CONSUMER LITIGATION
ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA 22030
Telephone: (703) 273-6080
Facsimile: (888) 892-3512
Email: matt@clalegal.com

Ian B. Lyngklip, Esq.  (*pro hac vice*)
CONSUMER LAW CENTER, PLC
24500 Northwestern Hwy, Ste. 206
Southfield, MI  48075

*Attorneys for Plaintiffs*
Thomas D. Domonoske & Victor Rivera

**Certificate of Service**

I hereby certify that on December 18, 2009, I served the foregoing **PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Timothy E. Cupp, Esq.
Cupp & Cupp, P.C.
1951 Evelyn Byrd Avenue, Suite D
P.O. Box 589
Harrisonburg, VA  22803

Matthew J. Erausquin
Consumer Litigation Associates, P.C.
3615-H Chain Bridge Road
Fairfax, VA  22030

Ian B. Lyngklip, Esq.
24500 Northwestern Highway, Ste. 206
Southfield, MI  48075

Michael J. Agoglia
Alexandria A. Amezcua
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105

R. Grant Decker
J. Douglas Cuthbertson
MILES & STOCKBRIDGE P.C.
1751 Pinnacle Drive, Suite 500
McLean, VA 22102

By:   /s/ Leonard A. Bennett
            Leonard A. Bennett (VSB # 27523)