Page 1

U.S. DISTRICT COURT

WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION

_____

THOMAS D. DOMONOSKE,                    )

Individually and on the behalf of  )

all those similarly situated,       )

                          Plaintiff,) CIVIL ACTION NO.

v.                                  ) 5:08CV00066

BANK OF AMERICA, N.A.,              )

                          Defendant.)

_____

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL F. URBANSKI, JUDGE

Harrisonburg, Virginia

Wednesday, November 18, 2009

11:38 a.m.

Pages 1 - 107

Reported by:  L. Michelle Flanary

Transcript of Proceedings
November 18, 2009

Page 2

1                    A P P E A R A N C E S

2

3           ON BEHALF OF THE PLAINTIFF:

4             LEONARD ANTHONY BENNETT, ESQUIRE

5             CONSUMER LITIGATION ASSOCIATES

6             12515 Warwick Boulevard, Suite 100

7             Newport News, VA  23606

8             (757) 930-3660

9             lenbennett@cox.net

10

11            - AND -

12

13            MATTHEW JAMES ERAUSQUIN

14            CONSUMER LITIGATION ASSOCIATES

15            1800 Diagonal Road, Suite 600

16            Alexandria, VA  22314

17            (703) 273-7770

18            matt@clalegal.com

19

20

21

22

23

24

25

Transcript of Proceedings
November 18, 2009

```
 1            A P P E A R A N C E S - Cont'd

 2

 3        ON BEHALF OF THE DEFENDANT:

 4            MICHAEL JOHN AGOGLIA, ESQUIRE

 5            MORRISON & FOERSTER

 6            425 Market Street

 7            San Francisco, CA  94105

 8            (412) 268-6057

 9            magoglia@mofo.com

10

11            - AND -

12

13            R. GRANT DECKER, ESQUIRE

14            MILES & STOCKBRIDGE

15            1751 Pinnacle Drive, Suite 500

16            McLean, VA  22102-3833

17            (703) 903-9000

18            gdecker@milesstockbridge.com

19

20

21

22

23

24

25
```

Transcript of Proceedings
November 18, 2009

Page 4

```
 1            P R O C E E D I N G S
 2            THE COURT:  All right.  This is the case of
 3  Domonoske versus Bank of America.  It's 5:08-CV-00066,
 4  and we've got a hearing this morning on the
 5  preliminary approval of the class action settlement.
 6  And I don't know which -- y'all need to introduce
 7  yourselves so I know who you are, and I guess the
 8  plaintiff's counsel will proceed.
 9            MR. BENNETT:  Yes, sir.
10            THE COURT:  Okay.
11            MR. BENNETT:  Your Honor, my name is Leonard
12  Bennett.  My co-counsel at the table is my law
13  partner, Matthew Erausquin.  We both practice at the
14  Virginia law firm, Consumer Litigation Associates.
15            THE COURT:  In Newport News?
16            MR. BENNETT:  In Newport News, yes, sir.
17  Mr. Erausquin is based in Fairfax, and the lion's
18  share of my Virginia practice is in Eastern District
19  of Virginia, most of that in Richmond, so this is the
20  first appearance I've made, other than via telephone
21  conference call.
22            THE COURT:  Yeah, I've talked to you all on
23  the phone a bunch of times in connection with
24  scheduling.
25            MR. BENNETT:  Yes, sir.
```

Transcript of Proceedings
November 18, 2009

 1              THE COURT:  Yes.

 2              MR. BENNETT:  Anyway, thank you very much,

 3    Judge, for accommodating the move to this hearing as

 4    well as my appearance before you.

 5              We represent the plaintiffs in this action,

 6    Domonoske v. Bank of America, which has been

 7    consolidated with this Court's entry of the

 8    consolidation order on transfer of venue of Rivera v.

 9    Bank of America from the Eastern District of Virginia.

10    Those cases have been litigated on relatively parallel

11    tracks, as well they've been negotiated together.

12    They both deal with --

13              THE COURT:  Is Mr. Rivera a lawyer?

14              MR. BENNETT:  No, sir.

15              THE COURT:  Is Mr. Domonoske a lawyer?

16              MR. BENNETT:  Mr. Domonoske is a lawyer.

17              THE COURT:  Here in Harrisonburg?

18              MR. BENNETT:  Yes, sir.

19              THE COURT:  All right.  Go ahead, sir.

20              MR. BENNETT:  Again, the distinction between

21    the two cases, Your Honor, was that the particular

22    Bank of America mortgage loan product at issue in the

23    Domonoske case was a -- this subset of total Bank of

24    America mortgage loans that were home equity line of

25    credit loans or comparable product; the Rivera was --

Transcript of Proceedings
November 18, 2009

1    consisted of loans other than that, conventional

2    mortgage loans.  The two together collectively allege

3    the same violation, which is provision of the federal

4    Fair Credit Reporting Act enacted by Congress as

5    what's referred to, the acronym of FACTA, FACTA

6    amendments to the Fair Credit Reporting Act in 2003.

7              THE COURT:  1681g(g)?

8              MR. BENNETT:  Yes, Your Honor.

9              THE COURT:  As soon as reasonably

10   practicable.

11             MR. BENNETT:  Absolutely, Judge, that's the

12   question, you know, whether the Court has many

13   opportunities to consider the language that Congress

14   imposes.  Of course, partly tongue in cheek, striving

15   for legal clarity, as soon as reasonably practicable

16   was an open question.  In fact, that was the primary

17   defense, at least from my perspective, that we based

18   from the defendant, whether or not the defendant, in

19   this instance, Bank of America --

20             THE COURT:  And they have two different

21   scenarios, as I understand it.  They have -- I forget

22   what it's called.  They have version one and version

23   two of the way they did things.

24             MR. BENNETT:  Yes, sir.  ACAPS is how it's

25   referred to internally and then Legacy system.

Page 7

```
 1              THE COURT:  Right.
 2              MR. BENNETT:  And --
 3              THE COURT:  As I understand ACAPS, the
 4  notice was given when the transaction closed or was
 5  terminated, and then under Legacy, it was like swept
 6  every Thursday or something and then notice was given
 7  the next week.
 8              MR. BENNETT:  Yes, Your Honor.
 9              THE COURT:  Do you know where Domonoske or
10  Rivera fell within either ACAPS or Legacy?
11              MR. BENNETT:  Mr. Domonoske fell within
12  ACAPS; Mr. Rivera fell within Legacy, Judge.
13              THE COURT:  What is the argument, that
14  Legacy is not reasonably practicable?
15              MR. BENNETT:  Well, the argument is,
16  Judge -- and the liability argument is that Bank of
17  America sent other disclosures -- well, disclosures
18  that had been in place or required by other federal
19  laws like RESPA, for example, the Good Faith Estimate
20  and other -- Truth in Lending Act disclosures.  It
21  sent those documents out just a couple days after the
22  application process, whereas it would delay this
23  additional -- the credit score disclosure until
24  sometime after that, even sweeping it every Thursday,
25  the as-soon-as-reasonably-practicable, we believed,
```

Transcript of Proceedings
November 18, 2009

 1  was disproven by -- or compliance with that term was

 2  disproven by the fact that obviously it was reasonably

 3  practicable to send these additional disclosures out,

 4  as well.

 5           THE COURT:  So your argument is they sent

 6  other notices; therefore, it was reasonably

 7  practicable to send these FACTA notices?

 8           MR. BENNETT:  Yes, Your Honor.

 9           THE COURT:  All right.  Now, you're asking

10  for, as part of this settlement, some injunctive

11  relief?

12           MR. BENNETT:  Yes, Your Honor.

13           THE COURT:  You're asking for -- for a year,

14  I believe, that the Bank of America give notice on

15  certain terms, and I think -- can you refresh me on

16  how many days they're required under the injunctive

17  aspect of this settlement?

18           MR. BENNETT:  Judge, under the injunction,

19  it is three business days.

20           THE COURT:  That's what I thought it was,

21  three days.

22           MR. BENNETT:  Yes, sir.

23           THE COURT:  So basically, you're saying --

24  are you saying that three business days is

25  reasonably -- as soon as reasonably practicable?  In

Transcript of Proceedings
November 18, 2009

Page 9

1    fact, the injunction -- the Court must find that.  The
2    Court must find that under the injunction that three
3    days is as soon as reasonably practicable, right?
4            MR. BENNETT:  Yes, sir.
5            THE COURT:  And I believe you're saying
6    seven days is not?
7            MR. BENNETT:  We are saying seven days is
8    not.
9            THE COURT:  Your argument is, under the
10   Legacy system, Mr. Rivera, as class representative
11   for -- that that's not as soon as reasonably
12   practicable?
13           MR. BENNETT:  That's correct, Judge.  And
14   one of the bases -- and I can recount the
15   negotiations, and I have had the good fortune of being
16   lead counsel in a number of class actions, I can
17   represent to you, Your Honor, and I hope to appear in
18   front of -- on other cases, certainly, that I don't
19   recall as contentious a series of negotiations --
20   professional, amicable as person to person, but there
21   was --
22           THE COURT:  Just because y'all settled with
23   them doesn't mean the Court has to approve it.
24           MR. BENNETT:  Absolutely, Judge.  My point
25   being that one of the more contentious components of

HART REPORTING, INC.
(877) 907-4278

Page 10

 1   this was negotiating the injunction itself.

 2            THE COURT:  Okay.  So you -- okay.  So that

 3   aspect was negotiated strongly as well as the amount

 4   of settlement?

 5            MR. BENNETT:  Absolutely, Judge.  And in

 6   fact, to do so -- and Mr. Agoglia can provide you

 7   background, as well, but there -- we actually required

 8   a detailed declaration, as well, there was testimony

 9   of the respective employees, those in charge of these

10   functions, and as to why mechanically this was the

11   shortest time possible.  It's not simply --

12            THE COURT:  Shouldn't the Court have some of

13   that information before the Court makes a judgment on

14   the ultimate approval of the class, especially for the

15   injunctive aspect of this?

16            MR. BENNETT:  You should, Judge.

17            THE COURT:  I mean, just because you guys --

18   just because you're satisfied it's as soon as

19   reasonably practicable, you're asking the Court to

20   make a judgment that three days is as soon as

21   reasonably practicable, shouldn't the Court have some

22   evidence as to that?

23            MR. BENNETT:  As a -- yes, conceptually, it

24   should, and if I could step back, as I disclaim any

25   direct answer to a judge as I need to.  The question

1    here is whether or not on its face this settlement

2    could pass muster as -- for preliminary approval, we

3    will have to have an additional and full-blown

4    fairness hearing in which there is --

5              THE COURT:  Oh, I'm not talking about

6    preliminary approval.  I was just sort of talking

7    about the later hearing.

8              MR. BENNETT:  Yes, sir.  Before the Court

9    enters the injunction, which is not -- if the Court

10   approves this settlement today on preliminary

11   approval, you are not entering the injunction today.

12             THE COURT:  Oh, no, I understand.

13             MR. BENNETT:  Yes, sir.

14             THE COURT:  I understand how Rule 23 works.

15             MR. BENNETT:  Yes, sir, but --

16             THE COURT:  I have stood where the lawyers

17   stand in this case in class actions before.

18             MR. BENNETT:  And we -- the class benefits

19   from that expertise.

20             I -- to answer your question, then, Judge,

21   yes, you will have to have evidence that this is as

22   soon as reasonably practicable.

23             THE COURT:  Right, because you're asking the

24   Court to make a legal ruling, and although it's a

25   concent injunction, you are asking the Court to make a

Transcript of Proceedings
November 18, 2009

Page 12

1   legal ruling that three days is as soon as reasonably

2   practicable, so the Court would need to hear evidence

3   to make that -- just because -- just because you guys

4   have agreed to that doesn't mean that we serve as a

5   rubber stamp.  I mean, we have to -- there has got to

6   be some basis for it.

7           MR. BENNETT:  Absolutely.  And to give -- to

8   flesh this out further for Your Honor, there is -- as

9   part of this process, there was a detailed affidavit

10  that explains the whole process.  It was consistent

11  with the deposition testimony, but it was a

12  declaration, and the question, given the ambition of

13  Bank of America to retain its internal processes to be

14  confidential to the extent possible and the possible

15  conflict with certainly the (inaudible) and local

16  rule, or at least -- not the -- the local rule, the

17  Eastern District and this Court's predisposition

18  against sealing without support, the question was what

19  to do with the declaration, but Bank of America

20  committed to the extent, and when the Court needs that

21  information to consider for the acceptance or

22  rejection of the injunction that Bank of America was

23  willing to provide it on record.

24          THE COURT:  It's not a question of what this

25  Court's predisposition is as to sealing; it's what the

Transcript of Proceedings
November 18, 2009

1    Fourth Circuit requires as to sealing.

2              MR. BENNETT:  Yes, sir.

3              MR. AGOGLIA:  I apologize for the

4    interruption, Your Honor.  Michael Agoglia on behalf

5    of Bank of America.

6              THE COURT:  Nice to see you.

7              MR. AGOGLIA:  Nice to see you, Judge.

8              Just on that point alone, I believe the --

9    and I may be wrong, but I believe that the declaration

10   of Marti Smith was submitted with the settlement

11   agreement.

12             THE COURT:  Yeah, I saw that declaration.

13             MR. AGOGLIA:  So --

14             THE COURT:  Is that what we're talking

15   about?

16             MR. AGOGLIA:  That's what Mr. Bennett is

17   referring to.  Ms. Smith is the person with the

18   30(b)(6) deposition witness on how it all works.

19   She's the person most knowledgeable about how the

20   system was redesigned.  I'll speak to the separate

21   question you raise about the finding we would ask of

22   you upon a fairness hearing, but we did --

23             THE COURT:  Ultimately, Judge Wilson.

24             MR. AGOGLIA:  Or ultimately, Judge Wilson.

25   (Inaudible) entering that injunction, but we did, I

Transcript of Proceedings
November 18, 2009

Page 14

1    think, submit that declaration with our materials.

2              THE COURT:  Thank you.  I appreciate that.

3              MR. BENNETT:  And I'm sorry, Judge, for --

4              THE COURT:  Are you feeling better?

5              MR. AGOGLIA:  Your Honor, I am, and I want

6    to thank you --

7              THE COURT:  We don't want anybody who is

8    sick with the flu to be traveling on a little airplane

9    across the country and perhaps infecting all the

10   others, so I was happy to accommodate you.

11             MR. AGOGLIA:  And your staff was incredibly

12   professional and accommodating.  Mr. Bennett and his

13   side, Mr. Cupp, who is your local counsel, agreed to

14   step aside to allow us to go forward today instead of

15   December, so I appreciate the courtesy shown all

16   around there.

17             THE COURT:  Happy to --

18             MR. BENNETT:  And Judge, and that aside,

19   just, I would offer, to the extent it hurt Mr. Cupp's

20   (inaudible) he had a conflict today, the only other

21   stars-aligned date that was available would have put

22   us in December and we were concerned about --

23             THE COURT:  Not a problem.  Not a problem.

24             MR. BENNETT:  Yes, sir.

25             The injunction, as Your Honor correctly

Transcript of Proceedings
November 18, 2009

 1    surmises, requires more than a rubber stamp.  It

 2    would -- we, in fact, the entirety of the settlement

 3    requires the Court's analysis and consideration in

 4    negotiating, as the Court recalls from sitting on this

 5    side of the courtroom.  Whether or not it's a fair

 6    deal is not our ultimate decision.  Our advice as to

 7    fairness or adequacies is just one factor.  An

 8    important one under -- but one factor.  And when we

 9    negotiate any term of this, it's critical that we

10    negotiate it for you and for Judge Wilson and your

11    consideration.

12             The additional background, Your Honor, that

13    is outside the pleadings, if the Court please -- and I

14    can argue it point by point, but in terms of

15    negotiating the attorneys' fees, Your Honor is

16    presented with a 9.95 number.

17             THE COURT:  Which is on a class of three --

18    a potential class of 3.5 million people?

19             MR. BENNETT:  Yes, sir.  The --

20             THE COURT:  So it's -- if you do the math,

21    it's something less than $3 a head.

22             MR. BENNETT:  It would be.

23             THE COURT:  If 100 percent of the class

24    members sign up.  And as I understand the class

25    compensation, it is up to $100.

Transcript of Proceedings
November 18, 2009

Page 16

 1            MR. BENNETT:  Yes, sir.

 2            THE COURT:  And it is -- and it scales back

 3    based on the number of people who sign up.  Obviously,

 4    a lot of people will just throw the notices away and

 5    not pay a bit of attention to it, but a max of 100 and

 6    I think the papers said maybe a minimum of $2?

 7            MR. BENNETT:  Yes, sir, if everyone does it.

 8            THE COURT:  Right.

 9            MR. BENNETT:  The two additional factors,

10    which to highlight in terms of the process, the

11    original settlement was actually 7 million and change,

12    and that was negotiated without a discussion of

13    attorneys' fees.  We didn't negotiate attorneys' fees

14    at that point.  We ultimately presented this -- we --

15    I'm sorry.  The -- we had intended to present a

16    settlement of 9.4 million gross to include the

17    defendant's consent to our asking the Court for up to

18    a 25-percent fee, but we then negotiated additional

19    money based on the savings of notice.  The original

20    settlement would have permitted a per person or

21    per-transaction distribution without the consumer or

22    the class member having to affirmatively act on it.

23    It would have been the $2 or approximately.

24            There is significant notice savings that

25    have been reached in discussions with Rust

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

1   Consulting and the defendants.  Those additional

2   savings are what bumped it from the 9.4 up to 9.95.

3   We, as part of that -- and not just for the Court, but

4   to convey to the defendant what we were negotiating in

5   that second stage, (inaudible) closed settlement

6   stage, our sincerity of our interest for the class

7   said that we would not ask for any attorneys' fees for

8   the 9. -- for the additional five -- approximately

9   $500,000, that that savings --

10          THE COURT:  Right.  So the 2.4 or whatever

11  it is you're asking for is actually less than 25

12  percent.

13          MR. BENNETT:  Yes, sir.

14          THE COURT:  Now, who is paying the cost of

15  the class administration?

16          MR. BENNETT:  The defendant --

17          THE COURT:  Is that in addition to the 9.9?

18          MR. BENNETT:  It's in addition, yes, sir.

19          THE COURT:  All right.  And you're using

20  this Rust Consulting Group to do the notices and

21  administer it and figure out who is in and who is out

22  and all those things?

23          MR. BENNETT:  Yes, Judge, and we have --

24          THE COURT:  That's the proposal?

25          MR. BENNETT:  Yes.  I have previous

Transcript of Proceedings
November 18, 2009

Page 18

1    experience with Rust in another case, including --

2    there was a $22 million settlement negotiation out of

3    Eastern District of Virginia.  It was actually a

4    contested certification and survived a 23-F appeal

5    before the Circuit and Rust administered that class

6    effectively.  Rust is sort of the Cadillac version

7    of -- or gold standard of administrative consultants,

8    and it was a material condition of our negotiation

9    that defendant absorb the expense of that.

10              THE COURT:  So the defendants are in for, if

11   this settlement is approved, 9.9 million and change

12   plus the cost of administration?

13              MR. BENNETT:  Yes, sir, and they are --

14              THE COURT:  And the attorneys' fees comes

15   out of the 9.9 million?

16              MR. BENNETT:  The 9.4 million.

17              THE COURT:  9.4?

18              MR. BENNETT:  Well, it comes out -- I'm

19   sorry.  9.5.  It does come out of 9.95.

20              THE COURT:  I thought it was 9.95.

21              MR. BENNETT:  It is.  We -- it is 9.95.

22              THE COURT:  But the attorneys' fees are a

23   percentage of 9.4?

24              MR. BENNETT:  Yes, sir.

25              THE COURT:  That's what you're telling me?

Transcript of Proceedings
November 18, 2009

Page 19

 1            MR. BENNETT:  That's what I'm telling you.

 2            THE COURT:  But the attorneys' fees are not

 3   over and on top of the 9.9?

 4            MR. BENNETT:  No, sir, they're not.  They

 5   are over and on top the original negotiation amount of

 6   a little over 7 million.  The attorneys' fees were

 7   added on top of that.

 8            THE COURT:  All right.  Go ahead.

 9            MR. BENNETT:  The -- in addition to merits

10   defenses, and the defendants can speak to these, as

11   well, certainly, or even better than I, but, of

12   course, we would have to show that there was a willful

13   violation of the statute, something in the beginning

14   of the case in posturing by the plaintiff's counsel,

15   I'm always optimistic about in my public statements,

16   but it's a challenge to show entitlement to -- to add

17   a threshold.

18            THE COURT:  Especially with how much trouble

19   it looks like they went to to try to comply with the

20   law.  I mean, they had -- I mean, these two iterations

21   and under ACAPS and Legacy, it looks like, at least

22   from the papers you presented, they spent a lot of

23   time, effort and money to try to comply with the law,

24   and I guess it would be your burden to prove that,

25   notwithstanding, it was a willful violation.

Transcript of Proceedings
November 18, 2009

Page 20

 1              MR. BENNETT:  Yes, sir, that would be our

 2    burden.

 3              The dollar amount -- assume, in terms of

 4    injury, not actual damages, but just in terms of the

 5    inequitable appreciation or appreciation of the

 6    equitable value of this, the cost of the credit score,

 7    if somebody were to buy -- wanted to (inaudible) and

 8    said, Look, you're not giving me my score in time.

 9    I'm going on the Internet and I'm buying the score,

10    it's $6, by federal regulation, and so the --

11              THE COURT:  What actual damages does

12    Mr. Rivera have?

13              MR. BENNETT:  He would have injury in that

14    same range.  He does not --

15              THE COURT:  What actual damages do you have

16    that -- to satisfy the typicality requirement that

17    Mr. Rivera has?

18              MR. BENNETT:  We do not allege actual

19    damages for Mr. Rivera.

20              THE COURT:  What about Mr. Domonoske?

21              MR. BENNETT:  We do not allege actual

22    damages for Mr. Domonoske.

23              THE COURT:  So they don't have any actual

24    damages?

25              MR. BENNETT:  Not that we could establish by

Transcript of Proceedings
November 18, 2009

```
 1   causation, Judge.  There was a -- the Seventh Circuit
 2   decision, which has been cited in other Virginia
 3   courts, the Murray versus GMAC case considered
 4   circumstances like these where there is a violation of
 5   statute, it does inflict injury or harm, but the
 6   denial of those rights is not a challenge to prove
 7   causation and establish actual damages, and in fact,
 8   in that case, the Seventh Circuit provided its seal of
 9   approval on class action remedy as a mechanism to
10   enforce Fair Credit Reporting Act violations such as
11   these.
12              THE COURT:  Was that under this statute or
13   was that under debt collection?
14              MR. BENNETT:  Under this statute, Judge.
15              THE COURT:  Under this statute.  All right.
16              MR. BENNETT:  And it's the primary -- it's
17   the Seventh Circuit, but it's the primary law on the
18   question of proceeding under the Fair Credit Reporting
19   Act without actual damages in a class basis and the
20   extent of analysis as the circumstances.  In that
21   case, the fact pattern was an impermissible pool
22   claims where the entity had been alleged to have
23   unlawfully accessed a consumer report.  The
24   analysis -- it describes any circumstance in which
25   it -- the establishment of actual damages, and
```

Transcript of Proceedings
November 18, 2009

1    certainly, measurable actual damages, liquidatable

2    actual damages is difficult if not impossible.

3            THE COURT:  For a willful violation, though,

4    don't you just need to prove actual damages or prove

5    the ability to get a statutory penalty of not less

6    than 100 but not more than a thousand?

7            MR. BENNETT:  Yes, sir.

8            THE COURT:  Isn't that right?

9            MR. BENNETT:  That is right.

10           THE COURT:  Isn't that the big problem for

11   the defendants in this case --

12           MR. BENNETT:  That is.

13           THE COURT:  -- is the statutory penalty?

14           MR. BENNETT:  It is, Judge.

15           THE COURT:  And in this case, if you were

16   actually able to prove a willful violation in this

17   case would a statutory penalty of $100 -- they're

18   settling, essentially, with 9.95 or so, for a little

19   less than $3 a head on a class of 3.5; is that fair or

20   is my math wrong?

21           MR. BENNETT:  Your math is correct.  There

22   are additional issues, which I -- I'm not (inaudible),

23   but this very case I described, Murray versus GMAC,

24   dealt with the due process argument, the -- whether or

25   not the punishment meets the crime, so to speak.  The

Transcript of Proceedings
November 18, 2009

Page 23

 1    Court is familiar, of course, with the jurisprudence
 2    coming out of the U.S. supreme Court as it pertains to
 3    punitive damages, and the argument that some
 4    defendants had made was that if the statutory damages
 5    uncapped by -- unlike the Fair Credit Reporting Act or
 6    Equal Credit Opportunity Act, which are capped at one
 7    percent --
 8              THE COURT:  That's exactly right.  Yeah, I'm
 9    familiar with that.
10              MR. BENNETT:  And so the Fair Credit
11    Reporting Act doesn't have such a cap, and some of the
12    defense arguments, including --
13              THE COURT:  I mean, it could be way out
14    there.  I mean, if you go $1,000 a head on 3.5 million
15    people, Bank of America ceases to exist.
16              MR. BENNETT:  Yes, sir.  And --
17              THE COURT:  Well, I mean, I'm exaggerating,
18    but it would be a big chunk of money.
19              MR. BENNETT:  That's -- well, we'd have to
20    go back, I'm sure, to the U.S. treasury for a relief,
21    tongue in cheek.
22              The question, then, is what -- the mechanism
23    that a judge like Your Honor would use to --
24              THE COURT:  Go to the due process issue.
25              MR. BENNETT:  The due process issue is

Page 24

 1   whether or not the amount of money to be awarded for

 2   the willful violation of statutories would be -- would

 3   annihilate the defendant or would be -- violate due

 4   process by forcing it to settle because of the fear of

 5   annihilation, and so that --

 6             THE COURT:  Right.

 7             MR. BENNETT:  -- the legal question that's

 8   considered in part in Murray is whether or not the

 9   Court would exercise a right to sort of pre-remit or

10   whether it would remit like the Leatherman due process

11   analysis for punitive damage claims after the fact,

12   and Murray, which has been adopted in the courts in

13   our state, has -- holds that this court would come in

14   after the fact, after result in a class action and

15   appropriately apply due process to remit.  Either way,

16   we would face not simply the hurdles of proving

17   willfulness; we would face the defense argument that

18   the Court should remit the amount of the award in

19   conformance with due process.

20             So it -- as much as I would posture in

21   settlement of any of these cases that, you know, we

22   think we could get $1,000 for each 3 million people,

23   I'm a realist, Judge.

24             THE COURT:  Right.

25             Now, what -- isn't this $6 a head just a

Page 25

1   fiction?  $6 that someone could have gotten -- or

2   could have been charged if they went to Experian and

3   asked for their own credit report?  I mean, what you

4   said, Rivera and Domonoske didn't do it.  Isn't this

5   $6 just a fiction?

6           MR. BENNETT:  It's the closest and the most,

7   I think, rational way to liquidate the right that's at

8   issue in the case.  Now, whether it's a fiction --

9   well, there are individuals, Judge -- let's -- if you

10  take the circumstances of a class member who had

11  perfect credit and got the very best rate that Bank of

12  America could offer and the score would have shown

13  that they were 800, then it's a violation of a right,

14  and Congress has set that right, FDC has priced it at

15  $6.  But in terms of what would get me as a

16  plaintiff's lawyer excited enough to go make arguments

17  in Federal Court?  If I was -- if the class was full

18  of those individuals, then --

19          THE COURT:  With no damages.

20          MR. BENNETT:  There are other wrongs to

21  right out there.

22          THE COURT:  Right.  No damages.

23          MR. BENNETT:  That's right, but there are

24  other individuals that might have wanted the score.

25  One of the significant reasons besides incentivizing

 1   individuals to contact by using the up to $100 amount,

 2   but one of the other reasons to have the structure for

 3   settlement distribution that is ultimately negotiated

 4   and we present to Your Honor asking for preliminary

 5   approval on is that some individuals would care about

 6   this.  It might have impacted them in at least some

 7   fashion and they might have requested such a score,

 8   and even though those actual damages might not be --

 9   you might not be able to prove causation and all of

10   the things that in a full jury trial would matter, but

11   at least in terms of basic fairness, the

12   considerations that we have as advocates for the

13   class, it makes sense that we provide a mechanism that

14   allows individuals to stand up and say, Yes, I would

15   have wanted that.  So to answer your question, Judge,

16   is it a fiction, I don't know that it's a fiction, but

17   it's also not as meaningful a right for some

18   individuals as for others.

19            THE COURT:  How -- well, if that's the case,

20   if it's not as meaningful a right for some as for

21   others, and therefore -- I mean, doesn't that argue

22   that there is no commonality?  Doesn't that argue that

23   not everybody would want to be or should be -- have

24   the same interest here?

25            MR. BENNETT:  No, sir, it wouldn't.  It

1   would be -- the right exists.  The violation exists.

2   It would be no different in any class -- in fact, in

3   some of our class actions, including cases in which we

4   have -- where accuracy was at issue and we were able

5   to have more significant dollars that we could send

6   out, we've had individuals that wrote in and opted out

7   and the explanation for the opt out is, I don't like

8   class actions.  And that's -- and there are certainly

9   enough of -- I'm on the board of directors of the

10  National Association of Consumer Advocates.  We have

11  enacted class action guidelines and we deal with, we

12  think, class action abuse often enough and combating

13  it as best as we can, and so I understand that

14  concern.  To say that there would not be commonality

15  between person A that is motivated to enforce a right

16  that exists in common with person B who would be more

17  motivated because maybe they cared more about the

18  score, their rights are the same, the violation is the

19  same, the determination of liability is the same, but

20  the motivation is not a commonality, typicality or

21  even -- or --

22          THE COURT:  Even if it's somebody who got

23  the loan they applied for versus someone who didn't

24  get the loan they applied for?

25          MR. BENNETT:  Yes, sir, the right --

Page 28

 1          THE COURT:  Is there commonality there?

 2          MR. BENNETT:  There is, yes, sir.  The --

 3   it's the right and the right to recover is exactly the

 4   same.  It's not simply close enough for horseshoes,

 5   but it is.

 6          THE COURT:  Well, why is there damages?  I

 7   mean, if somebody applies for a loan, gets the loan

 8   and maybe gets the notice a week later, how is that

 9   person harmed in any respect?

10          MR. BENNETT:  That would be a policy

11   question, Judge.  I mean, if the statute is violated,

12   these rights exist independent of that.  Now, if I

13   were representing an individual who came to me merely

14   for that reason and didn't -- wasn't otherwise able to

15   help the classes as we think we will here, I don't

16   know that that's -- that would equitably motivate me.

17   It's a decision given our --

18          THE COURT:  Of course not.  I mean, doesn't

19   that argue for class action consideration in this

20   case?

21          MR. BENNETT:  Yes, sir, it does.

22          THE COURT:  Because somebody who has got a

23   $6 damage claim isn't going to bring it.  The only way

24   this case is going to get brought is as a class

25   action.

Transcript of Proceedings
November 18, 2009

Page 29

 1            MR. BENNETT:  Yes, sir.

 2            THE COURT:  Isn't that your argument?

 3            MR. BENNETT:  It is, and that's -- again,

 4    reciting the Murray v. GMAC case, that's outlined at

 5    length in the Fourth Circuit.  The Fourth Circuit has

 6    recognized the importance of class -- in fact, the

 7    U.S. Supreme Court discusses it for consumer cases.

 8            THE COURT:  Do we know how many of the 3.5

 9    million are in the ACAPS versus the Legacy?

10            MR. BENNETT:  We do, Judge, and Mr. Agoglia

11    might have something more handy, but it is -- I want

12    to say -- it's not exactly half, but it is within a

13    range that the Court saw as approximately half one and

14    half the other.  It might be off by a hundred or a

15    couple hundred thousand in one direction or the other,

16    but we do have a specific number, and with time, I can

17    pull it out for you, but --

18            THE COURT:  Go ahead.

19            MR. BENNETT:  The additional considerations,

20    Your Honor --

21            THE COURT:  Well, let me ask you another

22    question.

23            MR. BENNETT:  Yes, sir.

24            THE COURT:  Sorry.

25            As regards -- and so you don't know, as

Page 30

1    regards this 3.5 million, how many of these loans

2    closed versus how many of these loans didn't close?

3              MR. BENNETT:  Again, that -- in the

4    discovery process, that has been -- there is evidence

5    that we can access as to that.  It would be, again, a

6    question I would have to either take a moment on or

7    defer to Mr. Agoglia.

8              THE COURT:  And your argument, though,

9    Mr. Bennett, is it's immaterial to the analysis of

10   the --

11             MR. BENNETT:  Absolutely, Judge, that is my

12   argument.

13             THE COURT:  Okay.  Some people, you know --

14   because I could see some folks under the ACAPS system

15   going through a loan process, whether it's for a new

16   house loan or whether it's for a line of credit on

17   their mortgage and then -- going through the process,

18   getting turned down, then getting notice that they

19   used this credit score, having some issue with it and

20   thinking, If I had known they were going to get it, I

21   would have made some efforts to change some things or

22   talked to the bank and -- but then it's too late

23   because the loan has closed and they've been rejected.

24             MR. BENNETT:  Yes, Your Honor.

25             THE COURT:  And -- but what you're saying is

Transcript of Proceedings
November 18, 2009

Page 31

 1   Congress has made that policy judgment already, and

 2   that regardless of whether the loans closed or didn't

 3   close, that's not a part of the statute that the Court

 4   should think about.  Congress made the policy

 5   judgment.

 6            MR. BENNETT:  That's correct, and I can

 7   offer a second response.

 8            THE COURT:  All right.  Go ahead.

 9            MR. BENNETT:  The class notice that is

10   proffered is, I think, unique to the form notices that

11   Your Honor might have seen in other class actions in

12   that we have gone to even greater detail than normal

13   to explain what the lawsuit is about.  You actually

14   see -- it's Exhibit B to our motion right after the

15   settlement agreement, but -- or memorandum, but the

16   class notice has, first section, What is this --

17   number one, I mean, What is this lawsuit about?  And

18   then we outline the facts, the background facts, what

19   the law requires and what remedies are available, what

20   the plaintiffs allege and how Bank of America

21   responded.  We also have negotiated a claims form that

22   would facilitate -- and as well as a process online

23   that would facilitate the consumer learning as much

24   about these rights as possible, and we have negotiated

25   a five percent opt-out rate, which is a large number

Transcript of Proceedings
November 18, 2009

1    of individuals.  I don't suggest that --

2            THE COURT:  In other words, if five percent

3    opt out, the defendant could pull the plug on the

4    settlement?

5            MR. BENNETT:  Yes, sir, which means a lot of

6    individuals.  If somebody is in a circumstance where

7    they actually believe that they are unique and that

8    they can present actual damages or certain

9    jurisprudence as well as other courts have supported

10   the opt-out for those outliers.  The question Your

11   Honor considers is whether or not they're outliers or

12   whether or not it's, you know, the -- those

13   individuals actually benefiting are the exception.  In

14   this circumstance, Judge, the -- it would be quite a

15   challenge to prove actual damages in any of these

16   instances, even if they existed.  If I could

17   articulate with Your Honor, Your Honor, of course, has

18   had more litigation experience than I do, you're

19   familiar with the challenge of putting on evidence,

20   and so --

21           THE COURT:  I think proving actual damages

22   is really hard in this case.

23           MR. BENNETT:  Yes, sir.  The -- so that in

24   that unusual circumstance, there is that safety valve

25   for that outlier who would fit that scenario -- we

1    think unusual scenario that Your Honor suggests, so --

2    I'm very proud of the settlement if we can get

3    approval on it, Judge.  I believe that's a just

4    result.  You have the say and Judge Wilson has the

5    say, not I, but this is a settlement that -- I teach

6    this stuff -- the Fair Credit Reporting Act stuff

7    around the country.  I'm supposed to be one of the

8    go-to guys, and I could not advocate a settlement --

9    an actual settlement that I could not stand up for,

10   and this is one I certainly can stand up for, for what

11   that's worth, Judge.

12              THE COURT:  All right.  Well, I have a

13   couple of questions.

14              MR. BENNETT:  Yes, sir.

15              THE COURT:  The settlement provides that the

16   class representatives are to get, in addition to

17   whatever the other members of the class get, to get a

18   $5,000 stipend; is that right?

19              MR. BENNETT:  Yes, sir.

20              THE COURT:  Is there any provision for the

21   sharing of attorneys' fees with Mr. Domonoske?

22              MR. BENNETT:  No, sir, none at all, and in

23   fact, when we learned about -- just to give the Court

24   more background.  When Mr. Domonoske first learned

25   about this and sought legal help -- and he himself is

Page 34

1   one of the top consumer lawyers in the country.  I --

2            THE COURT:  That's why I asked the question.

3            MR. BENNETT:  Yes, sir.

4            I wanted him to say, Look, you don't need to

5   be a representative.

6            THE COURT:  Wouldn't he be much better off

7   being --

8            MR. BENNETT:  Significantly.

9            THE COURT:  -- standing there right there

10  with getting -- or petitioning for these kind of

11  attorneys' fees than getting his little $5,000?

12            MR. BENNETT:  Significantly better off

13  financially.  I -- Mr. Domonoske, Judge --

14            THE COURT:  That's why I asked the question.

15  Is there some deal, unwritten, written, understanding,

16  otherwise, in which either Rivera or Domonoske are

17  going to benefit from this other than is set forth in

18  these papers?

19            MR. BENNETT:  No, sir, nothing at all, on my

20  law license.  There is nothing --

21            THE COURT:  Well, now, that -- everything

22  you say here is on that.

23            MR. BENNETT:  Yes, sir.

24            THE COURT:  I'm just asking the question.

25            MR. BENNETT:  The -- there is absolutely

Page 35

```
 1   none, and I can tell you, and I'm certain, and

 2   frankly, Mr. Agoglia has -- Mr. Domonoske's

 3   representation of the class in this case has been as

 4   diligent as any class representative could ever be.

 5   He has even insisted, because of an interpretation he

 6   had of a Fourth Circuit case in which the attorneys

 7   advanced costs in the case, he has insisted that he

 8   subsidize and pay himself all of the costs.  He has

 9   himself shelled out approximately $12,000 and

10   change --

11           THE COURT:  Well, yeah, he gets the stipend

12   plus whatever costs he has expended.

13           MR. BENNETT:  Yes, he has written a check --

14           THE COURT:  So he has done that himself?

15           MR. BENNETT:  He has, because of principle,

16   and it -- and I can tell you, Judge, that if we were

17   to after the fact offer Mr. Domonoske money, he would

18   be -- it would damage our relationship irreparably.

19   He is not -- he would not accept offers.

20           THE COURT:  I'm not suggesting that he or

21   you are doing anything untoward.  I'm just asking the

22   question.

23           MR. BENNETT:  And I'm just trying -- because

24   this is such a -- I could answer that with Mr. Rivera

25   by saying, There is no such thing, and -- at all.
```

Transcript of Proceedings
November 18, 2009

Page 36

1    With Mr. Domonoske, it's -- there is no such thing,

2    plus he has been remarkably involved in protecting the

3    class, to his own detriment.  I know that he will

4    appear before Your Honor on other cases.  I want to

5    make sure the Court understood that he has not done

6    this with self-interest at all, and, in fact, did not

7    say to us, Please negotiate me an incentive award.

8    Mr. Domonoske and Mr. Rivera both have been very

9    active in our litigation.  They've very effective

10   representatives.

11            THE COURT:  I've deposed close action reps

12   and they didn't even know the case was going on

13   hardly.

14            MR. BENNETT:  Yes, sir.

15            THE COURT:  It was just -- it was --

16   frankly, it was a matter of curiosity to me,

17   because -- and we'll talk about the attorneys' fees in

18   a minute, because the attorneys' fee aspect of this is

19   far larger -- far, far, far larger than the $5,000 he

20   would get, so I was simply asking the question --

21            MR. BENNETT:  Yes, sir.

22            THE COURT:  -- and I'm satisfied with your

23   answer.

24            MR. BENNETT:  Thank you, Judge.

25            THE COURT:  All right.  Now, you've taken

Page 37

 1   three depositions in this case, you've reviewed about

 2   10,000 documents and issued one third party subpoena.

 3   That's what your papers say.  How can you possibly

 4   justify attorneys' fees in the range of $2.4 million?

 5        MR. BENNETT:  Well, the -- first, the

 6   discovery itself and the -- was much broader.  The

 7   number of documents involved and the work that was

 8   actually done independent of the deposition, defending

 9   and taking, was much greater, similarly the

10   negotiation process and the trips to San Francisco and

11   the multiple sessions attempting to negotiate the

12   settlement and other work that will be handled through

13   the end of the case as individuals inquire not simply

14   of Rust but of us will be much greater and will be

15   summarized in that fashion.  But even still, Judge, we

16   would not be able to submit a straight time fee

17   petition to Your Honor for $2.5 million even with the

18   considerable work of the different -- two different

19   federal cases litigated in the two different courts.

20   However, the Court -- this Court --

21        THE COURT:  Have you kept time records?

22        MR. BENNETT:  We have, sir.  We have kept

23   time records.

24        The -- and we would contemplate that we

25   would present that to Your Honor or Judge Wilson with

Transcript of Proceedings
November 18, 2009

Page 38

1    the -- at the final fairness hearing, but independent
2    of that, the Court --
3                THE COURT:  Well, I'm going to ask for it
4    now.  I want affidavits and -- as to the time spent
5    from all the lawyers in this case on plaintiff's side.
6                MR. BENNETT:  Yes, sir, yes, sir.  And when
7    would you like that?
8                THE COURT:  When can you have it to me?
9                MR. BENNETT:  Early December, Judge.
10               We -- I mean, by preliminarily approving
11   this, you're not approving fees at this point.  We
12   would appreciate --
13               THE COURT:  I know, but if I'm going to
14   preliminarily approve the class -- I understand I'm
15   not approving fees at this point, but I've got to tell
16   you, the $2.4 million in attorneys' fees versus a max
17   of $100 per class representative is an awful lot of
18   money.
19               MR. BENNETT:  It's -- actually, Judge --
20               THE COURT:  It's an awful lot of money.
21               MR. BENNETT:  -- in any class recovery --
22   really, in any normal class recovery --
23               THE COURT:  It's an awful lot of money.
24               MR. BENNETT:  Judge, the living that we make
25   as attorneys is an awful lot compared to most folks

Transcript of Proceedings
November 18, 2009

Page 39

1    out there, at least most attorneys.  Now, the
2    percentage --
3             THE COURT:  Okay.  By December 10th, just
4    get me an affidavit with the time and billing
5    statements spent on this case from the lawyers on the
6    plaintiff's side.
7             MR. BENNETT:  Yes, sir.
8             THE COURT:  Can you do that by December
9    10th?  You said early December.
10            MR. BENNETT:  Yes, sir.
11            THE COURT:  Do you want me to order you
12   to -- you can give them to me as soon as you want.
13            MR. BENNETT:  Yeah, I was thinking, Judge --
14   well, we can try to get it by December 10th.  I'm
15   speaking on behalf of other lawyers, as well, and over
16   the --
17            THE COURT:  Well, if they can't get it by
18   then, just let me know and I'll extend it later.
19            MR. BENNETT:  Yes, sir.
20            THE COURT:  I mean, I don't want to put you
21   to any undue burden, but you are asking the Court to
22   approve settlement of $2.4 million.
23            MR. BENNETT:  Not yet, Judge.
24            THE COURT:  I know not yet, but you're
25   asking me to give preliminary approval to a class

1   and -- for the purposes of settling it, and the

2   settlement includes an attorneys' fees payment of $2.4

3   million for taking three depositions, looking at

4   10,000 documents and reviewing one third party

5   subpoena.  It seems like a pretty good payday to me,

6   Mr. Bennett.

7            MR. BENNETT:  It is a good payday, Judge,

8   and I've been fortunate to have good paydays.  I will

9   suggest, though, that that's sort of the --

10            THE COURT:  It may be the cart before the

11   horse.

12            MR. BENNETT:  Well, it's not --

13            THE COURT:  It may be the cart before the

14   horse for what I'm doing, okay?  I'm just here asking

15   questions.

16            MR. BENNETT:  The reason I'm saying this,

17   Judge, is that earlier I answered the -- this is just

18   preliminary approval on the injunction question, but

19   in this instance, even the preliminary approval is not

20   approving 25 percent fees, although I absolutely think

21   that that's a fair fee and I'll defend that fee, Your

22   Honor, based on the case law regarding the percentage

23   of cost recovery.  The common fund percentage is the

24   jurisprudence in the Fourth Circuit, and the -- and

25   we've been approved at 25 to 30 percent in other

Page 41

1    cases.  Mr. Domonoske refused to approve a settlement

2    agreement that would have allowed a range of 25 to 30.

3    What we had done in our previous class cases --

4              THE COURT:  In this case?

5              MR. BENNETT:  In this case.

6              What we've previously done is ask for a

7    midpoint between the 25 and 30 that's been approved by

8    other judges, and the -- Your Honor has that say.

9    This is your case and Judge Wilson's case.  But at

10   this point, we're not even asking for you to approve a

11   settlement that approves fees in principle.  Instead,

12   all it simply says is that we will seek attorneys'

13   fees, the defendant will not oppose attorneys' fees up

14   to 25 percent, and so conceivably, although, I'll

15   represent, very unlikely, we could ask for another

16   percentage now instead of 25 percent.  We --

17   certainly, I'll do whatever Your Honor wants,

18   including provide those affidavits, but the --

19             THE COURT:  By December 10th.

20             MR. BENNETT:  By December 10th, Judge.

21             The question is whether or not the

22   percentage of common fund, which is the Fourth

23   Circuit's process for determining fees, and, in fact,

24   it's the majority now, and it has been -- has become

25   the majority, the way the class action decisions have

Page 42

1    gone around the country, including, of course, in our

2    circuit, have gone in that direction, so it's not a

3    normal Lodestar determination, but the truth is, I

4    have to impress Your Honor to approve what is a lot of

5    money, and I have to impress that we represented the

6    class, that we benefited the class and that --

7           THE COURT:  Or that there is even an

8    appropriate class here.

9           MR. BENNETT:  Or that there is an

10   appropriate class here.  We have to -- and the more --

11   I don't want this, but --

12          THE COURT:  And I wonder about whether there

13   is an appropriate class here since you don't know what

14   percentage of the loans were approved, what percentage

15   of the loans weren't approved, what percentage of

16   these folks would have sustained any actual damages at

17   all, Mr. Rivera, Mr. Domonoske don't have any actual

18   damages.  I'll look at your Murray case, but I just

19   wonder if this is an appropriate class here.

20          MR. BENNETT:  Well, Judge, those -- we do

21   have that information.  The problem is my personal

22   preparation for this hearing, because I, in my mind,

23   marginalized -- apparently, improperly marginalized

24   the importance of those facts in preparation for this

25   argument, but the -- it would not be correct to say

Page 43

1  that we didn't obtain that information or that it's

2  not otherwise available to Your Honor, part of this

3  process.

4           In addition, Judge --

5           THE COURT:  Do you get any damages under

6  this statute if it's merely negligent as opposed to

7  willful?

8           MR. BENNETT:  You get actual damages, Judge.

9           THE COURT:  You get actual damages?

10          MR. BENNETT:  Yes.

11          THE COURT:  And you recognize that that

12  would be next to impossible to prove?

13          MR. BENNETT:  That on a class basis --

14          THE COURT:  On a class basis, how do you

15  prove actual damages, because in that case, there is

16  no commonality?

17          MR. BENNETT:  Well, we would have to argue

18  the loss as a credit score of a $6 loss.  That would

19  be the mechanism.

20          THE COURT:  But you're presuming that

21  someone would spend the $6 to get a credit score if

22  the bank didn't provide it to them in a time period

23  that is as soon as reasonably practicable.

24          MR. BENNETT:  Well, not necessarily.  What

25  we would be presuming is that we -- the consumer -- a

Transcript of Proceedings
November 18, 2009

Page 44

1    factfinder or to get to a factfinder by dispositive

2    motions that the -- that a market or economic value of

3    the right that is at issue in this instance is $6.

4    That's what we'd have to --

5              THE COURT:  That's the argument?

6              MR. BENNETT:  Yes, sir.

7              THE COURT:  Okay.  All right.

8              MR. BENNETT:  And so that would --

9              THE COURT:  So the economic value of what

10   was not provided in a timely manner was $6?

11             MR. BENNETT:  Yes, sir.

12             THE COURT:  Because they could have got it

13   themselves by going to Experian for $6.

14             MR. BENNETT:  Yes.  And so to say that, you

15   know, I suffered $100,000 of damages wouldn't sell

16   when they could have --

17             THE COURT:  Gotten their own --

18             MR. BENNETT:  -- gotten their own score for

19   $6.

20             One of the advantages, again, though, is

21   that all of these individuals that received these

22   notices -- I mean, the notices, costing maybe as much

23   as $7 million for the notice administration process,

24   certainly a couple million dollars, these notices will

25   have the additional benefit of informing each of these

Page 45

1   individuals that received a notice, for those that

2   will read page one of it, that the -- of these rights

3   and of their entitlement to these rights, not simply

4   with respect to Bank of America, but with respect to

5   many mortgage applications made by these folks.

6   The -- one other caveat, Judge --

7           THE COURT:  This is -- and this is -- each

8   member of the class is a member of the class for each

9   loan that they processed through Bank of America, so

10  one person may have -- if they process five or six

11  loans, they have a piece of this five or six times; is

12  that right?

13          MR. BENNETT:  Yes, generally, Judge.

14          THE COURT:  I mean, it's per person per

15  loan?

16          MR. BENNETT:  Yes, sir, per person per loan,

17  right.

18          THE COURT:  Per person for notice not

19  provided in a time that's reasonably practicable.

20          MR. BENNETT:  Yes, sir.

21          THE COURT:  All right.  So one person could

22  maybe get -- you know, if it was five loans and they

23  get $2 a piece, they could get $10 of this settlement,

24  right?

25          MR. BENNETT:  Well, they're going to receive

Transcript of Proceedings
November 18, 2009

Page 46

1    a single notice.

2              THE COURT:  No, no, I'm talking about notice

3    that they didn't get under the fair credit statute,

4    okay?  They applied for five loans.  Let's assume

5    everybody in the class submits notices, okay?  One

6    person -- one person applied for five loans.  They

7    could conceivably be entitled to $2 times five --

8              MR. BENNETT:  Yes, sir.

9              THE COURT:  For each -- for five violations,

10   right?

11             MR. BENNETT:  For each transaction.

12             THE COURT:  Each transaction, each alleged

13   violation, each failure to provide notice as soon as

14   reasonably practicable, right?

15             MR. BENNETT:  Yes, sir.

16             THE COURT:  All right.  And if a much

17   smaller percentage does it, then it could be up to

18   $100, right?

19             MR. BENNETT:  Yes, sir.

20             THE COURT:  So this person applies for five

21   loans, doesn't get the notice, maybe gets $500.  That

22   would be an unusually large class member.

23             MR. BENNETT:  Yes, sir.

24             THE COURT:  And you get 2.4 million.

25             MR. BENNETT:  We get $25 for that $100 that

Page 47

1    they receive, Judge, and for each individual that's

2    out there.  I mean, the argument -- the concern -- and

3    I'm not naive to the concerns, but it's the same

4    concerns as any contingency practice, if we were to

5    have represented each of these individuals.  We do

6    quality work and we obtain good results, Judge.

7    That's --

8              THE COURT:  I'm not saying this isn't a good

9    result for you, Mr. Bennett.

10             MR. BENNETT:  Well, I -- just to provide the

11   same -- the --

12             THE COURT:  But in a contingency practice,

13   your individual client is going to get 66 percent.  In

14   this case, the collective individual client gets that,

15   gets 75 percent --

16             MR. BENNETT:  Gets 75 --

17             THE COURT:  -- or a little more than that.

18             MR. BENNETT:  Yes, sir, Judge.

19             And I'd also -- just in terms of background

20   so that -- I mean, this is -- we're the same firm that

21   does ridiculous amounts of pro bono mortgage defense

22   work and other stuff, too.  I mean, this is not -- we

23   don't run around with --

24             THE COURT:  This is not an assessment of

25   your character or anyone else's character.  I'm just

Page 48

```
 1   trying to see whether or not that's a -- just trying
 2   to gather as much information I can so I can look at
 3   this matter to see whether or not the class should be
 4   preliminarily approved.  That's what -- I'm just --
 5   I'm just asking questions.
 6           MR. BENNETT:  Yes, sir, yes, sir, I
 7   understand.  My -- it's just a general defense of a
 8   contingency -- of a large fee and a successful
 9   contingency case, but it doesn't -- it would be a nice
10   world if you received 25 percent of $9.4 million on
11   each of your cases, but Your Honor understands that's
12   not the world we live in.
13           THE COURT:  Some cases don't turn out as
14   well as this one --
15           MR. BENNETT:  They don't at all, Judge.
16           THE COURT:  All right.  Anything else you
17   want to tell me before I hear from the bank folks?
18           MR. BENNETT:  Not unless there are other
19   questions Your Honor has at this or future points.
20           THE COURT:  Okay.
21           MR. AGOGLIA:  Thank you again, Your Honor,
22   for hearing us out.  Michael Agoglia on behalf of Bank
23   of America.  I have with me here Grant Decker from
24   Tyson's Corner who also has been representing the
25   bank.
```

Transcript of Proceedings
November 18, 2009

Page 49

```
 1            THE COURT:  And you're from San Francisco,
 2   right?
 3            MR. AGOGLIA:  I am, sir.  Not originally,
 4   but --
 5            THE COURT:  Nice to have you here and I hope
 6   you're feeling better.
 7            MR. AGOGLIA:  Thank you very much, and
 8   again, I greatly appreciate the courtesy shown by the
 9   Court and opposing counsel.
10            THE COURT:  Why in the world should the
11   Court preliminarily approve this on a class basis?
12            MR. AGOGLIA:  Many of the questions you ask
13   go to what I think are the perversities of the Fair
14   Credit Reporting Act as it imposes the threat of
15   liability in the billions of dollars as you were
16   calculating it in your head, and some of them are
17   specific to this case, but I've been doing this work
18   for coming on now 20 years.  I've settled a number of
19   FCRA class actions.  I was involved in litigation that
20   brought -- this Murray v. GMAC case that counsel
21   talked about, and I do think this is an abundantly
22   fair settlement from the standpoint --
23            THE COURT:  Bank of America thinks this
24   settlement is abundantly fair?
25            MR. AGOGLIA:  Well, Bank of America would
```

Transcript of Proceedings
November 18, 2009

1   prefer that the dollar figure be zero.

2            THE COURT:  Sure.

3            MR. AGOGLIA:  Bank of America had --

4            THE COURT:  They wouldn't settle for zero.

5            MR. AGOGLIA:   -- an extraordinarily

6   difficult time in a case where millions of dollars

7   were spent when FACTA was passed apprehending how you

8   comply with this specific provision, you know, that --

9   this six sigma practice, which is --

10            THE COURT:  Can they prove willful

11   violation?

12            MR. AGOGLIA:  We don't think so.  I think --

13            THE COURT:  Then why are you settling this

14   case?

15            MR. AGOGLIA:  Well, because from the bank's

16   perspective, even if you consider it a slam dunk --

17   and I don't know how you would handicap a slam dunk.

18            THE COURT:  There are no slam dunks.

19            MR. AGOGLIA:  But say it's 90 percent

20   certain that we'll defend this to a defense judgment,

21   which, really, all you would have to do, as you

22   identified, with the willfulness claim, that 10

23   percent risk of loss is several multiples of this

24   settlement.  So from the bank's perspective, Your

25   Honor --

Page 51

1           THE COURT:  From the statutory damages
2   standpoint?
3           MR. AGOGLIA:  Right.  The perversity of this
4   per transaction damage provision makes this an
5   economically rational settlement.  It sticks in their
6   craw, they have to ask the institution --
7           THE COURT:  It sticks in their craw because
8   they spent millions to try to get it right.
9           MR. AGOGLIA:  Right.
10           THE COURT:  And they have lawyers telling
11   them that they got it right.
12           MR. AGOGLIA:  Right, several, and several
13   leading FCRA lawyers, and they designed a system which
14   they think was better than the lowest common
15   denominator compliance approach that they've now gone
16   through really to make sure that they don't get sued
17   again and again in the future and that others went to,
18   and I'd like to talk to that, because as you
19   identified, there is this question of how soon is soon
20   enough?
21           THE COURT:  Three days versus seven -- the
22   seven days.
23           MR. AGOGLIA:  Right.
24           And let me take the ACAPS platform, which is
25   the home equity loans and home equity lines of credit

Page 52

1    platform that Mr. Domonoske's transaction was

2    originated on.  At the time Mr. Domonoske's

3    transaction took place, the average time between the

4    submission of an application and the decision, we'll

5    make it at -- we'll extend that line of credit, we'll

6    make it a home equity loan, you've withdrawn it,

7    you've turned it down, all the things that trigger the

8    sending of this notice, the average time was three

9    days.  Over the life of the class period, the average

10   time was eight days.  And it's true that indeed the

11   protocol was for loans that closed that we approved

12   and agreed to fund, that the notice was necessarily

13   triggered after the closing.

14          THE COURT:  And I think in Mr. Domonoske's

15   case, it was more --

16          MR. AGOGLIA:  Mr. Domonoske's transaction

17   was elongated.

18          THE COURT:  It was a longer period of time.

19          MR. AGOGLIA:  And he fell into the less than

20   one percent category where his mailings -- in the mail

21   processing center, his piece was rejected by this, you

22   know, sort of futuristic device that reads a million

23   pieces of mail a day and the barcode came up with an

24   error, so his got kicked out and another four or five

25   days of delay in its delivery.  There was testimony

Page 53

```
 1   about that.  But that's right, the --
 2            THE COURT:  Was it kicked out internally or
 3   by the postal service?
 4            MR. AGOGLIA:  By the bank's internal mail
 5   processing center, the facility --
 6            THE COURT:  But that was only by four or
 7   five days, you think?
 8            MR. AGOGLIA:  Right.  Just that it was
 9   anomalous in terms of how much time it took to get him
10   the disclosure after the --
11            THE COURT:  I thought it was more than 30
12   days for Mr. Domonoske -- in Mr. Domonoske's case.
13            MR. AGOGLIA:  From the time of his
14   application to the time of the close was a period of,
15   I think, 45 days, and during that period,
16   Mr. Domonoske was at times unhappy with the appraisal
17   that came in on it, there was a negotiation about
18   terms.  It was extended and elongated for a number of
19   reasons.  It was clearly statistically an outlier in
20   terms of how long it took to close.  Again, the entire
21   class period for that ACAPS platform was eight days
22   between application and a decision triggering the --
23            THE COURT:  Did Mr. Domonoske's loan close
24   or was --
25            MR. AGOGLIA:  Yes, yes.  And let me speak to
```

Transcript of Proceedings
November 18, 2009

Page 54

1    that issue.

2              THE COURT:  What kind of damages does he

3    have?

4              MR. AGOGLIA:  He doesn't have any actual

5    damages, and --

6              THE COURT:  Okay.

7              MR. AGOGLIA:  That's our position.  In fact,

8    Mr. Domonoske got his credit score the day after he

9    applied.  He went out and bought it himself.  And

10   Mr. Bennett alluded to the difficulties of proving

11   causation, but clearly, even under plaintiff's

12   conception, the next day was not when the disclosure

13   should have arrived, so he got that on his own.  He

14   had it, he got a later verbal disclosure of the actual

15   credit score from the bank making his proof of actual

16   injury even harder, and the proof of actual injury is

17   going to be difficult here.

18             THE COURT:  Oh, I would think so.

19             MR. AGOGLIA:  But you could envision cases

20   where someone would say, under either platform, Look,

21   this took awhile.  I was generally interested in

22   finding it out.  I had a dentist who said I owed him

23   money and I really didn't, that lowered my credit

24   score and that increased my --

25             THE COURT:  Might have.  And it may have

Page 55

1  affected the terms of the loan.

2             MR. AGOGLIA:  Right.

3             THE COURT:  Exactly.

4             MR. AGOGLIA:  Now -- and they would have to

5  say -- and so a person could come into court and say,

6  Look, I actually wanted to know, I would have followed

7  up, and if I had followed up, I might have lowered my

8  score within the time period that transaction was

9  pending and I might have gotten a better deal from the

10 bank.

11            THE COURT:  I mean, is that, in fact, the

12 public policy rationale behind the statute?

13            MR. AGOGLIA:  You know, I would say no.  The

14 FCRA provides a number of different opportunities when

15 creditors or insurance companies using credit reports

16 have to go ahead and tell consumers that it's being

17 done so the consumers can follow up and take advantage

18 of the other remedies available to check your credit

19 report to see that it's accurate, but in many

20 different instances, the FCRA says --

21            THE COURT:  Like those guys in the pirate

22 costumes who play on the TV commercials.

23            MR. AGOGLIA:  Right, the jingle that sticks

24 in your mind.

25            THE COURT:  Right, right.

Transcript of Proceedings
November 18, 2009

Page 56

1            MR. AGOGLIA:  And so there is no, for

2   instance, obligation for the bank to reprice your loan

3   if you get an early credit score disclosure, it turns

4   out to be wrong and you get it lowered.  It doesn't

5   impose upon the creditor the obligation to reprice it.

6            THE COURT:  It doesn't micromanage that

7   crediting -- that under -- not underwriting, that --

8   the lending decision.

9            MR. AGOGLIA:  Right.

10           But as a policy matter, I'm not sure --

11  there is really no legislative guidance on this

12  specific provision, 1681g(g), guiding what they meant

13  by as soon as reasonably practicable or the terms use,

14  which is also important in a liability analysis.  But

15  there is certainly a policy argument on the other side

16  that says the earlier they get it in the process, the

17  more valuable it will be for the consumer, and maybe

18  the consumer can affect by negotiation a change in the

19  outcome of the underlying transaction.

20           But what is also clear is that the bank had

21  no financial incentive.  It didn't reap any monetary

22  benefit by this delay.  So why did it do it?  It

23  delayed for a couple of what I think are

24  demonstratively reasonable and practicable reasons.

25  One, it often takes time, several days, to do the

Page 57

 1   internal housekeeping once an application comes in to

 2   make sure you have the right person, that you clear up

 3   these fraud alerts that are increasingly prevalent,

 4   then you look at whether or not there is an actual

 5   credit score that's been pulled.  Sometimes they get

 6   inaccurate social securities, somebody may have

 7   transposed a digit.  Those sorts of housekeeping

 8   matters take a minimum of a couple of days to sort

 9   out, and if they -- they decided -- and they tested

10   this.  If you waited a little bit longer, you would

11   actually have a greater pool of individuals who would

12   get their credit report sooner rather than sending the

13   earliest possible notice out, excluding those for whom

14   you did have a credit store and picking them up later

15   in time.  There is also a common practice in the home

16   lending field to pull multiple credit scores during

17   the life of the processing of the loan application,

18   and the bank would have come in and testified that the

19   one they actually use in any meaningful sense is the

20   last one pulled.  And so if your object is to get to

21   the consumer the score that's actually having an

22   impact in that transaction, waiting helps you.  And

23   then there are some, again, housekeeping issues about

24   getting a proper mailing address.  You know, people

25   are applying for a new home, they have a current

Page 58

1    address, they have the property address for the new

2    home, where they may be residing for a period of time

3    may be uncertain, and so some additional time, they

4    found, materially helped them mail accurately to the

5    right address.

6              What does this mean?  It means that I think

7    we have a very strong defense on even a negligence

8    violation claim.  This is a statute where there is no

9    authority outside of the language itself as to what as

10   soon as reasonable practicable after use means.  I

11   would submit that it is --

12             THE COURT:  I know.  I looked.

13             MR. AGOGLIA:  You know, you're not going to

14   find it.  There was a 2000 statute passed in

15   California providing the same disclosure that this

16   borrowed from, but the only roughly analogous language

17   was in the old Rule 23, as soon as practicable was a

18   time period for district court judges to hear class

19   certain motions, and that language is no longer there,

20   in part because the variation in how that was

21   interpreted and applied across the country was

22   incredible.  That was a year and-a-half for some

23   courts, it was three days in the Eastern District of

24   Virginia.  You know, it is, in fact, a very case by

25   case, transaction specific standard, and to add the

Page 59

1    additional qualifier, reasonably practicable, we

2    think, allowed them -- and their counsel at the time

3    thought -- allowed them to take into account mailing

4    addresses, multiple credit score pulls on that -- and

5    that --

6              THE COURT:  And doing it involved doing it

7    all at one time?

8              MR. AGOGLIA:  Right.

9              And they understand that you have to design

10   it based upon the origination systems because you're

11   talking hundreds of thousands of pieces a week.  It's

12   got to be automated, there has to be a system to do it

13   and you have to send it to these outside vendors.

14             So what's the alternative formulation?  The

15   alternative formulation -- and Mr. Bennett alluded to

16   it -- is this three-days-from-application standard.

17   The problem with that -- in that, that standard was

18   well-known to Congress at the time it passed back --

19   indeed, the Truth in Lending Act and the FCRA are both

20   under the same Consumer Credit Protection Act.  They

21   both are under the same umbrella statute.  And, you

22   know, I think of all the places you could make this

23   argument, it is most powerful here, that if Congress

24   wanted to set a clear temporal time period within

25   which this disclosure had to be provided, if it wanted

 1   to be three days after application, it would have said

 2   so.  It had done so in TELA for years, it had done so

 3   in RESPA for years.  So that is essentially within a

 4   day where we have gone in the current system, the one

 5   that's subject to the injunction, and I'll get that to

 6   you, but I think counsel is here to represent in

 7   connection with the junction, we are here to tell you

 8   that the system that they have gone to, the one that

 9   we're going to ask you to -- or Judge Wilson to

10   approve and enter an order finally approving the

11   hearing -- the settlement on this injunction is,

12   without any reasonable question, compliant with this

13   standard under the Fair Credit Reporting Act.

14        Let me mention a thing or two about the

15   counts here.  You've raised a couple of questions

16   about that.  It is true that there are, as we

17   estimate, approximately 3.5 potential class members

18   here, but there are 2.2 million transactions that were

19   affected, and the reason for the variance is that you

20   have co-applicants.

21        THE COURT:  The hypothetical that I posed,

22   perhaps.

23        MR. AGOGLIA:  Right.

24        And we think --

25        THE COURT:  Oh, and co-applicants.

Page 61

 1            MR. AGOGLIA:  Right.

 2            And because it's home lending,

 3    overwhelmingly, these are spouses or direct relatives.

 4    Who do you put on your deed or mortgage?

 5            THE COURT:  Oh, I see.  So it's -- the

 6    numbers are different than I suggested.

 7            MR. AGOGLIA:  So 2.2 is the number of

 8    transactions, and we think there is an argument, it's

 9    an unsettled question under this provision whether or

10    not liability should be per transaction or per

11    individual.

12            THE COURT:  Sounds like there is a lot of

13    stuff unsettled under this provision.

14            MR. AGOGLIA:  You know, the problem with the

15    FCRA in part is they gave the power to interpret the

16    statute to four separate agencies, and they didn't

17    include the FDC in that, because the FDC wasn't

18    trusted to make a ruling.  So there is no body of

19    regulation like you have under RESPA or Truth in

20    Lending to fill in the gaps here, and there is no

21    district court opinion, there is certainly no circuit

22    court opinion, there is no formal agency guidance

23    interpreting what the heck this means.  So we think

24    you could look at this from a fairness perspective

25    understanding that it could be 2. -- we could have

Page 62

 1   stuck at 2.2 million and divvied up the class benefits
 2   that way.  We are allowing per individual, per loan
 3   recovery, and it's simplified.  It's simplified in
 4   that if you are a class member and you have five
 5   transactions with Bank of America, A, you'll get a PIN
 6   number with your mail-in which will allow you to go
 7   online and see exactly how many qualifying
 8   transactions you have, and if you submit a claim form
 9   either in mail or online, we'll automatically pay you
10   for each of the qualifying transactions.  So it would
11   be, if there were five qualifying transactions and the
12   redemption for claims rates were low enough, it could
13   be $500 per an individual class member in terms of
14   their take.  The Legacy Bank of America class is by
15   definition all closed loans of that 2.2 million
16   transaction count.  By memory, I think it was just
17   around 980,000 transactions.  And so, as Mr. Bennett
18   said, it's not quite 50/50 but closer to 60/40 in
19   terms of the split between the ACAPS and the Legacy
20   Bank of America channels that feed into this class.
21   Because of the way the statute is written, it is our
22   position that a negligence violation class would be
23   uncertifiable, unless the Court were to accept this
24   theory of an imputed economic value on a class-wide
25   basis for a delay in receiving your credit score

Page 63

1    disclosure.  Other courts have rejected those

2    approaches.  It's subject to the quick rebuttal, But

3    what if they did get it, you know, that is something

4    there, and we don't impute actual damages, you know,

5    in Federal Court, we generally require proof of them,

6    so we turn to the willfulness claim.

7            THE COURT:  Why do you think that's

8    certifiable as opposed to the negligence claim?

9            MR. AGOGLIA:  Well, you know, if litigated,

10   our position would be it wouldn't be certifiable.  And

11   while the Supreme Court instructs in (inaudible) that

12   you can't ignore the standards of Rule 23 simply

13   because it's served up for the Court in the context of

14   a settlement, it did also recognize, however, that

15   things like manageability and superiority can be

16   fundamentally altered because the process of resolving

17   claims and managing the distribution of benefit has

18   been accounted for in an orderly fashion in the terms

19   of the settlement agreement.  I certainly think that's

20   the case here, that there is a very clear streamline,

21   straightforward, relatively easy to manage process

22   that we have agreed to to resolve the claims here.

23           THE COURT:  But that begs the question of

24   whether or not it's subject to class certification to

25   start with.  I mean, why -- tell me why you think a

Transcript of Proceedings
November 18, 2009

 1   negligent claim is not certifiable but a willful claim

 2   is.  Is it just because of the statutory damages?

 3           MR. AGOGLIA:  No.  I mean, I -- I would --

 4   again, I would say that I think neither -- I mean, we

 5   would argue -- we were prepared to argue to this Court

 6   when it was referred to you that neither claim is

 7   certifiable here, and that's in part because the

 8   Constitutional arguments on the willful violation side

 9   are not just the, it's just too much, what's

10   characterized in the Murray case as the annihilating

11   damages scenario and the due process concerns right

12   there.  They're more specific.  The 11th Circuit has

13   heard and passed on a challenge which we would be

14   prepared to raise in circumstances like this to the

15   effect of, if you do not have an assessment of whether

16   this class member suffered a penny's worth of actual

17   damage, how can the Court be guided as to where

18   between $100 and $1,000 it needs to exercise its

19   Congressionally-delegated discretion to impose what

20   is, from our reading, a punitive measure?  Now, that

21   hasn't been tested.  But there have been courts that

22   have said that the need to consider actual damages

23   precludes us from really moving forward with the class

24   in a litigated context on a willful claim.  There are

25   some courts, as Mr. Bennett referred to, that have

Page 65

 1   come out the other way under the FCRA on these issues
 2   and have said things like, Well, in that event, it
 3   would be impossible to certify any class under the
 4   Fair Credit Reporting Act.  So there is a body of law
 5   which comes out differently on these issues, and it's
 6   in that realm that we went forward and settled the
 7   class on these terms.
 8            THE COURT:  What possible -- from your
 9   perspective, what possible rationalization is there to
10   certify a willful class in this case?
11            MR. AGOGLIA:  Well --
12            THE COURT:  Because you're telling me it's
13   not certifiable.
14            MR. AGOGLIA:  Well, if litigated, I would
15   tell you we would strenuously object to certification
16   of it, but I would also have to concede that the
17   outcome of that argument isn't preordained, and
18   because there is a fair debate about that question,
19   Your Honor, that justifies the Court proceeding with
20   the nationwide settlement as we have proposed, and I
21   think this settlement is especially principled in the
22   way in which it distributes the benefit.  It is a
23   claims process.  It does ask folks very simply to say,
24   Were you interested in finding your credit score
25   during the transaction?  And in that -- it also

1    doesn't require that as the only basis upon which you

2    can submit a proper claim form, and we did that in

3    negotiation with plaintiff's counsel so that there

4    would be no claim that we were trying to drive down

5    redemption rates.  But that provision of the claims

6    process, to my way of thinking about the statute,

7    marries up with what is the legitimate basis upon

8    which any class member should recover here, and that's

9    a colorable claim of actual injury.  If they can say,

10   at least, I was interested in finding out about it and

11   I didn't get it quickly enough, then they have a

12   colorable claim of actual injury and have an

13   entitlement to participate in the benefits of the

14   class, which are -- which is principled and different

15   than the rest of the class members who may say, I

16   don't want to bother, I really didn't care about it.

17   I would agree with Mr. Bennett, they all do, from

18   plaintiff's perspective, come at it from a common

19   claim, a common theory of liability, and what

20   distinguishes them is, in my mind, whether they have a

21   colorable claim of actual injury, and that's a

22   principle basis upon which the Court can approve a

23   settlement that will ultimately distinguish between

24   who gets it and who doesn't, based upon the class

25   member's own action.

Transcript of Proceedings
November 18, 2009

1          THE COURT:  You're saying based on the

2   notice -- look at the notice, they filed their notice,

3   that demonstrates their colorable claim of actual

4   damages?

5          MR. AGOGLIA:  The claim form, Your Honor,

6   requires them to say the following:  By submitting

7   this claim, you are certifying that you are either

8   unaware of the fact that you have rendered -- you are

9   unaware of any fact that would render you ineligible

10  to participate in the settlement or that you were

11  interested in obtaining your credit score during the

12  Bank of America transaction.  And it's the second of

13  those two clauses that I was alluding to.  The first

14  is an independent basis upon which people can simply

15  participate and submit a claim so that we're not

16  facing the accusation that sometimes objectors make

17  that the claims process presents an unfair hurdle, an

18  unfair obstacle for class members to go ahead and

19  submit a claim and participate in the class, but there

20  is a principled -- you accurately defined the

21  consequence of the claims process in that some get

22  maybe 100 bucks and some get nothing if they don't

23  submit a claim form.  And my point is simply, I think

24  not only is that right, that is abundantly fair under

25  the terms of this statute where we would otherwise

Page 68

1    have a much more significant defense as to those

2    individuals on both the negligent claim, which they

3    only recover actual damages for, and on a willful

4    claim when we would say, there is no ratio starting

5    from zero that is Constitutionally permissible to

6    impose any dollar of statutory damages.

7              So those are -- I apologize -- my less than

8    organized thoughts in response to some of the

9    questions you had raised.

10             THE COURT:  Do you have any problem with

11   either Mr. Rivera or Mr. Domonoske as class

12   representative?

13             MR. AGOGLIA:  I do not.  I mean, for

14   purposes of settlement?

15             THE COURT:  Yes.

16             MR. AGOGLIA:  As always qualified?

17             THE COURT:  Yes.

18             MR. AGOGLIA:  I do not.  The classes are

19   designed so that they are both included in the Legacy

20   B of A platform class and the --

21             THE COURT:  Did you depose Rivera?

22             MR. AGOGLIA:  We did not depose Rivera.

23   We've got successive affidavits from Mr. Rivera.

24             THE COURT:  And does he seem -- does he

25   appear to be somebody who is knowledgeable about this

Transcript of Proceedings
November 18, 2009

Page 69

1   issue?

2            MR. AGOGLIA:  From the standpoint of defense

3   counsel, it does appear that he actively participated

4   with counsel on --

5            THE COURT:  All right.  Perhaps that's a

6   better question.

7            How about Mr. Domonoske?  From his

8   standpoint, does he appear to be someone who is

9   actively participating in terms of what he believes to

10  be a violation of the statute?

11           MR. AGOGLIA:  From the day after he applied

12  for his loan with Bank of America, as revealed in

13  copious handwritten notes, and thereafter,

14  Mr. Domonoske has set a new standard for involvement.

15           THE COURT:  Well, I mean, it sounds like to

16  me from what Mr. Bennett says is that he -- he's done

17  all the right things.  He's paid his -- the cost and

18  expenses upfront, he's -- you know, he's going to, if

19  the settlement is approved, get his share of the class

20  and plus a relatively minor stipend given the dollars

21  that are involved here, so it sounds to me like

22  Mr. Domonoske has acted appropriately and Mr. Rivera,

23  as well.  I just was -- from your perspective if there

24  was anything that you wanted to share with me on that

25  score?

Transcript of Proceedings
November 18, 2009

 1           MR. AGOGLIA:  No, Your Honor.  We have

 2   signed the settlement agreement agreeing that they can

 3   fairly and adequately --

 4           THE COURT:  One other question.

 5           MR. AGOGLIA:  Yes, Your Honor.

 6           THE COURT:  What is this outfit that is

 7   getting the bulk of the money if there is not enough

 8   claims to submit, you know, because there is $100 max

 9   and the attorneys' fees are capped, and if there is

10   something left over, it goes to some group.  What

11   is -- I'm not familiar with that, and I -- can you

12   tell me about that?

13           MR. AGOGLIA:  Mr. Bennett, I think --

14           THE COURT:  And I just forgot to ask him,

15   but if you don't have any information, I will ask him.

16           MR. AGOGLIA:  I have a couple more comments,

17   if you could leave it on notice, that I just want to

18   put on the record, but --

19           THE COURT:  No, no, I want to hear whatever

20   you have to say, and I apologize if my questions have

21   sent you askew.

22           MR. AGOGLIA:  Not at all.

23           MR. BENNETT:  Judge, the Center for

24   Responsible Lending is a --

25           THE COURT:  That's what it is.

Transcript of Proceedings
November 18, 2009

Page 71

1            MR. BENNETT:  Yes, sir.  It's a mainstream

2    organization in that it's one of the strongest

3    national nonprofit for consumer lending rights.  It's

4    one that --

5            THE COURT:  All right.  Let me ask you this

6    question, just because -- is there any association

7    between either the lawyers or the class

8    representatives in this case with this either in

9    ownership or --

10            MR. BENNETT:  We're not on the board, we're

11    not --

12            THE COURT:  -- on the board, any kind of

13    role in the Center for Responsible Lending?

14            MR. BENNETT:  No, sir.

15            THE COURT:  I mean, I think it's incumbent

16    on me to just ask the question.

17            MR. BENNETT:  Absolutely.

18            No, sir, and if I could provide Your Honor

19    the explanation of the attraction to the Center for --

20            THE COURT:  Yes, sir, yeah, I don't know

21    anything about them.

22            MR. BENNETT:  They have a more -- they have

23    a foreclosure mitigation project that provides

24    emergency help, financial counseling help to

25    foreclosure individuals.  We -- and it's actually

Page 72

 1  been -- so this organization -- I mean, I'm a top --
 2  you know, head-to-toe consumer advocate, so it's a --
 3  definitely, it's a consumer advocacy group.  It's also
 4  an organization that a lot of mainstream, reputable
 5  lenders, including Bank of America, have supported in
 6  the -- its various roles and causes.  It's one of the
 7  strongest advocacy organizations nationally.  In fact,
 8  what I could --
 9          THE COURT:  Supported by both borrowers and
10  lenders?
11          MR. BENNETT:  Yes, sir, although, I suspect
12  that -- yes, sir, it is.  It's supported by consumer
13  advocates, and amongst --
14          THE COURT:  So you're saying it's got this
15  program now to help folks out with counseling if
16  they're one of those folks who is struggling now with
17  being foreclosed on?
18          MR. BENNETT:  Yes, sir.
19          We've actually -- Mr. (Inaudible) had flown
20  to Washington and met with the director and the other
21  individuals who are working within this program and
22  project.  We have shared information and details and
23  discussions with Mr. Agoglia in his representation of
24  defendant.  It wasn't simply, we like these guys, we
25  picked them out.  The objective for the (inaudible) --

Page 73

1    and I think it's more likely that the (inaudible)

2    would be limited -- the money that they would likely

3    receive will be un-cashed or unclaimed checks, which

4    even when we distribute in class actions to

5    individuals that claim, some individuals just don't

6    exercise (inaudible), but we had thousand dollars

7    checks.

8              THE COURT:  I mean, wouldn't it be your

9    experience that most of the 7 million bucks is going

10   to go to the class members?

11             MR. BENNETT:  Absolutely, yes, sir.  I think

12   almost all of it will.

13             THE COURT:  Simply because there are so

14   many?

15             MR. BENNETT:  There are so many, and the up

16   to $100 is pretty significant.

17             THE COURT:  I mean, the up to $100 takes you

18   way over the $7 million.

19             MR. BENNETT:  Yes, sir.

20             THE COURT:  It just does.

21             MR. BENNETT:  It does, Your Honor.

22             THE COURT:  So you think there might be very

23   little that actually goes to the Center for

24   Responsible Lending?  I think what you said, maybe

25   unclaimed checks.

Transcript of Proceedings
November 18, 2009

 1          MR. BENNETT:  Yes, Your Honor.

 2          THE COURT:  All right.  Any other --

 3   Mr. Bennett, thank you.

 4          Any other things that you want to tell me,

 5   or perhaps your colleague, Mr. Erausquin, if

 6   Mr. Bennett has gotten things wrong, anything that you

 7   want to share with the Court to -- as I'm trying to --

 8   and I understand my role in this.  I understand we're

 9   looking at preliminary approval, but I just thought,

10   we've come up here -- Mr. Agoglia has traveled all the

11   way across the country, we at least ought to get some

12   of these questions on the table.  Anything else you

13   want -- anything else you guys want to say on the

14   plaintiff's side?

15          MR. ERAUSQUIN:  I'd just remind Mr. Bennett

16   that Mr. Domonoske did pay his $6 for his score.

17          THE COURT:  Oh, so he did actually pay $6?

18          MR. ERAUSQUIN:  Yes, sir.

19          THE COURT:  Okay.  All right.

20          MR. BENNETT:  Yeah, Judge, given the --

21          THE COURT:  I mean, it sounds like

22   Mr. Domonoske is, from my limited experience with

23   class representatives, the most active class

24   representative I've ever heard of and probably a good

25   client to have.

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

Page 75

1           MR. BENNETT:  Judge, it's not that great
2      sometimes when your client is smarter than you,
3      either, and as I learned --
4           THE COURT:  That was always the case when I
5      was practicing.
6           MR. BENNETT:  But he is.  He's done -- you
7      know, this -- I'm editorializing.  I met him as a
8      consumer advocate.  I didn't know him personally.  But
9      he has done a lot for consumers independent of this
10     role, and I was impressed that he lived by the same
11     mantra he was imposing on his class reps in working
12     other cases, so he -- in terms of paying the costs and
13     that kind of thing.
14          THE COURT:  Pretty unusual in my experience.
15          MR. BENNETT:  Incredibly unusual, if unusual
16     means the only time ever I've ever had that happen.
17     And certainly I would encourage that, you know, but
18     it's not a reality with the expenses of litigation as
19     they are?  And including in this instance -- I mean,
20     Mr. Domonoske, at our request for one of the
21     mediations -- the initial mediation took place in San
22     Francisco.  Unsuccessful in hindsight.  We should
23     probably stick with Virginia judges, but we made a
24     couple trips to San Francisco.  Mr. Domonoske was the
25     first one out there, paid his own way and flew out

 1    there for the mediation, and this was -- and in terms

 2    of cost as well, I think -- how much did we pay?  I

 3    think collectively, both the defendant and the

 4    plaintiff, together we paid about $8,000 a day for the

 5    mediation with a retired federal magistrate.

 6              THE COURT:  I do it for free.

 7              MR. BENNETT:  I told Judge Donell --

 8              THE COURT:  He's a good judge.

 9              MR. BENNETT:  He needs to put -- for 350

10    bucks, we get a heck of a lot in magistrate

11    mediations, but the one thing I could, if you give me

12    the opportunity with your catchall, anything else that

13    I could add, and if I could couch this initially, I

14    don't want to appear defensive because I'm not

15    defensive about the attorneys' fee issue, but what I

16    would like, if -- ideally, I could convince Your Honor

17    to the following to things:  First, I would be

18    concerned about submitting just -- if we were going to

19    submit this preliminary question of the magnitude of

20    the attorneys' fees question, Your Honor, I'd like to

21    submit it fully to Your Honor, because I don't just

22    simply want to say, Here's our time.  I would like to

23    be able to say, Judge, here is why this is a

24    reasonable fee.  And what I would ask, Judge, is that

25    we do that, and maybe if we have an additional -- if I

Transcript of Proceedings
November 18, 2009

 1   could have until the 17th?  Actually, we have two days

 2   of mediations the week of -- or on December 8th and

 3   9th before Judge Donell in Richmond and a packet of

 4   130 individual cases that we're trying to mediate,

 5   LexisNexis, but -- so that if I could provide that or

 6   we could provide the formal background, but if the

 7   Court decides that the settlement is fair, a decision

 8   that Your Honor has not necessarily reached yet, but

 9   the language of the attorneys' fee provision says that

10   defense counsel agree to request approval of fee in an

11   amount not to exceed $25,000.  It doesn't -- there is

12   nothing in the agreement, there is nothing in the

13   Court's order even as drafted that decides the fee

14   question.  In most --

15              THE COURT:  Oh, I understand that.  I

16   understand that that would not decide the fee

17   question, and at the end of the day, that's probably

18   not my decision anyway.  That's Judge Wilson's

19   decision.

20              MR. BENNETT:  Yes, sir, but it -- my

21   suspicion is that if it's anything like the Eastern

22   District our juges respect our judges, so the

23   question --

24              THE COURT:  I get reversed all the time.

25   Well, not all the time, but I do get reversed

Page 78

1    occasionally.

2              MR. BENNETT:  Well, Judge, it will be a good

3    warmup, because I'm sure Judge Wilson will ask a

4    question, If your clients are getting $100 max and

5    you're getting two -- you know, or $500,000, well, my

6    take would be, that's a lot of money, and when -- I'm

7    used to defending it.  We -- you know, the good news

8    about growing up litigating in Virginia --

9              THE COURT:  Take to the 17th.

10             MR. BENNETT:  Take to the 17th.

11             But I would like, if possible, if the Court

12   otherwise approves this, if you could add a provision

13   that requires that from us, but I don't want to hold

14   the settlement up because it's a lot of money

15   interest-wise for the class, and the value and the

16   addresses going stale and the like as far as timing.

17   I'm happy to do whatever Your Honor wants.  We can

18   defend our fee and we will, but the --

19             THE COURT:  Well, you're going to have to

20   submit that anyway, so go ahead and do it and I'll

21   work as hard on this as I possibly can.

22             MR. BENNETT:  Yes, sir.

23             THE COURT:  All right.  Mr. Agoglia, I have

24   two questions for you.

25             MR. AGOGLIA:  Yes, sir.

Transcript of Proceedings
November 18, 2009

 1              THE COURT:  First, from the standpoint of

 2    the defendant, Bank of America, with all the time,

 3    effort and trouble you've put into this, do you

 4    believe that under the provision of Rule 23 that the

 5    class as proposed is certifiable?

 6              MR. AGOGLIA:  I believe that it is, Your

 7    Honor.  I would have to --

 8              THE COURT:  For the purposes of a settlement

 9    in this case.

10              MR. AGOGLIA:  Right.

11              I would have to have made that decision

12    consciously before signing and submitting the joinder,

13    which we did, and for the purposes of settlement

14    alone, knowing that you can look at manageability and

15    superiority as important prongs of the 23 B3 class

16    differently permissibly under the (inaudible)

17    teaching, I do.

18              THE COURT:  Second question:  What do you

19    think about the attorneys' fees?

20              MR. AGOGLIA:  I believe that I am

21    contractually rendered close to mute on the attorneys'

22    fees.  What we have agreed to is a fairly standard

23    provision.

24              THE COURT:  In other words, you're not --

25              MR. AGOGLIA:  We're not going to object up

Page 80

1   to what is 25 percent of that 9.4 or 23 percent of the

2   9.9.  That was the confusion, I think, earlier.  And

3   as with many things, that's (inaudible) that we have

4   to commit to the Court's discretion.

5           THE COURT:  Fair enough.  I accept that.

6           Anything else you want to say?

7           MR. AGOGLIA:  On the notice issue, because

8   one of the most important things in the preliminary

9   approval stage of a class settlement is getting

10  approval of the specific notice regime, because that

11  will have taken place in advance of the fairness

12  hearing.

13          THE COURT:  Yes, sir.

14          MR. AGOGLIA:  The expenses involved here are

15  enormous in terms of the cost to mail notice here, so

16  I want to make sure we're very clear with the Court on

17  what we're going to do.  I do think, having settled

18  many nationwide class actions, that it's the single

19  finest protocol for developing accurate address lists

20  and providing a meaningful notice to the class members

21  that I have seen ever.  It starts with the preparation

22  of the class list.  The class list is drawn from the

23  underlying mortgage records.  Mortgage records are

24  inherently more reliable than, you know, sort of, cell

25  phone account records or other consumer purchase

```
 1   records.  In the case of Bank of America, those
 2   records are scrubbed and updated routinely.  There is
 3   the national change of address database that the U.S.
 4   Postal Service maintains to update addresses when
 5   people move.  The bank for the ACAPS platform
 6   scrubs -- sends all of its addresses for its consumers
 7   on those home equity loans through the NCOA database
 8   on a daily basis.  For the Legacy Bank of America
 9   system, it was every six months that they updated the
10   addresses through the NCOA database; it's now every --
11   it's been every three months that they do that for the
12   last several months.  If any mail is returned
13   undeliverable when a statement of your mortgage or
14   home equity line is sent, the bank immediately follows
15   up with a telephone call to the individual to get
16   updated address information, and they are robust about
17   constantly updating those records.  They have a real
18   interest in getting their mortgage and home equity
19   loan payments on a timely basis.  So they start with a
20   great degree of reliability, and then we've gone
21   beyond that.  For any loans that were paid off as of
22   September 30, because we needed a date to administer,
23   we will have the records updated by comparing them to
24   our central customer repository, so if they were a
25   home equity loan customer who paid off that home
```

Page 82

1    equity loan in August but they have a checking

2    account, if they have a car loan, if they have a

3    credit card, if they have a student loan, that record

4    will be updated accordingly.  There is a significant

5    cost associated with that process.  And then we have

6    provided that for anyone who paid off -- more than

7    recently; more than six months ago, and for whom we do

8    not have an updated record in our customer database

9    elsewhere, we will submit all those records through

10   LexisNexis, the sort of skiptracing platinum standard

11   to get updated information.  It's very expensive to do

12   that.  We anticipate it will cost well over $100,000

13   just to do that step of the process, and all of that

14   together will form a class list that will be turned

15   over -- the time period is 14 days after the entry by

16   Judge Wilson of an order preliminarily approving the

17   class settlement.  That will be the most reliable set

18   of mailing addresses I can imagine.  We then will have

19   Rust Consulting, who Mr. Bennett accurately described

20   as the gold standard, I think he used, for settlement

21   administrators, send the entire class list back

22   through the National Change of Address database.

23   There is a cost associated with that, as well.  And

24   then Rust will send out a mailer.  And the mailer will

25   contain the class notice, which we've attached to the

Page 83

1   settlement agreement, the claim form, which we've

2   attached to the settlement agreement, and the class

3   notice contains an opt-out form.

4           I'd like, if I could, approach and hand Your

5   Honor two sample mailers so that you have in your hand

6   what it is we intend to send.

7           THE COURT:  All right.  Do you want to mark

8   those as exhibits?

9           MR. BENNETT:  Sure, yes, we would -- we join

10  in them, yes.  We have seen exactly the same thing --

11  or have exactly the same thing.

12          THE COURT:  All right.  Let's go ahead and

13  we'll mark them as Bank of America Exhibit 1.

14          MR. AGOGLIA:  If we could, maybe we could

15  mark them 1 and 2, Your Honor.  I'm going to

16  separately refer to them.  There are two of them.

17          THE COURT:  There are two of them?

18          All right.  Yeah, mark them as 1 and 2,

19  then.

20

21          (Plaintiff's Exhibits Nos. 1 and 2 were

22  received into evidence.)

23

24          MR. AGOGLIA:  So Your Honor, what has been

25  marked as Bank of America Exhibit 1 is an actual

Transcript of Proceedings
November 18, 2009

Page 84

1    mockup by Rust of the class notice opt-out form and

2    claim form that we intend to use in Domonoske, with

3    one resurrection.  The text is identical; the

4    formatting will be different.

5              I submit to you the Bank of America Exhibit

6    Number 2 so that you can see the actual mailer that

7    will go out will be somewhat differently.  Most

8    particularly, its fonts will be substantially larger

9    and easier to read.  The reason for the difference,

10   Your Honor, is just that it costs a great deal of

11   money to have it finally formatted and sent to the

12   printer, which is a final step the settlement

13   administrator will do once the notice -- formal notice

14   is approved, but I wanted to have in front of you that

15   mailer.  As you can see, it's multipage.  I think --

16   and Mr. Bennett can speak to this -- that the content

17   of our class note -- it's not only -- faithfully

18   discharges what are our obligations and the Court's

19   obligations under Rule 23 to inform class members

20   about the nature of the case, their rights to opt out,

21   their rights to object, the deadlines for doing so,

22   but it does so in a very user-friendly format, if

23   there can be something described as user-friendly

24   about a legal notice.

25              The class members will also have access to a

Page 85

1    Web site dedicated to the settlement on which all of
2    the claim forms, class notices, will reside.  The
3    complaint, important orders of the Court will be
4    posted there.  The class members can download claim
5    forms and they can, online, submit a request to opt
6    out.  They can online submit a claim form and they can
7    online, through their unique PIN number provided with
8    the mailer, see just how many qualifying transactions
9    they have within this class period.
10            Again, I think that now is the platinum
11   standard.  It used to be, 15, 20 years ago, you know,
12   there would be some publication in USA Today that
13   would be good business for USA Today and, frankly,
14   have a utility for professional objectors who trolled
15   for those notices but almost no utility for class
16   members.  We think this is a much better, much better
17   system.  There will also be a toll free number that
18   class members can call that will have information.
19            THE COURT:  Does that go straight to
20   Mr. Bennett's desk?
21            MR. BENNETT:  It doesn't, but I can promise
22   you that I will be happy to copy Bank of America's
23   counsel on all the many contacts we did get.
24            MR. AGOGLIA:  As long as he's willing to
25   make me a co-payee on that check at the end of the

1    day, I'm happy to be included on that list.

2          The class members will be able to update

3    their mailing address information on that, the toll

4    free number, they'll be able to ask for a copy of the

5    claim form or opt-out notice to be sent to them.

6    Again, I think it's belt and suspenders in terms of

7    best notice under the circumstances, which is the both

8    Rule 23 and due process standard we operate under

9    here.

10         So one of the things we asked for in the

11   proposed preliminary approval order, which is Exhibit

12   A to the settlement agreement, is for the Court to

13   find that that is consistent with the obligations

14   under Rule 23.  The details that I've described to

15   you, I think, are clearly spelled out in the terms of

16   the settlement agreement itself, and again, I do think

17   it is really the state of the art in terms of class

18   notice.  We -- the one thing I will alert the Court to

19   is we're sending it out through standard rate, that

20   mailer -- that type of -- goes out bulk rate, standard

21   rate.  The only difference between that and what

22   people commonly refer to as first class is, while the

23   post office goes ahead and forwards any forwarding

24   address that they have, they don't get undeliverables

25   back.  You don't get undeliverables back.  What we

Page 87

1   have done, however, is do everything you would do if

2   you got undeliverables on the front end in how we've

3   prepared the class list, including taking those for

4   whom we don't have a current updated address and

5   running them through the skiptracing database of

6   LexisNexis all in advance.  So again, I -- I would

7   submit that this is -- saves you a bunch of money on

8   the mailing.  The standard rate --

9             THE COURT:  Bulk rate versus the standard

10  rate?

11            MR. AGOGLIA:  Right.

12            Standard rate will save hundreds of

13  thousands of dollars, perhaps, on the mailing, but

14  what you get, frankly, is a form of mailer -- I don't

15  know if it's properly called a sixfold anymore, but

16  this form of mailer is far better than an envelope --

17  you know, it's -- you know, there are experts in the

18  country who are involved in mail processing who will

19  tell you that people are -- on an order of

20  magnitude -- more likely to open that mailer than they

21  are an envelope, say -- a legal notice that they have

22  that pulls out, one-by-14 -- or eight-and-a-half-by-14

23  notice out of an (inaudible) -- so I wanted to speak

24  to notice directly.  With that, Judge, I think I have

25  exhausted your patience and all I needed to --

Page 88

```
 1            THE COURT:  By no means.  What was Exhibit

 2   2?  Is that from another --

 3            MR. AGOGLIA:  I'm sorry, I should have told

 4   you.  Yes, Rust has provided that to us as an example,

 5   one from another class settlement of what the font

 6   size -- and there won't be staples.  As you can see in

 7   Exhibit 2 as opposed to Exhibit 1, there is a

 8   peel-back, you know, closure at the top.

 9            THE COURT:  I understand.  That is from

10   another settlement and it's just an example of what

11   the finished product is going to look like with the

12   font.

13            MR. AGOGLIA:  Out ambition here is to obtain

14   an order from, I believe, Judge Wilson, also --

15            THE COURT REPORTER:  Excuse me.  I'm sorry.

16   I'm having some technical difficulties.  Can we go off

17   the record for a minute?

18            THE COURT:  All right.

19

20            (Off the record.)

21

22            THE COURT:  All right.  We're back on the

23   record.

24            MR. AGOGLIA:  So Your Honor, I'll start --

25   if you'll let me, I'll just quickly outline what I
```

Page 89

1   think the operative deadlines should be.  I've

2   reviewed these in advance with Mr. Bennett and I think

3   we are in agreement in terms of these timeframes.

4            The fairness hearing should be set 120 days

5   after entry of the preliminary approval order, and

6   that is in substantial part because this administrator

7   will have 30 days to send the mailing out after

8   preliminary approval.  We would then ask that the

9   deadline for class members to opt out be set 40 days

10  in advance of that fairness hearing, that filing of

11  objections and accompanying briefs to the settlement

12  occur 30 days in advance of the fairness hearing, that

13  any responses by the parties to objectors be filed at

14  least 14 days in advance of the fairness hearing.  And

15  we have discussed, this may be altered somewhat in

16  light of today's proceeding, but that the formal

17  motion for final approval of fees, costs and the

18  (inaudible) incentive award be submitted at least 14

19  days in advance of the fairness hearing.

20            THE COURT:  Okay.  Let's just go through --

21  and what I'm looking at, Exhibit A, you've given me

22  these numbers.

23            MR. AGOGLIA:  And I can -- if I can walk you

24  through where I think they should go.

25            THE COURT:  Yes, sir.

 1              MR. AGOGLIA:  On page one of the proposed
 2     preliminary approval order, Exhibit A, the settlement
 3     agreement, the opening paragraph, (inaudible) is
 4     simply left blank.  September 30, 2009 in that opening
 5     paragraph space, that's when the agreement was
 6     executed.  The next date is on page three, paragraph
 7     eight, that a proposed -- proposed preliminary
 8     approval order, and it provides a trigger, again, for
 9     the preparation of class list and the sending of the
10     class notice by either the preliminary approval date
11     or such other date if the Court wanted to set a later
12     date.  Frankly, I think we could eliminate that
13     altogether, and if the Court wishes, I think after
14     this proceeding today, we can submit an amended
15     proposed preliminary approval order with these planned
16     periods bracketed just so you have it, but I think we
17     can do without that date.  The next date is on page
18     four, paragraph 10, and that is the deadline to
19     postmark requests to opt out of the class.
20              THE COURT:  That's the 40 days?
21              MR. AGOGLIA:  40 days, correct.
22              Moving to page five, paragraph 11, that's
23     the setting of the fairness hearing.  We would --
24              THE COURT:  Here you're suggesting 120 days?
25              MR. AGOGLIA:  120 days, and the reason for

 1    that, Judge, is so that --

 2              THE COURT:  Is to get it all done?

 3              MR. AGOGLIA:  Right.

 4              And so you'd have 30 days to mail and that

 5    they'd have, you know, 50 days to consider opt out, 60

 6    days to object, that sort of thing.  Those are pretty

 7    conventional timeframes.

 8              MR. BENNETT:  And, in fact, now, with the

 9    Class Action Fairness Act, I'm sure -- certain Your

10    Honor is familiar with it, there is automatically a

11    built-in period of at least 90 days notice that has to

12    be sent out to the Attorneys General and --

13              MR. AGOGLIA:  Paragraph 12, this is the

14    deadline for briefs.

15              THE COURT:  That would be 30 days?

16              MR. AGOGLIA:  30 days, objections.  And --

17    that's paragraph 13, page six.

18              THE COURT:  That's right.  Okay.  I've got

19    it.

20              If you want to send me a -- just file an

21    amended with the suggested dates in it, that would be

22    helpful, as well.

23              Now, let me ask you -- and this was alluded

24    to, and the Court has to find this.  Mr. Bennett

25    talked about it earlier, this being a very -- a very

Page 92

 1   aggressively and toughly litigated and negotiated

 2   settlement.  Do you believe there is any aspect at all

 3   of this case, Mr. Agoglia, of collusion to the

 4   detriment of class members whatsoever?

 5          MR. AGOGLIA:  No, and I would fully endorse

 6   his representation that this was fought tooth and nail

 7   on things that started with the disclosures of

 8   insurance policies and the initial disclosure that we

 9   started to hear to umbrella protective orders.  There

10   wasn't, I don't think, a single issue that wasn't

11   litigated.  I set many career firsts in terms of the

12   number of issues that were litigated, and I will

13   represent, as well, that this was a completely arm's

14   length -- a tough negotiation overseen in substantial

15   part by retired Judge Edward Infante, who, although

16   expensive and distant and ultimately not able to

17   deliver what this Court might have been able to

18   deliver had we been before you, considered to be a

19   mediator of unimpeached integrity, so that I can

20   represent to you unqualifiedly.

21          THE COURT:  And, you know, the Court -- this

22   order also requires a finding that the settlement is

23   preliminarily approved is fair, reasonable, adequate

24   in light of the relevant and factual and practical and

25   procedural considerations of the action, and I take it

Page 93

1    you would fully endorse that.

2              MR. AGOGLIA:  I would, Your Honor.

3              THE COURT:  As did Mr. Bennett.

4              All right.  And for the reasons we talked

5    about earlier?

6              MR. AGOGLIA:  Correct.

7              THE COURT:  Because I was trying to figure

8    out why you settled this case, but I'm -- and I

9    appreciate you telling me.

10             MR. AGOGLIA:  You know, Your Honor, and I

11   said this to Mr. Bennett a couple of times, I would

12   loved to have tried this case.  You do, however, have

13   to answer the question posed by good clients, Are you

14   willing to risk having your tombstone read, Here lies

15   the person who lost the $3.5 million case that was

16   supposed to be a slam dunk?  I would have loved

17   personally to have tried this.  I have tried to

18   articulate for you why with a $3.5 billion potential

19   exposure this is a rational economic settlement from

20   the bank's perspective.  That doesn't mean it does not

21   stick in my craw.

22             THE COURT:  Well, if you weren't -- if it

23   didn't stick in your craw, you wouldn't be good at

24   what you do, because that's just -- that's just the

25   way it is, you know?  There are many times -- and I'm

Page 94

1    sure that Mr. Bennett would have loved to try to get

2    3.5 billion in damages, too, you know.  I mean,

3    settlements are what they are.  Lots of times, the

4    folks on both sides are unhappy.  I've mediated 400

5    cases myself, or in that neighborhood.  Lots of times,

6    folks are unhappy, but at the end of the day, I

7    believe it's a -- a settlement in general has

8    significant advantages in terms of resolution of

9    disputes, finality and -- and in terms of eliminating

10   the highs and the lows.

11          MR. AGOGLIA:  And I would say that that

12   assessment of the strength of the defense here at this

13   juncture leaves me to say I think this is a great deal

14   for the class members.  I think it's abundantly fair,

15   reasonable and adequate, because, as you must, you

16   have to consider what their walkaway alternative is,

17   and I think the prospects of them coming through this

18   with a recovery, which, as you know, is almost

19   entirely bound up on proving a willful violation

20   claim, was, at best, a long shot.

21          THE COURT:  Do you have any idea what your

22   fees are to date?

23          MR. AGOGLIA:  My fees are to date?

24          THE COURT:  I mean, just ballpark.

25          MR. AGOGLIA:  I do not.  If the Court wants

Transcript of Proceedings
November 18, 2009

Page 95

1    us to submit something in connection with your

2    consideration of fees --

3            THE COURT:  And that's pretty typical.  I

4    mean, at least I -- I would be curious to know how

5    they compare.  And I'm more interested from your

6    standpoint of a total.

7            MR. AGOGLIA:  Understood.

8            THE COURT:  Total fees to date by -- and if

9    you could get that by the 17th of December.

10           MR. AGOGLIA:  We will submit it.

11           MR. BENNETT:  We would agree if the Court

12   would permit it to be in camera.  We don't have an

13   objection to that, you know, whatever, if that's --

14           MR. AGOGLIA:  There is some sensitivity to

15   that, but I understand the Court may want to publish

16   that in its report and findings.  I understand.

17           THE COURT:  I don't have -- I don't see any

18   reason why, given the amount at stake here, that you

19   ought to be -- a $3.5 billion potential recovery that

20   you ought to be the least bit concerned about what the

21   total amount of your fees are, and if you want to

22   submit a request to have it considered in camera, you

23   can do that, and I'll decide what I want to do with

24   it.

25           MR. AGOGLIA:  Understood, Your Honor.

Transcript of Proceedings
November 18, 2009

1           THE COURT:  Gentlemen, anything else you'd
2    like to say?
3           Let me just ask you some of the same
4    questions I just asked Mr. Agoglia.
5           From your standpoint, officer of the court,
6    and this is kind of an offshoot of the question that I
7    asked earlier, but just in looking at the order that
8    you have provided, have you got any suggestion, any
9    respect from anybody associated with this case that
10   there is any collusion to the detriment of class
11   members?
12          MR. BENNETT:  Absolutely not, Judge.  There
13   has not been any at all.  The -- I think that you can
14   see that we're -- we both are advocating the
15   settlement.  We both are not -- but that we didn't
16   script this hearing today, and I would suggest that
17   each of the items that Mr. Agoglia went through,
18   notice, the language in the claims form, the
19   injunction, the mailing method, all of it was
20   negotiated point by point by point.  It was all -- I
21   don't want to say contentious because that seems as if
22   we were -- we weren't getting along.  We weren't
23   necessarily drinking friends, but we were -- we were
24   professional in our dealings with one another and
25   various team members, but we had to negotiate each of

Page 97

1    these elements and each of these items, and I --

2    certainly, whatever Bank of America --

3           THE COURT:  I know I could never get you to

4    stick to a deadline.

5           MR. BENNETT:  Well, Judge, it was -- the

6    reason -- we were not simply snoozing.  We were -- we

7    would negotiate even to the eve of our

8    end-of-the-month deadline to get the documents in.

9    One reason that Your Honor has -- you know, with Rust,

10   we had to get -- involve multiple third parties in

11   determining even cost structures and the renegotiation

12   of the dollar amounts was realizing the savings.  I

13   would also suggest, Judge, in terms of, you know,

14   value produced that all these things -- all of these

15   changes increase the quality of the notice, the

16   quality of the process.  I think it is as strong as

17   any process that I have seen, observed or pitched

18   for -- from the ease of submitting the claim, either

19   in paper, on the computer, there is no test -- sign

20   this under penalty of perjury, there is no, you know,

21   Tell me the date of your mortgage and three secret

22   facts only you would know.  There is none of these

23   impediments.  I think that in truth, Mr. Agoglia has

24   been a fair negotiator, and a number of his concerns

25   were as to the effectiveness of the process, that is,

 1   we didn't face -- and though we faced the negotiating

 2   opponent, we didn't face an individual who was

 3   attempting to obstruct or act in a way that might be

 4   improper.  He obviously was negotiating for his

 5   client, but once we both were committed to making sure

 6   the notice informed the class, we both negotiated

 7   well.  There is nothing about this, though, that I

 8   would say could be construed as collusion.

 9           THE COURT:  Mr. Agoglia characterized this

10   as the gold standard, the best class notice he's ever

11   seen, and I take that -- do you agree with that?

12           MR. BENNETT:  I agree with that.

13           THE COURT:  And therefore designed to get

14   the most people from the class to opt -- to

15   participate.

16           MR. BENNETT:  Absolutely, and --

17           THE COURT:  Because none of this works if

18   five -- if five percent opt out, none of this works.

19   This settlement goes away.  Or no, the bank has the

20   ability to pull the plug on it.  The bank can make

21   that judgment, correct, Mr. Agoglia?

22           MR. AGOGLIA:  That's absolutely correct.

23           MR. BENNETT:  If five percent of the class,

24   though, expresses to this consumer advocate that

25   they're not satisfied -- they think it's a failed

 1   result, it's not successful.  I mean, however we

 2   measure success, from my own success measure, that's

 3   not successful.  Our attempt here is to get as much

 4   money as we can negotiate into the hands of these

 5   class members.  That's the objective.

 6              THE COURT:  And Mr. Agoglia says this is a

 7   great deal for the class members, it's abundantly fair

 8   to them and the prospect of recovery for them if they

 9   had to prove willfulness was, at best, a long shot; do

10   you agree with that?

11              MR. BENNETT:  I agree that it was -- that

12   the settlement is in proportion to the merits

13   assessment that we have.  I think I'm good at what I

14   do, hopefully, Your Honor, but that we were able to

15   negotiate that this value, in significant part, I

16   think, because the discovery work that was done, and

17   that -- we had arguments.  I mean, it's -- it's a

18   delicate position to be here.  I don't want to argue

19   that we filed a frivolous case.  This was a case

20   which -- that had merit, which we believe would

21   survive summary judgment, but on the other hand, I

22   agree that there are significant unknowns and

23   challenges and impediments that would have kept these

24   folks from recovery.

25              I think a critical question in any class

Transcript of Proceedings
November 18, 2009

Page 100

1    action, Your Honor, is how have class members

2    themselves acted independent to the lawsuit.  In this

3    circumstance, these lawsuits both were filed in 2008.

4    The statute would go back, you know, about two years

5    before that, and to my knowledge, no class member has

6    filed their own action independently.  There are no

7    individual actions.  So absent our -- I mean, for no

8    other reason than tolling the statute during the --

9    for this period of time to preserve these claims, but

10   for the filing of this case, none of the class members

11   really would have any claims at all.  The procedures

12   were changed in September of 2008.  None of these

13   class members, had they not -- this not been for the

14   class, would have a claim within the statute of

15   limitations, and certainly, they haven't filed,

16   probably, in part, because it's -- the value of the

17   case, even were liability a slam dunk, it's

18   challenging to find consumer advocates to take these

19   cases or lawyers to take these cases, and also, in

20   part, that a lot of folks don't know about these

21   rights.  One of the benefits of sending 3 million

22   people a detailed explanation of their rights and

23   access to the Web site (inaudible) it's a good thing

24   and I'm sure that Bank of America would support an

25   informed -- you know, this is not one of the less

Page 101

1   reputable lenders out there, would support an informed

2   consumer body.  But again, I think it's a fantastic

3   result.

4              THE COURT:  Let me ask you a question, and

5   it may -- it has no bearing on this issue, but I'll

6   ask it anyway:  Have you got other similar lawsuits

7   pending against other lenders?

8              MR. BENNETT:  We have -- we have -- had one

9   other case against a company called Downey Savings and

10  Loan that was taken over by the FDIC, and we settled

11  that case on unrelated claims.  There was --

12             THE COURT:  On a class basis?

13             MR. BENNETT:  No, an individual case.  There

14  were -- we had a separate Truth in Lending Act --

15             THE COURT:  Are you aware of any similar

16  class cases pending under this statute against other

17  lenders elsewhere in the U.S.?

18             MR. BENNETT:  I'm not, and I think, you

19  know --

20             THE COURT:  Mr. Agoglia, are you aware of

21  any?

22             MR. AGOGLIA:  Other than the Downey case,

23  which counsel has spoken to; otherwise, no, I'm not.

24             MR. BENNETT:  But there aren't that many of

25  us that do this, so I think I would have a pretty

 1   good --

 2             THE COURT:  There are a lot of lawyers out

 3   there, though, Mr. Bennett.

 4             MR. BENNETT:  There are, but there aren't

 5   that many foolish lawyers that start off taking

 6   Automobile Repair Facility Act cases in General

 7   District Court in Newport News and try to learn how to

 8   make a living off it.  There aren't that many consumer

 9   advocates.  There are fewer still that have been

10   qualified for class action litigation.

11             THE COURT:  All right.  Anything else that

12   either side wants to say?

13             I -- let me ask you gentlemen this, one

14   other question:  What makes sense to you in terms

15   of -- is there any particular timing that you need

16   from the Court, in terms of the -- I mean, do you need

17   me to do this within 10 days?  30 days?  60 days?  Are

18   there any things that I'm not aware of that might pose

19   some problems or issues or concerns?

20             MR. BENNETT:  There are two issues, and this

21   is what discussing -- trying to balance our scheduling

22   of this today with Mr. Cupp not here, as well as --

23             THE COURT:  Well, that certainly --

24             MR. BENNETT:  -- filing of attorneys' fees.

25             THE COURT:  That's part of the reason why I

Transcript of Proceedings
November 18, 2009

 1   asked the question.

 2             MR. BENNETT:  Yes, sir.

 3             Two things.  The first is just the time

 4   value of money.

 5             THE COURT:  Interest is huge.

 6             MR. BENNETT:  Yes, sir.

 7             But the second is, the longer you go through

 8   a class action process, the more difficult it becomes

 9   to guarantee you're going to reach every class member

10   because addresses can change.  We used the September

11   of '09 date for the scrub process.  To the extent that

12   we have approval within a timeframe that Your Honor

13   would probably render a decision anyway, that's

14   probably moot, but certainly, if we waited until March

15   or February, that's -- you're increasing by three or

16   four months the individuals that we have to rely

17   simply on skiptraces or NCOA for.

18             THE COURT:  Okay.  So it really bears on the

19   quality of the database, because that's -- that was

20   sort of triggered at the end of September.

21             MR. AGOGLIA:  The -- that's right.

22   September was the date on which we took a snapshot of

23   who had paid off and then who would be sent through

24   this additional updating protocol and looking at

25   central repository and then updating with LexisNexis,

Transcript of Proceedings
November 18, 2009

1    so that is a date out there.  I would say, however,

2    that the sort of class periods and well before that,

3    it -- you know, both on the ACAPS system and the

4    Legacy system, because the systems changed to this new

5    (inaudible) very soon, protocol, but other than what

6    Mr. Bennett said, I'm not aware of any other external

7    drivers of deadlines.

8              THE COURT:  The system that Bank of America

9    uses now, is that consistent with the system that's

10   set forth in the injunctive relief in this --

11             MR. AGOGLIA:  It's exactly one and the same.

12             THE COURT:  And does it already exist?

13             MR. AGOGLIA:  Yes.

14             THE COURT:  It's already working?

15             MR. AGOGLIA:  We have already instituted

16   that, so --

17             THE COURT:  ACAPS and Legacy are gone?

18             MR. AGOGLIA:  Actually, ACAPS still exists.

19   Legacy has been reduced from collection three to one

20   system, and those are described in Marti Smith's

21   declaration, and the timing, how they do it is

22   described, I think, at least in terms that will allow

23   you to familiarize yourself, but there is still an

24   ACAPS system.  That is what is being used to originate

25   home equity loans and home equity lines of credit, and

 1   there is still a Legacy system.  The real functional

 2   difference between the two is with the Legacy system,

 3   they use an outside vendor to mail, and for the ACAPS,

 4   for historical reasons and system compatibility

 5   issues, they use their own internal mail processing

 6   facility up in Massachusetts.

 7           THE COURT:  But in terms of the notice, it's

 8   being done consistent with the injunction being set

 9   forth and the settlement?

10           MR. AGOGLIA:  It is, Your Honor.

11           THE COURT:  All right.  Mr. Agoglia,

12   anything else further from you?

13           MR. AGOGLIA:  No.  The one thing I would say

14   is to the extent that the -- if the Court were to

15   enter a preliminary approval order close to the

16   holiday, it would complicate the administration issue,

17   so if the Court -- frankly, if the Court is going to

18   consider it, I would -- for files this size, I would

19   much prefer for them to transfer early January or mid

20   December rather than late December, because you can

21   really run into some serious problems with 2.2 million

22   transaction records if you don't have your best people

23   working on it.

24           THE COURT:  All right.  Fair enough.  I

25   appreciate that.

Transcript of Proceedings
November 18, 2009

```
 1            All right.  Anything else from the
 2   plaintiff?
 3            MR. BENNETT:  No, sir.  Thank you.
 4            THE COURT:  Gentlemen, thank you.  I
 5   appreciate a great deal the way in which we've been
 6   able to have a dialogue about these issues and the
 7   concerns that -- or at least the questions that I had;
 8   not necessarily concerns.  If there is anything else
 9   that occurs to you in the next few days, if you want
10   to send me anything else in writing, please feel free
11   to do that.  I will look at it, and I'll try to turn
12   this around just as soon as I can.  I've got lots of
13   stuff going on, as you can imagine, but I will do that
14   just as soon as I can, mindful of what you said,
15   Mr. Agoglia, about the -- what you have to do and
16   mindful about the interest, mindful about the accuracy
17   of the database and mindful about the holidays.  I'll
18   turn this around as soon as I can.
19            MR. AGOGLIA:  We appreciate you taking the
20   amount of time you've taken with the parties.
21            THE COURT:  All right.
22            MR. BENNETT:  Thank you, Your Honor.
23            THE COURT:  Thank you all very much.
24
25            (Proceedings concluded at 1:52 p.m.)
```

Transcript of Proceedings
November 18, 2009

Page 107

1                   CERTIFICATE OF COURT REPORTER

2

3

4              I, L. Michelle Flanary, do hereby certify

5    that I recorded verbatim the proceedings in the United

6    States District Court for the Western District of

7    Virginia, Harrisonburg Division in the captioned

8    cause, heard by The Honorable Michael F. Urbanski,

9    Judge of said Court, on November 18, 2009.

10             I further certify that the foregoing pages,

11   numbering 1 through 107 inclusive, constitute a true,

12   accurate and complete transcript of said proceedings.

13             Given under my hand this 9th day of

14   December, 2009.

15

16

17

18                            _____

19                            L. Michelle Flanary

20

21

22

23

24

25

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

**A**

**ability** 22:5
98:20
**able** 22:16 26:9
27:4 28:14
37:16 76:23
86:2,4 92:16
92:17 99:14
106:6
**absent** 100:7
**absolutely** 6:11
9:24 10:5 12:7
30:11 34:25
40:20 71:17
73:11 96:12
98:16,22
**absorb** 18:9
**abundantly**
49:21,24
67:24 94:14
99:7
**abuse** 27:12
**ACAPS** 6:24
7:3,10,12
19:21 29:9
30:14 51:24
53:21 62:19
81:5 104:3,17
104:18,24
105:3
**accept** 35:19
62:23 80:5
**acceptance**
12:21
**access** 30:5
84:25 100:23
**accessed** 21:23
**accommodate**
14:10
**accommodati...**
5:3 14:12
**accompanying**
89:11
**account** 59:3

80:25 82:2
**accounted**
63:18
**accuracy** 27:4
106:16
**accurate** 55:19
80:19 107:12
**accurately** 58:4
67:20 82:19
**accusation**
67:16
**acronym** 6:5
**act** 6:4,6 7:20
16:22 21:10
21:19 23:5,6
23:11 33:6
49:14 59:19
59:20 60:13
65:4 91:9 98:3
101:14 102:6
**acted** 69:22
100:2
**action** 1:8 4:5
5:5 21:9 24:14
27:11,12
28:19,25
36:11 41:25
66:25 91:9
92:25 100:1,6
102:10 103:8
**actions** 9:16
11:17 27:3,8
31:11 49:19
73:4 80:18
100:7
**active** 36:9
74:23
**actively** 69:3,9
**actual** 20:4,11
20:15,18,21
20:23 21:7,19
21:25 22:1,2,4
26:8 32:8,15
32:21 33:9
42:16,17 43:8

43:9,15 54:4
54:14,15,16
57:4 63:4
64:16,22 66:9
66:12,21 67:3
68:3 83:25
84:6
**add** 19:16 58:25
76:13 78:12
**added** 19:7
**addition** 17:17
17:18 19:9
33:16 43:4
**additional** 7:23
8:3 11:3 15:12
16:9,18 17:1,8
22:22 29:19
44:25 58:3
59:1 76:25
103:24
**address** 57:24
58:1,1,5 80:19
81:3,16 82:22
86:3,24 87:4
**addresses** 59:4
78:16 81:4,6
81:10 82:18
103:10
**adequacies**
15:7
**adequate** 92:23
94:15
**adequately**
70:3
**administer**
17:21 81:22
**administered**
18:5
**administration**
17:15 18:12
44:23 105:16
**administrative**
18:7
**administrator**
84:13 89:6

**administrators**
82:21
**adopted** 24:12
**advance** 80:11
87:6 89:2,10
89:12,14,19
**advanced** 35:7
**advantage**
55:17
**advantages**
44:20 94:8
**advice** 15:6
**advocacy** 72:3
72:7
**advocate** 33:8
72:2 75:8
98:24
**advocates**
26:12 27:10
72:13 100:18
102:9
**advocating**
96:14
**affect** 56:18
**affidavit** 12:9
39:4
**affidavits** 38:4
41:18 68:23
**affirmatively**
16:22
**agencies** 61:16
**agency** 61:22
**aggressively**
92:1
**ago** 82:7 85:11
**Agoglia** 3:4
10:6 13:3,4,7
13:13,16,24
14:5,11 29:10
30:7 35:2
48:21,22 49:3
49:7,12,25
50:3,5,12,15
50:19 51:3,9
51:12,23

52:16,19 53:4
53:8,13,25
54:4,7,19 55:2
55:4,13,23
56:1,9 58:13
59:8 60:23
61:1,7,14 63:9
64:3 65:11,14
67:5 68:13,16
68:18,22 69:2
69:11 70:1,5
70:13,16,22
72:23 74:10
78:23,25 79:6
79:10,20,25
80:7,14 83:14
83:24 85:24
87:11 88:3,13
88:24 89:23
90:1,21,25
91:3,13,16
92:3,5 93:2,6
93:10 94:11
94:23,25 95:7
95:10,14,25
96:4,17 97:23
98:9,21,22
99:6 101:20
101:22 103:21
104:11,13,15
104:18 105:10
105:11,13
106:15,19
**agree** 66:17
77:10 95:11
98:11,12
99:10,11,22
**agreed** 12:4
14:13 52:12
63:22 79:22
**agreeing** 70:2
**agreement**
13:11 31:15
41:2 63:19
70:2 77:12

83:1,2 86:12
86:16 89:3
90:3,5
**ahead** 5:19 19:8
29:18 31:8
55:16 67:18
78:20 83:12
86:23
**airplane** 14:8
**alert** 86:18
**alerts** 57:3
**Alexandria**
2:16
**allege** 6:2 20:18
20:21 31:20
**alleged** 21:22
46:12
**allow** 14:14
62:6 104:22
**allowed** 41:2
59:2,3
**allowing** 62:2
**allows** 26:14
**alluded** 54:10
59:15 91:23
**alluding** 67:13
**altered** 63:16
89:15
**alternative**
59:14,15
94:16
**altogether**
90:13
**ambition** 12:12
88:13
**amended** 90:14
91:21
**amendments**
6:6
**America** 1:10
4:3 5:6,9,22
5:24 6:19 7:17
8:14 12:13,19
12:22 13:5
23:15 25:12

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

31:20 45:4,9
48:23 49:23
49:25 50:3
62:5,14,20
67:12 69:12
72:5 79:2 81:1
81:8 83:13,25
84:5 97:2
100:24 104:8
**America's**
85:22
**amicable** 9:20
**amount** 10:3
19:5 20:3 24:1
24:18 26:1
77:11 95:18
95:21 106:20
**amounts** 47:21
97:12
**analogous**
58:16
**analysis** 15:3
21:20,24
24:11 30:9
56:14
**and-a-half**
58:22
**annihilate** 24:3
**annihilating**
64:10
**annihilation**
24:5
**anomalous** 53:9
**answer** 10:25
11:20 26:15
35:24 36:23
93:13
**answered** 40:17
**ANTHONY** 2:4
**anticipate**
82:12
**anybody** 14:7
96:9
**anymore** 87:15
**anyway** 5:2

77:18 78:20
101:6 103:13
**apologize** 13:3
68:7 70:20
**apparently**
42:23
**appeal** 18:4
**appear** 9:17
36:4 68:25
69:3,8 76:14
**appearance**
4:20 5:4
**application**
7:22 52:4
53:14,22 57:1
57:17 60:1
**applications**
45:5
**applied** 27:23
27:24 46:4,6
54:9 58:21
69:11
**applies** 28:7
46:20
**apply** 24:15
**applying** 57:25
**appraisal** 53:16
**appreciate** 14:2
14:15 38:12
49:8 93:9
105:25 106:5
106:19
**appreciation**
20:5,5
**apprehending**
50:7
**approach** 51:15
83:4
**approaches**
63:2
**appropriate**
42:8,10,13,19
**appropriately**
24:15 69:22
**approval** 4:5

10:14 11:2,6
11:11 21:9
26:5 33:3
39:25 40:18
40:19 74:9
77:10 80:9,10
86:11 89:5,8
89:17 90:2,8
90:10,15
103:12 105:15
**approve** 9:23
38:14 39:22
41:1,10 42:4
49:11 60:10
66:22
**approved** 18:11
40:25 41:7
42:14,15 48:4
52:11 69:19
84:14 92:23
**approves** 11:10
41:11 78:12
**approving**
38:10,11,15
40:20 60:10
82:16
**approximately**
16:23 17:8
29:13 35:9
60:17
**argue** 15:14
26:21,22
28:19 43:17
64:5,5 99:18
**argument** 7:13
7:15,16 8:5
9:9 22:24 23:3
24:17 29:2
30:8,12 42:25
44:5 47:2
56:15 59:23
61:8 65:17
**arguments**
23:12 25:16
64:8 99:17

**arm's** 92:13
**arrived** 54:13
**art** 86:17
**articulate** 32:17
93:18
**aside** 14:14,18
**asked** 25:3 34:2
34:14 86:10
96:4,7 103:1
**askew** 70:21
**asking** 8:9,13
10:19 11:23
11:25 16:17
17:11 26:4
34:24 35:21
36:20 39:21
39:25 40:14
41:10 48:5
**aspect** 8:17
10:3,15 36:18
92:2
**assessment**
47:24 64:15
94:12 99:13
**associated** 82:5
82:23 96:9
**Associates** 2:5
2:14 4:14
**association**
27:10 71:6
**assume** 20:3
46:4
**as-soon-as-re...**
7:25
**attached** 82:25
83:2
**attempt** 99:3
**attempting**
37:11 98:3
**attention** 16:5
**attorneys** 15:15
16:13,13 17:7
18:14,22 19:2
19:6 33:21
34:11 35:6

36:17,18 37:4
38:16,25 39:1
40:2 41:12,13
70:9 76:15,20
77:9 79:19,21
91:12 102:24
**attraction**
71:19
**August** 82:1
**authority** 58:9
**automated**
59:12
**automatically**
62:9 91:10
**Automobile**
102:6
**available** 14:21
31:19 43:2
55:18
**average** 52:3,8
52:9
**award** 24:18
36:7 89:18
**awarded** 24:1
**aware** 101:15
101:20 102:18
104:6
**awful** 38:17,20
38:23,25
**awhile** 54:21
**a.m** 1:17

**B**
**B** 27:16 31:14
68:20
**back** 10:24 16:2
23:20 59:18
82:21 86:25
86:25 88:22
100:4
**background**
10:7 15:12
31:18 33:24
47:19 77:6
**balance** 102:21

**ballpark** 94:24
**bank** 1:10 4:3
5:6,9,22,23
6:19 7:16 8:14
12:13,19,22
13:5 23:15
25:11 30:22
31:20 43:22
45:4,9 48:17
48:22,25
49:23,25 50:3
54:15 55:10
56:2,20 57:18
62:5,14,20
67:12 69:12
72:5 79:2 81:1
81:5,8,14
83:13,25 84:5
85:22 97:2
98:19,20
100:24 104:8
**bank's** 50:15,24
53:4 93:20
**barcode** 52:23
**based** 4:17 6:17
16:3,19 40:22
59:10 66:24
67:1
**bases** 9:14
**basic** 26:11
**basically** 8:23
**basis** 12:6 21:19
43:13,14
49:11 62:25
66:1,7,22
67:14 81:8,19
101:12
**bearing** 101:5
**bears** 103:18
**beginning**
19:13
**begs** 63:23
**behalf** 1:6 2:3
3:3 13:4 39:15
48:22

Transcript of Proceedings
November 18, 2009

**believe** 8:14 9:5
13:8,9 32:7
33:3 79:4,6,20
88:14 92:2
94:7 99:20
**believed** 7:25
**believes** 69:9
**belt** 86:6
**benefit** 34:17
44:25 56:22
63:17 65:22
**benefited** 42:6
**benefiting**
32:13
**benefits** 11:18
62:1 66:13
100:21
**Bennett** 2:4 4:9
4:11,12,16,25
5:2,14,16,18
5:20 6:8,11,24
7:2,8,11,15
8:8,12,18,22
9:4,7,13,24
10:5,16,23
11:8,13,15,18
12:7 13:2,16
14:3,12,18,24
15:19,22 16:1
16:7,9 17:13
17:16,18,23
17:25 18:13
18:16,18,21
18:24 19:1,4,9
20:1,13,18,21
20:25 21:14
21:16 22:7,9
22:12,14,21
23:10,16,19
23:25 24:7
25:6,20,23
26:25 27:25
28:2,10,21
29:1,3,10,19
29:23 30:3,9

30:11,24 31:6
31:9 32:5,23
33:14,19,22
34:3,8,12,19
34:23,25
35:13,15,23
36:14,21,24
37:5,22 38:6,9
38:19,21,24
39:7,10,13,19
39:23 40:6,7
40:12,16 41:5
41:20 42:9,20
43:8,10,13,17
43:24 44:6,8
44:11,14,18
45:13,16,20
45:25 46:8,11
46:15,19,23
46:25 47:9,10
47:16,18 48:6
48:15,18
54:10 59:15
62:17 64:25
66:17 69:16
70:13,23 71:1
71:10,14,17
71:22 72:11
72:18 73:11
73:15,19,21
74:1,3,6,15,20
75:1,6,15 76:7
76:9 77:20
78:2,10,22
82:19 83:9
84:16 85:21
89:2 91:8,24
93:3,11 94:1
95:11 96:12
97:5 98:12,16
98:23 99:11
101:8,13,18
101:24 102:3
102:4,20,24
103:2,6 104:6

106:3,22
**Bennett's** 85:20
**best** 25:11
27:13 86:7
94:20 98:10
99:9 105:22
**better** 14:4
19:11 34:6,12
49:6 51:14
55:9 69:6
85:16,16
87:16
**beyond** 81:21
**big** 22:10 23:18
**billing** 39:4
**billion** 93:18
94:2 95:19
**billions** 49:15
**bit** 16:5 57:10
95:20
**blank** 90:4
**board** 27:9
71:10,12
**body** 61:18 65:4
101:2
**bono** 47:21
**borrowed**
58:16
**borrowers** 72:9
**bother** 66:16
**bought** 54:9
**Boulevard** 2:6
**bound** 94:19
**bracketed**
90:16
**briefs** 89:11
91:14
**bring** 28:23
**broader** 37:6
**brought** 28:24
49:20
**bucks** 67:22
73:9 76:10
**built-in** 91:11
**bulk** 70:7 86:20

87:9
**bumped** 17:2
**bunch** 4:23
87:7
**burden** 19:24
20:2 39:21
**business** 8:19
8:24 85:13
**buy** 20:7
**buying** 20:9
**B3** 79:15

## C

**C** 2:1 3:1 4:1
**CA** 3:7
**Cadillac** 18:6
**calculating**
49:16
**California**
58:15
**call** 4:21 81:15
85:18
**called** 6:22
87:15 101:9
**camera** 95:12
95:22
**cap** 23:11
**capped** 23:6
70:9
**captioned**
107:7
**car** 82:2
**card** 82:3
**care** 26:5 66:16
**cared** 27:17
**career** 92:11
**cart** 40:10,13
**case** 4:2 5:23
11:17 18:1
19:14 21:3,8
21:21 22:11
22:15,17,23
25:8 26:19
28:20,24 29:4
32:22 35:3,6,7

36:12 37:1,13
38:5 39:5
40:22 41:4,5,9
41:9 42:18
43:15 47:14
48:9 49:17,20
50:6,14 52:15
53:12 58:24
58:25 63:20
64:10 65:10
71:8 75:4 79:9
81:1 84:20
92:3 93:8,12
93:15 96:9
99:19,19
100:10,17
101:9,11,13
101:22
**cases** 5:10,21
9:18 24:21
27:3 29:7 36:4
37:19 41:1,3
48:11,13
54:19 75:12
77:4 94:5
100:19,19
101:16 102:6
**catchall** 76:12
**category** 52:20
**causation** 21:1
21:7 26:9
54:11
**cause** 107:8
**causes** 72:6
**caveat** 45:6
**ceases** 23:15
**cell** 80:24
**center** 52:21
53:5 70:23
71:13,19
73:23
**central** 81:24
103:25
**certain** 8:15
32:8 35:1

50:20 58:19
91:9
**certainly** 9:18
12:15 19:11
22:1 27:8
33:10 41:17
44:24 56:15
61:21 63:19
75:17 97:2
100:15 102:23
103:14
**certifiable** 63:8
63:10 64:1,7
65:13 79:5
**CERTIFICA...**
107:1
**certification**
18:4 63:24
65:15
**certify** 65:3,10
107:4,10
**certifying** 67:7
**challenge** 19:16
21:6 32:15,19
64:13
**challenges**
99:23
**challenging**
100:18
**change** 16:11
18:11 30:21
35:10 56:18
81:3 82:22
103:10
**changed** 100:12
104:4
**changes** 97:15
**channels** 62:20
**character** 47:25
47:25
**characterized**
64:10 98:9
**charge** 10:9
**charged** 25:2
**check** 35:13

Transcript of Proceedings
November 18, 2009

55:18 85:25
**checking** 82:1
**checks** 73:3,7
73:25
**cheek** 6:14
23:21
**chunk** 23:18
**circuit** 13:1
18:5 21:1,8,17
29:5,5 35:6
40:24 42:2
61:21 64:12
**Circuit's** 41:23
**circumstance**
21:24 32:6,14
32:24 100:3
**circumstances**
21:4,20 25:10
64:14 86:7
**cited** 21:2
**CIVIL** 1:8
**claim** 28:23
50:22 58:8
62:8 63:6,8
64:1,1,6,24
66:2,4,9,12,19
66:21 67:3,5,7
67:15,19,23
68:2,4 73:5
83:1 84:2 85:2
85:4,6 86:5
94:20 97:18
100:14
**claims** 21:22
24:11 31:21
62:12 63:17
63:22 65:23
66:5 67:17,21
70:8 96:18
100:9,11
101:11
**clarity** 6:15
**class** 4:5 9:10
9:16 10:14
11:17,18

15:17,18,23
15:24 16:22
17:6,15 18:5
21:9,19 22:19
24:14 25:10
25:17 26:13
27:2,3,8,11,12
28:19,24 29:6
31:9,11,16
33:16,17 35:3
35:4 36:3
38:14,17,21
38:22 39:25
41:3,25 42:6,6
42:8,10,13,19
43:13,14 45:8
45:8 46:5,22
48:3 49:11,19
52:9 53:21
58:18 60:17
62:1,4,13,14
62:20,22
63:24 64:16
64:23 65:3,7
65:10 66:8,14
66:15,24
67:18,19
68:11,20
69:19 71:7
73:4,10 74:23
74:23 75:11
78:15 79:5,15
80:9,18,20,22
80:22 82:14
82:17,21,25
83:2 84:1,17
84:19,25 85:2
85:4,9,15,18
86:2,17,22
87:3 88:5 89:9
90:9,10,19
91:9 92:4
94:14 96:10
98:6,10,14,23
99:5,7,25

100:1,5,10,13
100:14 101:12
101:16 102:10
103:8,9 104:2
**classes** 28:15
68:18
**class-wide**
62:24
**clauses** 67:13
**clear** 56:20 57:2
59:24 63:20
80:16
**clearly** 53:19
54:11 86:15
**client** 47:13,14
74:25 75:2
98:5
**clients** 78:4
93:13
**close** 28:4 30:2
31:3 36:11
53:14,20,23
79:21 105:15
**closed** 7:4 17:5
30:2,23 31:2
52:11 62:15
**closer** 62:18
**closest** 25:6
**closing** 52:13
**closure** 88:8
**colleague** 74:5
**collection** 21:13
104:19
**collective** 47:14
**collectively** 6:2
76:3
**collusion** 92:3
96:10 98:8
**colorable** 66:9
66:12,21 67:3
**combating**
27:12
**come** 18:19
24:13 55:5
57:18 65:1

66:18 74:10
**comes** 18:14,18
57:1 65:5
**coming** 23:2
49:18 94:17
**comments**
70:16
**commercials**
55:22
**commit** 80:4
**committed**
12:20 98:5
**common** 27:16
40:23 41:22
51:14 57:15
66:18,19
**commonality**
26:22 27:14
27:20 28:1
43:16
**commonly**
86:22
**companies**
55:15
**company** 101:9
**comparable**
5:25
**compare** 95:5
**compared**
38:25
**comparing**
81:23
**compatibility**
105:4
**compensation**
15:25
**complaint** 85:3
**complete**
107:12
**completely**
92:13
**compliance** 8:1
51:15
**compliant**
60:12

**complicate**
105:16
**comply** 19:19
19:23 50:8
**components**
9:25
**computer** 97:19
**concede** 65:16
**conceivably**
41:14 46:7
**concent** 11:25
**conception**
54:12
**conceptually**
10:23
**concern** 27:14
47:2
**concerned**
14:22 76:18
95:20
**concerns** 47:3,4
64:11 97:24
102:19 106:7
106:8
**concluded**
106:25
**condition** 18:8
**conference** 4:21
**confidential**
12:14
**conflict** 12:15
14:20
**conformance**
24:19
**confusion** 80:2
**Congress** 6:4
6:13 25:14
31:1,4 59:18
59:23
**Congressiona...**
64:19
**connection** 4:23
60:7 95:1
**consciously**
79:12

**consent** 16:17
**consequence**
67:21
**consider** 6:13
12:21 50:16
64:22 91:5
94:16 105:18
**considerable**
37:18
**consideration**
15:3,11 28:19
95:2
**considerations**
26:12 29:19
92:25
**considered** 21:3
24:8 92:18
95:22
**considers** 32:11
**consisted** 6:1
**consistent**
12:10 86:13
104:9 105:8
**consolidated**
5:7
**consolidation**
5:8
**constantly**
81:17
**constitute**
107:11
**Constitutional**
64:8
**Constitutiona...**
68:5
**construed** 98:8
**consultants**
18:7
**Consulting**
17:1,20 82:19
**consumer** 2:5
2:14 4:14
16:21 21:23
27:10 29:7
31:23 34:1

Transcript of Proceedings
November 18, 2009

43:25 56:17
56:18 57:21
59:20 71:3
72:2,3,12 75:8
80:25 98:24
100:18 101:2
102:8
**consumers**
55:16,17 75:9
81:6
**contact** 26:1
**contacts** 85:23
**contain** 82:25
**contains** 83:3
**contemplate**
37:24
**content** 84:16
**contentious**
9:19,25 96:21
**contested** 18:4
**context** 63:13
64:24
**contingency**
47:4,12 48:8,9
**contractually**
79:21
**Cont'd** 3:1
**conventional**
6:1 91:7
**convey** 17:4
**convince** 76:16
**copious** 69:13
**copy** 85:22 86:4
**Corner** 48:24
**correct** 9:13
22:21 31:6
42:25 90:21
93:6 98:21,22
**correctly** 14:25
**cost** 17:14
18:12 20:6
40:23 69:17
76:2 80:15
82:5,12,23
97:11

**costing** 44:22
**costs** 35:7,8,12
75:12 84:10
89:17
**costumes** 55:22
**couch** 76:13
**counsel** 4:8
9:16 14:13
19:14 49:9,20
59:2 60:6 66:3
69:3,4 77:10
85:23 101:23
**counseling**
71:24 72:15
**count** 62:16
**country** 14:9
33:7 34:1 42:1
58:21 74:11
87:18
**counts** 60:15
**couple** 7:21
29:15 33:13
44:24 56:23
57:8 60:15
70:16 75:24
93:11
**course** 6:14
19:12 23:1
28:18 32:17
42:1
**court** 1:1 4:2,10
4:15,22 5:1,13
5:15,17,19 6:7
6:9,12,20 7:1
7:3,9,13 8:5,9
8:13,20,23 9:1
9:2,5,9,22,23
10:2,12,12,13
10:17,19,21
11:5,8,9,12,14
11:16,23,24
11:25 12:2,20
12:24 13:6,12
13:14,23 14:2
14:4,7,17,23

15:4,13,17,20
15:23 16:2,8
16:17 17:3,10
17:14,17,19
17:24 18:10
18:14,17,20
18:22,25 19:2
19:8,18 20:11
20:15,20,23
21:12,15 22:3
22:8,10,13,15
23:1,2,8,13,17
23:24 24:6,9
24:13,18,24
25:17,19,22
26:19 27:22
28:1,6,18,22
29:2,7,8,13,18
29:21,24 30:8
30:13,25 31:3
31:8 32:2,21
33:12,15,20
33:23 34:2,6,9
34:14,21,24
35:11,14,20
36:5,11,15,22
36:25 37:20
37:20,21 38:2
38:3,8,13,20
38:23 39:3,8
39:11,17,20
39:21,24
40:10,13 41:4
41:19 42:7,12
43:5,9,11,14
43:20 44:5,7,9
44:12,17 45:7
45:14,18,21
46:2,9,12,16
46:20,24 47:8
47:12,17,24
48:13,16,20
49:1,5,9,10,11
49:23 50:2,4
50:10,13,18

51:1,7,10,21
52:14,18 53:2
53:6,11,23
54:2,6,18,25
55:3,5,11,21
55:25 56:6
58:12,18 59:6
60:21,25 61:5
61:12,21,22
62:23 63:5,7
63:11,13,23
64:5,17 65:8
65:12,19
66:22 67:1
68:10,15,17
68:21,24 69:5
69:15 70:4,6
70:14,19,25
71:5,12,15,20
72:9,14 73:8
73:13,17,20
73:22 74:2,7
74:17,19,21
75:4,14 76:6,8
77:7,15,24
78:9,11,19,23
79:1,8,18,24
80:5,13,16
83:7,12,17
85:3,19 86:12
86:18 87:9
88:1,9,15,18
88:22 89:20
89:25 90:11
90:13,20,24
91:2,15,18,24
92:17,21,21
93:3,7,22
94:21,24,25
95:3,8,11,15
95:17 96:1,5
97:3 98:9,13
98:17 99:6
101:4,12,15
101:20 102:2

102:7,11,16
102:23,25
103:5,18
104:8,12,14
104:17 105:7
105:11,14,17
105:17,24
106:4,21,23
107:1,6,9
**courtesy** 14:15
49:8
**courtroom** 15:5
**courts** 21:3
24:12 32:9
37:19 58:23
63:1 64:21,25
**Court's** 5:7
12:17,25 15:3
77:13 80:4
84:18
**co-applicants**
60:20,25
**co-counsel** 4:12
**co-payee** 85:25
**craw** 51:6,7
93:21,23
**credit** 5:25 6:4
6:6 7:23 20:6
21:10,18 23:5
23:6,10 25:3
25:11 30:16
30:19 33:6
43:18,21 46:3
49:14 51:25
52:5 54:8,15
54:23 55:15
55:18 56:3
57:5,12,14,16
59:4,20 60:13
62:25 65:4,24
67:11 82:3
104:25
**crediting** 56:7
**creditor** 56:5
**creditors** 55:15

**crime** 22:25
**critical** 15:9
99:25
**Cupp** 14:13
102:22
**Cupp's** 14:19
**curiosity** 36:16
**curious** 95:4
**current** 57:25
60:4 87:4
**customer** 81:24
81:25 82:8

_____

**D**

**D** 1:5 4:1
**daily** 81:8
**damage** 24:11
28:23 35:18
51:4 64:17
**damages** 20:4
20:11,15,19
20:22,24 21:7
21:19,25 22:1
22:2,4 23:3,4
25:19,22 26:8
28:6 32:8,15
32:21 42:16
42:18 43:5,8,9
43:15 44:15
51:1 54:2,5
63:4 64:2,11
64:22 67:4
68:3,6 94:2
**database** 81:3,7
81:10 82:8,22
87:5 103:19
106:17
**date** 14:21
81:22 90:6,10
90:11,12,17
90:17 94:22
94:23 95:8
97:21 103:11
103:22 104:1
**dates** 91:21

Transcript of Proceedings
November 18, 2009

**day** 52:23 54:8
54:12 60:4
69:11 76:4
77:17 86:1
94:6 107:13
**days** 7:21 8:16
8:19,21,24 9:3
9:6,7 10:20
12:1 51:21,22
52:9,10,25
53:7,12,15,21
56:25 57:8
58:23 60:1
77:1 82:15
89:4,7,9,12,14
89:19 90:20
90:21,24,25
91:4,5,6,11,15
91:16 102:17
102:17,17
106:9
**deadline** 89:9
90:18 91:14
97:4,8
**deadlines** 84:21
89:1 104:7
**deal** 5:12 15:6
27:11 34:15
55:9 84:10
94:13 99:7
106:5
**dealings** 96:24
**dealt** 22:24
**debate** 65:18
**debt** 21:13
**December**
14:15,22 38:9
39:3,8,9,14
41:19,20 77:2
95:9 105:20
105:20 107:14
**decide** 77:16
95:23
**decided** 57:9
**decides** 77:7,13

**decision** 15:6
21:2 28:17
52:4 53:22
56:8 77:7,18
77:19 79:11
103:13
**decisions** 41:25
**Decker** 3:13
48:23
**declaration**
10:8 12:12,19
13:9,12 14:1
104:21
**dedicated** 85:1
**deed** 61:4
**defend** 40:21
50:20 78:18
**defendant** 1:11
3:3 6:18,18
17:4,16 18:9
24:3 32:3
41:13 72:24
76:3 79:2
**defendants**
17:1 18:10
19:10 22:11
23:4
**defendant's**
16:17
**defending** 37:8
78:7
**defense** 6:17
23:12 24:17
47:21 48:7
50:20 58:7
68:1 69:2
77:10 94:12
**defenses** 19:10
**defensive** 76:14
76:15
**defer** 30:7
**defined** 67:20
**definitely** 72:3
**definition** 62:15
**degree** 81:20

**delay** 7:22
52:25 56:22
62:25
**delayed** 56:23
**delicate** 99:18
**deliver** 92:17
92:18
**delivery** 52:25
**demonstrates**
67:3
**demonstrativ...**
56:24
**denial** 21:6
**denominator**
51:15
**dentist** 54:22
**depose** 68:21,22
**deposed** 36:11
**deposition**
12:11 13:18
37:8
**depositions**
37:1 40:3
**described** 22:23
82:19 84:23
86:14 104:20
104:22
**describes** 21:24
**design** 59:9
**designed** 51:13
68:19 98:13
**desk** 85:20
**detail** 31:12
**detailed** 10:8
12:9 100:22
**details** 72:22
86:14
**determination**
27:19 42:3
**determining**
41:23 97:11
**detriment** 36:3
92:4 96:10
**developing**
80:19

**device** 52:22
**Diagonal** 2:15
**dialogue** 106:6
**difference** 84:9
86:21 105:2
**different** 6:20
27:2 37:18,18
37:19 55:14
55:20 61:6
66:14 84:4
**differently** 65:5
79:16 84:7
**difficult** 22:2
50:6 54:17
103:8
**difficulties**
54:10 88:16
**digit** 57:7
**diligent** 35:4
**direct** 10:25
61:3
**direction** 29:15
42:2
**directly** 87:24
**director** 72:20
**directors** 27:9
**discharges**
84:18
**disclaim** 10:24
**disclosure** 7:23
53:10 54:12
54:14 56:3
58:15 59:25
63:1 92:8
**disclosures**
7:17,17,20 8:3
92:7
**discovery** 30:4
37:6 99:16
**discretion**
64:19 80:4
**discussed** 89:15
**discusses** 29:7
**discussing**
102:21

**discussion**
16:12
**discussions**
16:25 72:23
**dispositive** 44:1
**disproven** 8:1,2
**disputes** 94:9
**distant** 92:16
**distinction** 5:20
**distinguish**
66:23
**distinguishes**
66:20
**distribute** 73:4
**distributes**
65:22
**distribution**
16:21 26:3
63:17
**district** 1:1,2
4:18 5:9 12:17
18:3 58:18,23
61:21 77:22
102:7 107:6,6
**Division** 1:3
107:7
**divvied** 62:1
**documents** 7:21
37:2,7 40:4
97:8
**doing** 35:21
40:14 49:17
59:6,6 84:21
**dollar** 20:3 50:1
68:6 97:12
**dollars** 27:5
44:24 49:15
50:6 69:20
73:6 87:13
**Domonoske** 1:5
4:3 5:6,15,16
5:23 7:9,11
20:20,22 25:4
33:21,24
34:13,16

35:17 36:1,8
41:1 42:17
53:12,16 54:8
68:11 69:7,14
69:22 74:16
74:22 75:20
75:24 84:2
**Domonoske's**
35:2 52:1,2,14
52:16 53:12
53:23
**Donell** 76:7
77:3
**Downey** 101:9
101:22
**download** 85:4
**drafted** 77:13
**drawn** 80:22
**drinking** 96:23
**drive** 3:15 66:4
**drivers** 104:7
**due** 22:24 23:24
23:25 24:3,10
24:15,19
64:11 86:8
**dunk** 50:16,17
93:16 100:17
**dunks** 50:18

**E**

**E** 2:1,1 3:1,1
4:1,1
**earlier** 40:17
56:16 80:2
91:25 93:5
96:7
**earliest** 57:13
**early** 38:9 39:9
56:3 105:19
**ease** 97:18
**easier** 84:9
**Eastern** 4:18
5:9 12:17 18:3
58:23 77:21
**easy** 63:21

Transcript of Proceedings
November 18, 2009

economic 44:2
  44:9 62:24
  93:19
economically
  51:5
editorializing
  75:7
Edward 92:15
effect 64:15
effective 36:9
effectively 18:6
effectiveness
  97:25
effort 19:23
  79:3
efforts 30:21
eight 52:10
  53:21 90:7
eight-and-a-h...
  87:22
either 7:10
  24:15 30:6
  34:16 54:20
  62:9 67:7
  68:11 71:7,8
  75:3 90:10
  97:18 102:12
elements 97:1
eliminate 90:12
eliminating
  94:9
elongated 52:17
  53:18
else's 47:25
emergency
  71:24
employees 10:9
enacted 6:4
  27:11
encourage
  75:17
endorse 92:5
  93:1
end-of-the-m...
  97:8

enforce 21:10
  27:15
enormous
  80:15
enter 60:10
  105:15
entering 11:11
  13:25
enters 11:9
entire 53:20
  82:21
entirely 94:19
entirety 15:2
entitled 46:7
entitlement
  19:16 45:3
  66:13
entity 21:22
entry 5:7 82:15
  89:5
envelope 87:16
  87:21
envision 54:19
Equal 23:6
equitable 20:6
equitably 28:16
equity 5:24
  51:25,25 52:6
  81:7,14,18,25
  82:1 104:25
  104:25
Erausquin 2:13
  4:13,17 74:5
  74:15,18
error 52:24
especially 10:14
  19:18 65:21
ESQUIRE 2:4
  3:4,13
essentially
  22:18 60:3
establish 20:25
  21:7
establishment
  21:25

estimate 7:19
  60:17
eve 97:7
event 65:2
everybody
  26:23 46:5
evidence 10:22
  11:21 12:2
  30:4 32:19
  83:22
exactly 23:8
  28:3 29:12
  55:3 62:7
  83:10,11
  104:11
exaggerating
  23:17
example 7:19
  88:4,10
exceed 77:11
exception 32:13
excited 25:16
excluding 57:13
Excuse 88:15
executed 90:6
exercise 24:9
  64:18 73:6
exhausted
  87:25
Exhibit 31:14
  83:13,25 84:5
  86:11 88:1,7,7
  89:21 90:2
exhibits 83:8,21
exist 23:15
  28:12 104:12
existed 32:16
exists 27:1,1,16
  104:18
expended 35:12
expense 18:9
expenses 69:18
  75:18 80:14
expensive 82:11
  92:16

Experian 25:2
  44:13
experience 18:1
  32:18 73:9
  74:22 75:14
expertise 11:19
experts 87:17
explain 31:13
explains 12:10
explanation
  27:7 71:19
  100:22
exposure 93:19
expresses 98:24
extend 39:18
  52:5
extended 53:18
extent 12:14,20
  14:19 21:20
  103:11 105:14
external 104:6
extraordinarily
  50:5
_____
**F**
F 1:14 107:8
face 11:1 24:16
  24:17 98:1,2
faced 98:1
facilitate 31:22
  31:23
facility 53:5
  102:6 105:6
facing 67:16
fact 6:16 8:2
  9:1 10:6 15:2
  21:7,21 24:11
  24:14 27:2
  29:6 33:23
  35:17 36:6
  41:23 54:7
  55:11 58:24
  67:8,9 72:7
  91:8
FACTA 6:5,5

8:7 50:7
factfinder 44:1
  44:1
factor 15:7,8
factors 16:9
facts 31:18,18
  42:24 97:22
factual 92:24
failed 98:25
failure 46:13
fair 6:4,6 15:5
  21:10,18
  22:19 23:5,10
  33:6 40:21
  46:3 49:13,22
  49:24 60:13
  65:4,18 67:24
  77:7 80:5
  92:23 94:14
  97:24 99:7
  105:24
Fairfax 4:17
fairly 70:3
  79:22
fairness 11:4
  13:22 15:7
  26:11 38:1
  61:24 80:11
  89:4,10,12,14
  89:19 90:23
  91:9
Faith 7:19
faithfully 84:17
familiar 23:1,9
  32:19 70:11
  91:10
familiarize
  104:23
fantastic 101:2
far 36:19,19,19
  36:19 78:16
  87:16
fashion 26:7
  37:15 63:18
FCRA 49:19

51:13 55:14
  55:20 59:19
  61:15 65:1
FDC 25:14
  61:17,17
FDIC 101:10
fear 24:4
February
  103:15
federal 6:3 7:18
  20:10 25:17
  37:19 63:5
  76:5
fee 16:18 36:18
  37:16 40:21
  40:21 48:8
  76:15,24 77:9
  77:10,13,16
  78:18
feed 62:20
feel 106:10
feeling 14:4
  49:6
fees 15:15 16:13
  16:13 17:7
  18:14,22 19:2
  19:6 33:21
  34:11 36:17
  37:4 38:11,15
  38:16 40:2,20
  41:11,13,13
  41:23 70:9
  76:20 79:19
  79:22 89:17
  94:22,23 95:2
  95:8,21
  102:24
fell 7:10,11,12
  52:19
fewer 102:9
fiction 25:1,5,8
  26:16,16
field 57:16
figure 17:21
  50:1 93:7

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

**file** 91:20
**filed** 67:2 89:13
 99:19 100:3,6
 100:15
**files** 105:18
**filing** 89:10
 100:10 102:24
**fill** 61:20
**final** 38:1 84:12
 89:17
**finality** 94:9
**finally** 60:10
 84:11
**financial** 56:21
 71:24
**financially**
 34:13
**find** 9:1,2 58:14
 86:13 91:24
 100:18
**finding** 13:21
 54:22 65:24
 66:10 92:22
**findings** 95:16
**finest** 80:19
**finished** 88:11
**firm** 4:14 47:20
**first** 4:20 31:16
 33:24 37:5
 67:13 75:25
 76:17 79:1
 86:22 103:3
**firsts** 92:11
**fit** 32:25
**five** 17:8 31:25
 32:2 45:10,11
 45:22 46:4,6,7
 46:9,20 52:24
 53:7 62:4,11
 90:22 98:18
 98:18,23
**Flanary** 1:19
 107:4,19
**flesh** 12:8
**flew** 75:25

**flown** 72:19
**flu** 14:8
**FOERSTER**
 3:5
**folks** 30:14
 38:25 42:16
 45:5 48:17
 65:23 72:15
 72:16 94:4,6
 99:24 100:20
**follow** 55:17
**followed** 55:6,7
**following** 67:6
 76:17
**follows** 81:14
**font** 88:5,12
**fonts** 84:8
**foolish** 102:5
**forcing** 24:4
**foreclosed**
 72:17
**foreclosure**
 71:23,25
**foregoing**
 107:10
**forget** 6:21
**forgot** 70:14
**form** 31:10,21
 62:8 66:2 67:5
 67:23 82:14
 83:1,3 84:1,2
 85:6 86:5
 87:14,16
 96:18
**formal** 61:22
 77:6 84:13
 89:16
**format** 84:22
**formatted**
 84:11
**formatting** 84:4
**forms** 85:2,5
**formulation**
 59:14,15
**forth** 34:17

 104:10 105:9
**fortunate** 40:8
**fortune** 9:15
**forward** 14:14
 64:23 65:6
**forwarding**
 86:23
**forwards** 86:23
**fought** 92:6
**found** 58:4
**four** 52:24 53:6
 61:16 90:18
 103:16
**Fourth** 13:1
 29:5,5 35:6
 40:24 41:22
**Francisco** 3:7
 37:10 49:1
 75:22,24
**frankly** 35:2
 36:16 85:13
 87:14 90:12
 105:17
**fraud** 57:3
**free** 76:6 85:17
 86:4 106:10
**friends** 96:23
**frivolous** 99:19
**front** 9:18
 84:14 87:2
**full** 25:17 26:10
**fully** 76:21 92:5
 93:1
**full-blown** 11:3
**functional**
 105:1
**functions** 10:10
**fund** 40:23
 41:22 52:12
**fundamentally**
 63:16
**further** 12:8
 105:12 107:10
**future** 48:19
 51:17

**futuristic** 52:22

---
### G

**G** 4:1
**gaps** 61:20
**gather** 48:2
**gdecker@mil...**
 3:18
**general** 48:7
 91:12 94:7
 102:6
**generally** 45:13
 54:21 63:5
**gentlemen** 96:1
 102:13 106:4
**getting** 30:18
 30:18 34:10
 34:11 57:24
 70:7 78:4,5
 80:9 81:18
 96:22
**give** 8:14 12:7
 33:23 39:12
 39:25 76:11
**given** 7:4,6
 12:12 28:17
 69:20 74:20
 89:21 95:18
 107:13
**giving** 20:8
**GMAC** 21:3
 22:23 29:4
 49:20
**go** 5:19 14:14
 19:8 23:14,20
 23:24 25:16
 29:18 31:8
 49:13 55:16
 62:6 67:18
 73:10 78:20
 83:12 84:7
 85:19 88:16
 89:20,24
 100:4 103:7
**goes** 70:10

 73:23 86:20
 86:23 98:19
**going** 20:9
 28:23,24
 30:15,17,20
 34:17 36:12
 38:3,13 44:13
 45:25 47:13
 54:17 58:13
 60:9 69:18
 73:9 76:18
 78:16,19
 79:25 80:17
 83:15 88:11
 103:9 105:17
 106:13
**gold** 18:7 82:20
 98:10
**good** 7:19 9:15
 40:5,7,8 47:6
 47:8 74:24
 76:8 78:2,7
 85:13 93:13
 93:23 99:13
 100:23 102:1
**gotten** 25:1
 44:17,18 55:9
 74:6
**go-to** 33:8
**Grant** 3:13
 48:23
**great** 75:1
 81:20 84:10
 94:13 99:7
 106:5
**greater** 31:12
 37:9,14 57:11
**greatly** 49:8
**gross** 16:16
**group** 17:20
 70:10 72:3
**growing** 78:8
**guarantee**
 103:9
**guess** 4:7 19:24

**guidance** 56:11
 61:22
**guided** 64:17
**guidelines**
 27:11
**guiding** 56:12
**guys** 10:17 12:3
 33:8 55:21
 72:24 74:13

---
### H

**half** 29:12,13
 29:14
**hand** 83:4,5
 99:21 107:13
**handicap** 50:17
**handled** 37:12
**hands** 99:4
**handwritten**
 69:13
**handy** 29:11
**happen** 75:16
**happy** 14:10,17
 78:17 85:22
 86:1
**hard** 32:22
 78:21
**harder** 54:16
**harm** 21:5
**harmed** 28:9
**Harrisonburg**
 1:3,15 5:17
 107:7
**head** 15:21
 22:19 23:14
 24:25 49:16
**head-to-toe**
 72:2
**hear** 12:2 48:17
 58:18 70:19
 92:9
**heard** 64:13
 74:24 107:8
**hearing** 4:4 5:3
 11:4,7 13:22

Transcript of Proceedings
November 18, 2009

38:1 42:22
48:22 60:11
80:12 89:4,10
89:12,14,19
90:23 96:16
**heck** 61:23
76:10
**help** 28:15
33:25 71:24
71:24 72:15
**helped** 58:4
**helpful** 91:22
**helps** 57:22
**highlight** 16:10
**highs** 94:10
**hindsight** 75:22
**historical** 105:4
**hold** 78:13
**holds** 24:13
**holiday** 105:16
**holidays** 106:17
**home** 5:24
51:25,25 52:6
57:15,25 58:2
61:2 81:7,14
81:18,25,25
104:25,25
**Honor** 4:11
5:21 6:8 7:8
8:8,12 9:17
12:8 13:4 14:5
14:25 15:12
15:15 23:23
26:4 29:20
30:24 31:11
32:11,17,17
33:1 36:4
37:17,25
40:22 41:8,17
42:4 43:2
48:11,19,21
50:25 65:19
67:5 70:1,5
71:18 73:21
74:1 76:16,20

76:21 77:8
78:17 79:7
83:5,15,24
84:10 88:24
91:10 93:2,10
95:25 97:9
99:14 100:1
103:12 105:10
106:22
**Honorable** 1:14
107:8
**hope** 9:17 49:5
**hopefully** 99:14
**horse** 40:11,14
**horseshoes** 28:4
**house** 30:16
**housekeeping**
57:1,7,23
**huge** 103:5
**hundred** 29:14
29:15
**hundreds** 59:11
87:12
**hurdle** 67:17
**hurdles** 24:16
**hurt** 14:19
**hypothetical**
60:21

**I**

**idea** 94:21
**ideally** 76:16
**identical** 84:3
**identified** 50:22
51:19
**ignore** 63:12
**imagine** 82:18
106:13
**immaterial**
30:9
**immediately**
81:14
**impact** 57:22
**impacted** 26:6
**impediments**

97:23 99:23
**impermissible**
21:21
**importance**
29:6 42:24
**important** 15:8
56:14 79:15
80:8 85:3
**impose** 56:5
64:19 68:6
**imposes** 6:14
49:14
**imposing** 75:11
**impossible** 22:2
43:12 65:3
**impress** 42:4,5
**impressed**
75:10
**improper** 98:4
**improperly**
42:23
**impute** 63:4
**imputed** 62:24
**inaccurate** 57:6
**inaudible** 12:15
13:25 14:20
17:5 20:7
22:22 63:11
72:19,25 73:1
73:6 79:16
80:3 87:23
89:18 90:3
100:23 104:5
**incentive** 36:7
56:21 89:18
**incentivizing**
25:25
**include** 16:16
61:17
**included** 68:19
86:1
**includes** 40:2
**including** 18:1
23:12 27:3
41:18 42:1

72:5 75:19
87:3
**inclusive**
107:11
**increase** 97:15
**increased** 54:24
**increasing**
103:15
**increasingly**
57:3
**incredible**
58:22
**incredibly**
14:11 75:15
**incumbent**
71:15
**independent**
28:12 37:8
38:1 67:14
75:9 100:2
**independently**
100:6
**individual**
28:13 47:1,13
47:14 61:11
62:2,13 77:4
81:15 98:2
100:7 101:13
**Individually**
1:6
**individuals**
25:9,18,24
26:1,5,14,18
27:6 32:1,6,13
37:13 44:21
45:1 47:5
57:11 68:2
71:25 72:21
73:5,5 103:16
**ineligible** 67:9
**inequitable**
20:5
**Infante** 92:15
**infecting** 14:9
**inflict** 21:5

**inform** 84:19
**information**
10:13 12:21
42:21 43:1
48:2 70:15
72:22 81:16
82:11 85:18
86:3
**informed** 98:6
100:25 101:1
**informing**
44:25
**inherently**
80:24
**initial** 75:21
92:8
**initially** 76:13
**injunction** 8:18
9:1,2 10:1
11:9,11,25
12:22 13:25
14:25 40:18
60:5,11 96:19
105:8
**injunctive** 8:10
8:16 10:15
104:10
**injury** 20:4,13
21:5 54:16,16
66:9,12,21
**inquire** 37:13
**insisted** 35:5,7
**instance** 6:19
40:19 44:3
56:2 75:19
**instances** 32:16
55:20
**instituted**
104:15
**institution** 51:6
**instructs** 63:11
**insurance**
55:15 92:8
**integrity** 92:19
**intend** 83:6

84:2
**intended** 16:15
**interest** 17:6
26:24 81:18
103:5 106:16
**interested**
54:21 65:24
66:10 67:11
95:5
**interest-wise**
78:15
**internal** 12:13
53:4 57:1
105:5
**internally** 6:25
53:2
**Internet** 20:9
**interpret** 61:15
**interpretation**
35:5
**interpreted**
58:21
**interpreting**
61:23
**interruption**
13:4
**introduce** 4:6
**involve** 97:10
**involved** 36:2
37:7 49:19
59:6 69:21
80:14 87:18
**involvement**
69:14
**irreparably**
35:18
**issue** 5:22 23:24
23:25 25:8
27:4 30:19
44:3 54:1 69:1
76:15 80:7
92:10 101:5
105:16
**issued** 37:2
**issues** 22:22

Transcript of Proceedings
November 18, 2009

57:23 65:1,5
92:12 102:19
102:20 105:5
106:6
**items** 96:17
97:1
**iterations** 19:20

_____
**J**
**JAMES** 2:13
**January** 105:19
**jingle** 55:23
**JOHN** 3:4
**join** 83:9
**joinder** 79:12
**judge** 1:14 5:3
6:11 7:12,16
8:18 9:13,24
10:5,16,25
11:20 13:7,23
13:24 14:3,18
15:10 17:23
21:1,14 22:14
23:23 24:23
25:9 26:15
28:11 29:10
30:11 32:14
33:3,4,11
34:13 35:16
36:24 37:15
37:25 38:9,19
38:24 39:13
39:23 40:7,17
41:9,20 42:20
43:4,8 45:6,13
47:1,6,18
48:15 60:9
70:23 74:20
75:1 76:7,8,23
76:24 77:3,18
78:2,3 82:16
87:24 88:14
91:1 92:15
96:12 97:5,13
107:9

**judges** 41:8
58:18 75:23
77:22
**judgment** 10:13
10:20 31:1,5
50:20 98:21
99:21
**juges** 77:22
**junction** 60:7
**juncture** 94:13
**jurisprudence**
23:1 32:9
40:24
**jury** 26:10
**justifies** 65:19
**justify** 37:4

_____
**K**
**kept** 37:21,22
99:23
**kicked** 52:24
53:2
**kind** 34:10 54:2
71:12 75:13
96:6
**know** 4:6,7 6:12
7:9 24:21
26:16 28:16
29:8,25 30:13
32:12 36:3,12
38:13 39:18
39:24 42:13
44:15 45:22
50:8,17 52:22
55:6,13 57:24
58:12,13,24
59:22 61:14
63:3,4,9 69:18
70:8 71:20
72:2 75:7,8,17
78:5,7 80:24
85:11 87:15
87:17,17 88:8
91:5 92:21
93:10,25 94:2

94:18 95:4,13
97:3,9,13,20
97:22 100:4
100:20,25
101:19 104:3
**knowing** 79:14
**knowledge**
100:5
**knowledgeable**
13:19 68:25
**known** 30:20

_____
**L**
**L** 1:19 107:4,19
**language** 6:13
58:9,16,19
77:9 96:18
**large** 31:25
46:22 48:8
**larger** 36:19,19
84:8
**late** 30:22
105:20
**law** 4:12,14
19:20,23
21:17 31:19
34:20 40:22
65:4
**laws** 7:19
**lawsuit** 31:13
31:17 100:2
**lawsuits** 100:3
101:6
**lawyer** 5:13,15
5:16 25:16
**lawyers** 11:16
34:1 38:5 39:5
39:15 51:10
51:13 71:7
100:19 102:2
102:5
**lead** 9:16
**leading** 51:13
**learn** 102:7
**learned** 33:23

33:24 75:3
**learning** 31:23
**Leatherman**
24:10
**leave** 70:17
**leaves** 94:13
**left** 70:10 90:4
**Legacy** 6:25 7:5
7:10,12,14
9:10 19:21
29:9 62:14,19
68:19 81:8
104:4,17,19
105:1,2
**legal** 6:15 11:24
12:1 24:7
33:25 84:24
87:21
**legislative**
56:11
**legitimate** 66:7
**lenbennett@...**
2:9
**lenders** 72:5,10
101:1,7,17
**lending** 7:20
56:8 57:16
59:19 61:2,20
70:24 71:3,13
73:24 101:14
**length** 29:5
92:14
**Leonard** 2:4
4:11
**let's** 25:9 46:4
83:12 89:20
**LexisNexis** 77:5
82:10 87:6
103:25
**liability** 7:16
27:19 49:15
56:14 61:10
66:19 100:17
**license** 34:20
**lies** 93:14

**life** 52:9 57:17
**light** 89:16
92:24
**limitations**
100:15
**limited** 73:2
74:22
**line** 5:24 30:16
52:5 81:14
**lines** 51:25
104:25
**lion's** 4:17
**liquidatable**
22:1
**liquidate** 25:7
**list** 80:22,22
82:14,21 86:1
87:3 90:9
**lists** 80:19
**litigated** 5:10
37:19 63:9
64:24 65:14
92:1,11,12
**litigating** 78:8
**litigation** 2:5,14
4:14 32:18
36:9 49:19
75:18 102:10
**little** 14:8 19:6
22:18 34:11
47:17 57:10
73:23
**live** 48:12
**lived** 75:10
**living** 38:24
102:8
**loan** 5:22 27:23
27:24 28:7,7
30:15,16,23
45:9,15,16
52:6 53:23
55:1 56:2
57:17 62:2
69:12 81:19
81:25 82:1,2,3

101:10
**loans** 5:24,25
6:1,2 30:1,2
31:2 42:14,15
45:11,22 46:4
46:6,21 51:25
52:11 62:15
81:7,21
104:25
**local** 12:15,16
14:13
**Lodestar** 42:3
**long** 53:20
85:24 94:20
99:9
**longer** 52:18
57:10 58:19
103:7
**look** 20:8 34:4
42:18 48:2
54:20 55:6
57:4 61:24
67:2 79:14
88:11 106:11
**looked** 58:12
**looking** 40:3
74:9 89:21
96:7 103:24
**looks** 19:19,21
**loss** 43:18,18
50:23
**lost** 93:15
**lot** 16:4 19:22
32:5 38:17,20
38:23,25 42:4
61:12 72:4
75:9 76:10
78:6,14
100:20 102:2
**lots** 94:3,5
106:12
**loved** 93:12,16
94:1
**low** 62:12
**lowered** 54:23

Transcript of Proceedings
November 18, 2009

55:7 56:4
**lowest** 51:14
**lows** 94:10

**M**

**magistrate** 76:5
76:10
**magnitude**
76:19 87:20
**magoglia@m...**
3:9
**mail** 52:20,23
53:4 58:4 62:9
80:15 81:12
87:18 91:4
105:3,5
**mailer** 82:24,24
84:6,15 85:8
86:20 87:14
87:16,20
**mailers** 83:5
**mailing** 57:24
59:3 82:18
86:3 87:8,13
89:7 96:19
**mailings** 52:20
**mail-in** 62:6
**mainstream**
71:1 72:4
**maintains** 81:4
**majority** 41:24
41:25
**making** 54:15
98:5
**manage** 63:21
**manageability**
63:15 79:14
**managing**
63:17
**manner** 44:10
**mantra** 75:11
**March** 103:14
**marginalized**
42:23,23
**mark** 83:7,13

83:15,18
**marked** 83:25
**market** 3:6 44:2
**marries** 66:7
**Marti** 13:10
104:20
**Massachusetts**
105:6
**material** 18:8
**materially** 58:4
**materials** 14:1
**math** 15:20
22:20,21
**matter** 26:10
36:16 48:3
56:10
**matters** 57:8
**Matthew** 2:13
4:13
**matt@claleg...**
2:18
**max** 16:5 38:16
70:8 78:4
**McLean** 3:16
**mean** 9:23
10:17 12:4,5
19:20,20
23:13,14,17
25:3 26:21
28:7,11,18
31:17 38:10
39:20 44:22
45:14 47:2,20
47:22 55:11
58:6 63:25
64:3,4 68:13
69:15 71:15
72:1 73:8,17
74:21 75:19
93:20 94:2,24
95:4 99:1,17
100:7 102:16
**meaningful**
26:17,20
57:19 80:20

**means** 32:5
58:6,10 61:23
75:16 88:1
**meant** 56:12
**measurable**
22:1
**measure** 64:20
99:2,2
**mechanically**
10:10
**mechanism**
21:9 23:22
26:13 43:19
**mediate** 77:4
**mediated** 94:4
**mediation**
75:21 76:1,5
**mediations**
75:21 76:11
77:2
**mediator** 92:19
**meets** 22:25
**member** 16:22
25:10 45:8,8
46:22 62:4,13
64:16 66:8
100:5 103:9
**members** 15:24
33:17 60:17
66:15 67:18
73:10 80:20
84:19,25 85:4
85:16,18 86:2
89:9 92:4
94:14 96:11
96:25 99:5,7
100:1,10,13
**member's**
66:25
**memorandum**
31:15
**memory** 62:16
**mention** 60:14
**merely** 28:13
43:6

**merit** 99:20
**merits** 19:9
99:12
**met** 72:20 75:7
**method** 96:19
**Michael** 1:14
3:4 13:4 48:22
107:8
**Michelle** 1:19
107:4,19
**micromanage**
56:6
**mid** 105:19
**midpoint** 41:7
**MILES** 3:14
**million** 15:18
16:11,16 18:2
18:11,15,16
19:6 23:14
24:22 29:9
30:1 37:4,17
38:16 39:22
40:3 44:23,24
46:24 48:10
52:22 60:18
62:1,15 73:9
73:18 93:15
100:21 105:21
**millions** 50:6
51:8
**mind** 42:22
55:24 66:20
**mindful** 106:14
106:16,16,17
**minimum** 16:6
57:8
**minor** 69:20
**minute** 36:18
88:17
**mitigation**
71:23
**mockup** 84:1
**moment** 30:6
**monetary** 56:21
**money** 16:19

19:23 23:18
24:1 35:17
38:18,20,23
42:5 54:23
70:7 73:2 78:6
78:14 84:11
87:7 99:4
103:4
**months** 81:9,11
81:12 82:7
103:16
**moot** 103:14
**morning** 4:4
**MORRISON**
3:5
**mortgage** 5:22
5:24 6:2 30:17
45:5 47:21
61:4 80:23,23
81:13,18
97:21
**motion** 31:14
89:17
**motions** 44:2
58:19
**motivate** 28:16
**motivated**
27:15,17
**motivation**
27:20
**move** 5:3 81:5
**moving** 64:23
90:22
**multipage**
84:15
**multiple** 37:11
57:16 59:4
97:10
**multiples** 50:23
**Murray** 21:3
22:23 24:8,12
29:4 42:18
49:20 64:10
**muster** 11:2
**mute** 79:21

**N**

**N** 2:1 3:1 4:1
**nail** 92:6
**naive** 47:3
**name** 4:11
**national** 27:10
71:3 81:3
82:22
**nationally** 72:7
**nationwide**
65:20 80:18
**nature** 84:20
**NCOA** 81:7,10
103:17
**necessarily**
43:24 52:12
77:8 96:23
106:8
**need** 4:6 10:25
12:2 22:4 34:4
64:22 102:15
102:16
**needed** 81:22
87:25
**needs** 12:20
64:18 76:9
**negligence** 58:7
62:22 63:8
**negligent** 43:6
64:1 68:2
**negotiate** 15:9
15:10 16:13
36:7 37:11
96:25 97:7
99:4,15
**negotiated** 5:11
10:3 16:12,18
26:3 31:21,24
92:1 96:20
98:6
**negotiating**
10:1 15:4,15
17:4 98:1,4
**negotiation**

Transcript of Proceedings
November 18, 2009

18:2,8 19:5
37:10 53:17
56:18 66:3
92:14
**negotiations**
9:15,19
**negotiator**
97:24
**neighborhood**
94:5
**neither** 64:4,6
**never** 97:3
**new** 30:15
57:25 58:1
69:14 104:4
**Newport** 2:7
4:15,16 102:7
**news** 2:7 4:15
4:16 78:7
102:7
**nice** 13:6,7 48:9
49:5
**nonprofit** 71:3
**normal** 31:12
38:22 42:3
**Nos** 83:21
**note** 84:17
**notes** 69:13
**notice** 7:4,6
8:14 16:19,24
28:8 30:18
31:9,16 44:23
45:1,18 46:1,2
46:13,21 52:8
52:12 57:13
67:2,2,2 70:17
80:7,10,15,20
82:25 83:3
84:1,13,13,24
86:5,7,18
87:21,23,24
90:10 91:11
96:18 97:15
98:6,10 105:7
**notices** 8:6,7

16:4 17:20
31:10 44:22
44:22,24 46:5
85:2,15
**notwithstand...**
19:25
**November** 1:16
107:9
**number** 9:16
15:16 16:3
29:16 31:17
31:25 37:7
49:18 53:18
55:14 61:7
62:6 84:6 85:7
85:17 86:4
92:12 97:24
**numbering**
107:11
**numbers** 61:6
89:22
**N.A** 1:10

**O**

**O** 4:1
**object** 57:20
65:15 79:25
84:21 91:6
**objection** 95:13
**objections**
89:11 91:16
**objective** 72:25
99:5
**objectors** 67:16
85:14 89:13
**obligation** 56:2
56:5
**obligations**
84:18,19
86:13
**observed** 97:17
**obstacle** 67:18
**obstruct** 98:3
**obtain** 43:1
47:6 88:13

**obtaining** 67:11
**obviously** 8:2
16:3 98:4
**occasionally**
78:1
**occur** 89:12
**occurs** 106:9
**offer** 14:19
25:12 31:7
35:17
**offers** 35:19
**office** 86:23
**officer** 96:5
**offshoot** 96:6
**Oh** 11:5,12
54:18 60:25
61:5 74:17
77:15
**okay** 4:10 10:2
10:2 30:13
39:3 40:14
44:7 46:4,5
48:20 54:6
74:19 89:20
91:18 103:18
**old** 58:17
**once** 57:1 84:13
98:5
**one-by-14**
87:22
**online** 31:22
62:7,9 85:5,6
85:7
**open** 6:16 87:20
**opening** 90:3,4
**operate** 86:8
**operative** 89:1
**opinion** 61:21
61:22
**opponent** 98:2
**opportunities**
6:13 55:14
**opportunity**
23:6 76:12
**oppose** 41:13

**opposed** 43:6
63:8 88:7
**opposing** 49:9
**opt** 27:7 32:3
84:20 85:5
89:9 90:19
91:5 98:14,18
**opted** 27:6
**optimistic**
19:15
**opt-out** 31:25
32:10 83:3
84:1 86:5
**order** 5:8 39:11
60:10 77:13
82:16 86:11
87:19 88:14
89:5 90:2,8,15
92:22 96:7
105:15
**orderly** 63:18
**orders** 85:3
92:9
**organization**
71:2 72:1,4
**organizations**
72:7
**organized** 68:8
**original** 16:11
16:19 19:5
**originally** 49:3
**originate**
104:24
**originated** 52:2
**origination**
59:10
**ought** 74:11
95:19,20
**outcome** 56:19
65:17
**outfit** 70:6
**outlier** 32:25
53:19
**outliers** 32:10
32:11

**outline** 31:18
88:25
**outlined** 29:4
**outside** 15:13
58:9 59:13
105:3
**overseen** 92:14
**overwhelmin...**
61:3
**owed** 54:22
**ownership** 71:9

**P**

**P** 2:1,1 3:1,1
4:1
**packet** 77:3
**page** 45:2 90:1
90:6,17,22
91:17
**pages** 1:18
107:10
**paid** 69:17
75:25 76:4
81:21,25 82:6
103:23
**paper** 97:19
**papers** 16:6
19:22 34:18
37:3
**paragraph** 90:3
90:5,6,18,22
91:13,17
**parallel** 5:10
**part** 8:10 12:9
17:3 24:8 31:3
43:2 58:20
61:15 64:7
89:6 92:15
99:15 100:16
100:20 102:25
**participate**
66:13 67:10
67:15,19
98:15
**participated**

69:3
**participating**
69:9
**particular** 5:21
102:15
**particularly**
84:8
**parties** 89:13
97:10 106:20
**partly** 6:14
**partner** 4:13
**party** 37:2 40:4
**pass** 11:2
**passed** 50:7
58:14 59:18
64:13
**patience** 87:25
**pattern** 21:21
**pay** 16:5 35:8
62:9 74:16,17
76:2
**payday** 40:5,7
**paydays** 40:8
**paying** 17:14
75:12
**payment** 40:2
**payments** 81:19
**peel-back** 88:8
**penalty** 22:5,13
22:17 97:20
**pending** 55:9
101:7,16
**penny's** 64:16
**people** 15:18
16:3,4 23:15
24:22 30:13
57:24 67:14
81:5 86:22
87:19 98:14
100:22 105:22
**percent** 15:23
17:12 23:7
31:25 32:2
40:20,25
41:14,16

Transcript of Proceedings
November 18, 2009

48:10 50:19
50:23 52:20
80:1,1 98:18
98:23
**percentage**
18:23 39:2
40:22,23
41:16,22
42:14,14,15
46:17
**perfect** 25:11
**period** 43:22
52:9,18 53:14
53:15,21 55:8
58:2,18 59:24
82:15 85:9
91:11 100:9
**periods** 90:16
104:2
**perjury** 97:20
**permissible**
68:5
**permissibly**
79:16
**permit** 95:12
**permitted**
16:20
**person** 9:20,20
13:17,19
16:20 27:15
27:16 28:9
45:10,14,16
45:18,21 46:6
46:6,20 55:5
57:2 93:15
**personal** 42:21
**personally** 75:8
93:17
**perspective**
6:17 50:16,24
61:24 65:9
66:18 69:23
93:20
**pertains** 23:2
**perversities**

49:13
**perversity** 51:3
**per-transacti...**
16:21
**petition** 37:17
**petitioning**
34:10
**phone** 4:23
80:25
**picked** 72:25
**picking** 57:14
**piece** 45:11,23
52:21
**pieces** 52:23
59:11
**PIN** 62:5 85:7
**Pinnacle** 3:15
**pirate** 55:21
**pitched** 97:17
**place** 7:18 52:3
75:21 80:11
**places** 59:22
**plaintiff** 1:8 2:3
76:4 106:2
**plaintiffs** 5:5
31:20
**plaintiff's** 4:8
19:14 25:16
38:5 39:6
54:11 66:3,18
74:14 83:21
**planned** 90:15
**platform** 51:24
52:1 53:21
54:20 68:20
81:5
**platinum** 82:10
85:10
**play** 55:22
**pleadings** 15:13
**please** 15:13
36:7 106:10
**plug** 32:3 98:20
**plus** 18:12
35:12 36:2

69:20
**point** 9:24 13:8
15:14,14
16:14 38:11
38:15 41:10
67:23 96:20
96:20,20
**points** 48:19
**policies** 92:8
**policy** 28:10
31:1,4 55:12
56:10,15
**pool** 21:21
57:11
**pose** 102:18
**posed** 60:21
93:13
**position** 54:7
62:22 63:10
99:18
**possible** 10:11
12:14,14
31:24 57:13
65:8,9 78:11
**possibly** 37:3
78:21
**post** 86:23
**postal** 53:3 81:4
**posted** 85:4
**postmark** 90:19
**posture** 24:20
**posturing** 19:14
**potential** 15:18
60:17 93:18
95:19
**power** 61:15
**powerful** 59:23
**practicable**
6:10,15 7:14
8:3,7,25 9:3
9:12 10:19,21
11:22 12:2
43:23 45:19
46:14 56:13
56:24 58:10

58:17 59:1
**practical** 92:24
**practice** 4:13
4:18 47:4,12
50:9 57:15
**practicing** 75:5
**precludes** 64:23
**predisposition**
12:17,25
**prefer** 50:1
105:19
**preliminarily**
38:10,14 48:4
49:11 82:16
92:23
**preliminary** 4:5
11:2,6,10 26:4
39:25 40:18
40:19 74:9
76:19 80:8
86:11 89:5,8
90:2,7,10,15
105:15
**preordained**
65:17
**preparation**
42:22,24
80:21 90:9
**prepared** 64:5
64:14 87:3
**present** 16:15
26:4 32:8
37:25
**presented**
15:16 16:14
19:22
**presents** 67:17
**preserve** 100:9
**presuming**
43:20,25
**pretty** 40:5
73:16 75:14
91:6 95:3
101:25
**prevalent** 57:3

**previous** 17:25
41:3
**previously** 41:6
**pre-remit** 24:9
**priced** 25:14
**primary** 6:16
21:16,17
**principle** 35:15
41:11 66:22
**principled**
65:21 66:14
67:20
**printer** 84:12
**pro** 47:21
**probably** 74:24
75:23 77:17
100:16 103:13
103:14
**problem** 14:23
14:23 22:10
42:21 59:17
61:14 68:10
**problems**
102:19 105:21
**procedural**
92:25
**procedures**
100:11
**proceed** 4:8
**proceeding**
21:18 65:19
89:16 90:14
**proceedings**
1:13 106:25
107:5,12
**process** 7:22
12:9,10 16:10
22:24 23:24
23:25 24:4,10
24:15,19 30:4
30:15,17
31:22 37:10
41:23 43:3
44:23 45:10
56:16 63:16

63:21 64:11
65:23 66:6
67:17,21 82:5
82:13 86:8
97:16,17,25
103:8,11
**processed** 45:9
**processes** 12:13
**processing**
52:21 53:5
57:17 87:18
105:5
**produced** 97:14
**product** 5:22,25
88:11
**professional**
9:20 14:12
85:14 96:24
**proffered** 31:10
**program** 72:15
72:21
**project** 71:23
72:22
**promise** 85:21
**prongs** 79:15
**proof** 54:15,16
63:5
**proper** 57:24
66:2
**properly** 87:15
**property** 58:1
**proportion**
99:12
**proposal** 17:24
**proposed** 65:20
79:5 86:11
90:1,7,7,15
**prospect** 99:8
**prospects** 94:17
**protecting** 36:2
**Protection**
59:20
**protective** 92:9
**protocol** 52:11
80:19 103:24

Transcript of Proceedings
November 18, 2009

104:5
**proud** 33:2
**prove** 19:24
  21:6 22:4,4,16
  26:9 32:15
  43:12,15
  50:10 99:9
**provide** 10:6
  12:23 26:13
  41:18 43:22
  46:13 47:10
  71:18 77:5,6
**provided** 21:8
  44:10 45:19
  59:25 82:6
  85:7 88:4 96:8
**provides** 33:15
  55:14 71:23
  90:8
**providing**
  58:15 80:20
**proving** 24:16
  32:21 54:10
  94:19
**provision** 6:3
  33:20 50:8
  51:4 56:12
  61:9,13 66:5
  77:9 78:12
  79:4,23
**public** 19:15
  55:12
**publication**
  85:12
**publish** 95:15
**pull** 29:17 32:3
  57:16 98:20
**pulled** 57:5,20
**pulls** 59:4 87:22
**punishment**
  22:25
**punitive** 23:3
  24:11 64:20
**purchase** 80:25
**purposes** 40:1

68:14 79:8,13
**put** 14:21 39:20
  61:4 70:18
  76:9 79:3
**putting** 32:19
**p.m** 106:25

**Q**

**qualified** 68:16
  102:10
**qualifier** 59:1
**qualifying** 62:7
  62:10,11 85:8
**quality** 47:6
  97:15,16
  103:19
**question** 6:12
  6:16 10:25
  11:20 12:12
  12:18,24
  13:21 21:18
  23:22 24:7
  26:15 28:11
  29:22 30:6
  32:10 34:2,14
  34:24 35:22
  36:20 40:18
  41:21 51:19
  60:12 61:9
  63:23 65:18
  69:6 70:4 71:6
  71:16 76:19
  76:20 77:14
  77:17,23 78:4
  79:18 93:13
  96:6 99:25
  101:4 102:14
  103:1
**questions** 33:13
  40:15 48:5,19
  49:12 60:15
  68:9 70:20
  74:12 78:24
  96:4 106:7
**quick** 63:2

**quickly** 66:11
  88:25
**quite** 32:14
  62:18

**R**

**R** 2:1 3:1,13 4:1
**raise** 13:21
  64:14
**raised** 60:15
  68:9
**range** 20:14
  29:13 37:4
  41:2
**rate** 25:11
  31:25 86:19
  86:20,21 87:8
  87:9,10,12
**rates** 62:12 66:5
**ratio** 68:4
**rational** 25:7
  51:5 93:19
**rationale** 55:12
**rationalization**
  65:9
**reach** 103:9
**reached** 16:25
  77:8
**read** 45:2 84:9
  93:14
**reading** 64:20
**reads** 52:22
**real** 81:17
  105:1
**realist** 24:23
**reality** 75:18
**realizing** 97:12
**really** 32:22
  38:22 50:21
  51:16 54:23
  56:11 64:23
  66:16 86:17
  100:11 103:18
  105:21
**realm** 65:6

**reap** 56:21
**reason** 28:14
  40:16 60:19
  84:9 90:25
  95:18 97:6,9
  100:8 102:25
**reasonable**
  56:24 58:10
  60:12 76:24
  92:23 94:15
**reasonably** 6:9
  6:15 7:14 8:2
  8:6,25,25 9:3
  9:11 10:19,21
  11:22 12:1
  43:23 45:19
  46:14 56:13
  59:1
**reasons** 25:25
  26:2 53:19
  56:24 93:4
  105:4
**rebuttal** 63:2
**recall** 9:19
**recalls** 15:4
**receive** 45:25
  47:1 73:3
**received** 44:21
  45:1 48:10
  83:22
**receiving** 62:25
**reciting** 29:4
**recognize** 43:11
  63:14
**recognized** 29:6
**record** 12:23
  70:18 82:3,8
  88:17,20,23
**recorded** 107:5
**records** 37:21
  37:23 80:23
  80:23,25 81:1
  81:2,17,23
  82:9 105:22
**recount** 9:14

**recover** 28:3
  66:8 68:3
**recovery** 38:21
  38:22 40:23
  62:3 94:18
  95:19 99:8,24
**redemption**
  62:12 66:5
**redesigned**
  13:20
**reduced** 104:19
**refer** 83:16
  86:22
**referred** 6:5,25
  64:6,25
**referring** 13:17
**refresh** 8:15
**refused** 41:1
**regarding**
  40:22
**regardless** 31:2
**regards** 29:25
  30:1
**regime** 80:10
**regulation**
  20:10 61:19
**rejected** 30:23
  52:21 63:1
**rejection** 12:22
**relationship**
  35:18
**relatively** 5:10
  63:21 69:20
**relatives** 61:3
**relevant** 92:24
**reliability**
  81:20
**reliable** 80:24
  82:17
**relief** 8:11
  23:20 104:10
**rely** 103:16
**remarkably**
  36:2
**remedies** 31:19

55:18
**remedy** 21:9
**remind** 74:15
**remit** 24:10,15
  24:18
**render** 67:9
  103:13
**rendered** 67:8
  79:21
**renegotiation**
  97:11
**Repair** 102:6
**report** 21:23
  25:3 55:19
  57:12 95:16
**Reported** 1:19
**REPORTER**
  88:15 107:1
**Reporting** 6:4,6
  21:10,18 23:5
  23:11 33:6
  49:14 60:13
  65:4
**reports** 55:15
**repository**
  81:24 103:25
**represent** 5:5
  9:17 41:15
  60:6 92:13,20
**representation**
  35:3 72:23
  92:6
**representative**
  9:10 34:5 35:4
  38:17 68:12
  74:24
**representatives**
  33:16 36:10
  71:8 74:23
**represented**
  42:5 47:5
**representing**
  28:13 48:24
**reprice** 56:2,5
**reps** 36:11

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

75:11
**reputable** 72:4
101:1
**request** 75:20
77:10 85:5
95:22
**requested** 26:7
**requests** 90:19
**require** 63:5
66:1
**required** 7:18
8:16 10:7
**requirement**
20:16
**requires** 13:1
15:1,3 31:19
67:6 78:13
92:22
**reside** 85:2
**residing** 58:2
**resolution** 94:8
**resolve** 63:22
**resolving** 63:16
**RESPA** 7:19
60:3 61:19
**respect** 28:9
45:4,4 77:22
96:9
**respective** 10:9
**responded**
31:21
**response** 31:7
68:8
**responses** 89:13
**Responsible**
70:24 71:13
73:24
**rest** 66:15
**result** 24:14
33:4 47:9 99:1
101:3
**results** 47:6
**resurrection**
84:3
**retain** 12:13

**retired** 76:5
92:15
**returned** 81:12
**revealed** 69:12
**reversed** 77:24
77:25
**reviewed** 37:1
89:2
**reviewing** 40:4
**Richmond** 4:19
77:3
**ridiculous**
47:21
**right** 4:2 5:19
7:1 8:9 9:3
11:23 16:8
17:10,19 19:8
21:15 22:8,9
23:8 24:6,9,24
25:7,13,14,21
25:22,23
26:17,20 27:1
27:15,25 28:3
28:3 31:8,14
33:12,18 34:9
36:25 44:3,7
45:12,17,21
45:24 46:10
46:14,16,18
48:16 49:2
51:3,8,9,11,12
51:23 53:1,8
55:2,23,25,25
56:9 57:2 58:5
59:8 60:23
61:1 64:11
67:24 69:5,17
71:5 74:2,19
78:23 79:10
83:7,12,18
87:11 88:18
88:22 91:3,18
93:4 102:11
103:21 105:11
105:24 106:1

106:21
**rights** 21:6
27:18 28:12
31:24 45:2,3
71:3 84:20,21
100:21,22
**risk** 50:23
93:14
**Rivera** 5:8,13
5:25 7:10,12
9:10 20:12,17
20:19 25:4
34:16 35:24
36:8 42:17
68:11,21,22
68:23 69:22
**Road** 2:15
**robust** 81:16
**role** 71:13 74:8
75:10
**roles** 72:6
**roughly** 58:16
**routinely** 81:2
**rubber** 12:5
15:1
**rule** 11:14
12:16,16
58:17 63:12
79:4 84:19
86:8,14
**ruling** 11:24
12:1 61:18
**run** 47:23
105:21
**running** 87:5
**Rust** 16:25
17:20 18:1,5,6
37:14 82:19
82:24 84:1
88:4 97:9

——————
**S**
**S** 2:1 3:1 4:1
**safety** 32:24
**sample** 83:5

**San** 3:7 37:10
49:1 75:21,24
**satisfied** 10:18
36:22 98:25
**satisfy** 20:16
**save** 87:12
**saves** 87:7
**savings** 16:19
16:24 17:2,9
97:12 101:9
**saw** 13:12 29:13
**saying** 8:23,24
9:5,7 30:25
35:25 40:16
47:8 67:1
72:14
**says** 41:12
55:20 56:16
69:16 77:9
99:6
**scales** 16:2
**scenario** 32:25
33:1 64:11
**scenarios** 6:21
**scheduling** 4:24
102:21
**score** 7:23 20:6
20:8,9 25:12
25:24 26:7
27:18 30:19
43:18,21
44:18 54:8,15
54:24 55:8
56:3 57:5,21
59:4 62:25
65:24 67:11
69:25 74:16
**scores** 57:16
**script** 96:16
**scrub** 103:11
**scrubbed** 81:2
**scrubs** 81:6
**seal** 21:8
**sealing** 12:18
12:25 13:1

**second** 17:5
31:7 67:12
79:18 103:7
**secret** 97:21
**section** 31:16
**securities** 57:6
**see** 13:6,7 30:14
31:14 48:1,3
55:19 61:5
62:7 84:6,15
85:8 88:6
95:17 96:14
**seek** 41:12
**seen** 31:11
80:21 83:10
97:17 98:11
**self-interest**
36:6
**sell** 44:15
**send** 8:3,7 27:5
59:13 82:21
82:24 83:6
89:7 91:20
106:10
**sending** 52:8
57:12 86:19
90:9 100:21
**sends** 81:6
**sense** 26:13
57:19 102:14
**sensitivity**
95:14
**sent** 7:17,21 8:5
70:21 81:14
84:11 86:5
91:12 103:23
**separate** 13:20
61:16 101:14
**separately**
83:16
**September**
81:22 90:4
100:12 103:10
103:20,22
**series** 9:19

**serious** 105:21
**serve** 12:4
**served** 63:13
**service** 53:3
81:4
**sessions** 37:11
**set** 25:14 34:17
59:24 69:14
82:17 89:4,9
90:11 92:11
104:10 105:8
**setting** 90:23
**settle** 24:4 50:4
**settled** 9:22
49:18 65:6
80:17 93:8
101:10
**settlement** 4:5
8:10,17 10:4
11:1,10 13:10
15:2 16:11,16
16:20 17:5
18:2,11 24:21
26:3 31:15
32:4 33:2,5,8
33:9,15 37:12
39:22 40:2
41:1,11 45:23
49:22,24
50:24 51:5
60:11 63:14
63:19 65:20
65:21 66:23
67:10 68:14
69:19 70:2
77:7 78:14
79:8,13 80:9
82:17,20 83:1
83:2 84:12
85:1 86:12,16
88:5,10 89:11
90:2 92:2,22
93:19 94:7
96:15 98:19
99:12 105:9

Transcript of Proceedings
November 18, 2009

Page 123

| | | | | | |
|---|---|---|---|---|---|
| **settlements** 94:3 | 41:12 45:3 63:12 65:23 67:14,23 72:24 73:13 76:22 90:4 97:6 103:17 | **sixfold** 87:15 **size** 88:6 105:18 **skiptraces** 103:17 **skiptracing** 82:10 87:5 | **sounds** 61:12 69:15,21 74:21 **space** 90:5 **speak** 13:20 19:10 22:25 53:25 84:16 87:23 | **stars-aligned** 14:21 **start** 63:25 81:19 88:24 102:5 **started** 92:7,9 **starting** 68:4 | 85:19 **straightforwa...** 63:21 **streamline** 63:20 **Street** 3:6 **strength** 94:12 |
| **settling** 22:18 40:1 50:13 | **sincerity** 17:6 **single** 46:1 80:18 92:10 | **slam** 50:16,17 50:18 93:16 100:17 | **speaking** 39:15 **specific** 29:16 | **starts** 80:21 **state** 24:13 86:17 | **strenuously** 65:15 **striving** 6:14 |
| **seven** 9:6,7 51:21,22 | **sir** 4:9,16,25 5:14,18,19 | **smaller** 46:17 **smarter** 75:2 | 49:17 50:8 56:12 58:25 | **statement** 81:13 | **strong** 58:7 97:16 |
| **Seventh** 21:1,8 21:17 | 6:24 8:22 9:4 11:8,13,15 | **Smith** 13:10,17 **Smith's** 104:20 | 64:12 80:10 **spelled** 86:15 | **statements** 19:15 39:5 | **strongest** 71:2 72:7 |
| **share** 4:18 69:19,24 74:7 | 13:2 14:24 15:19 16:1,7 | **snapshot** 103:22 | **spend** 43:21 **spent** 19:22 | **States** 107:6 **statistically** | **strongly** 10:3 **structure** 26:2 |
| **shared** 72:22 **sharing** 33:21 | 17:13,18 18:13,24 19:4 | **snoozing** 97:6 **social** 57:6 | 38:4 39:5 50:7 51:8 | 53:19 **statute** 19:13 | **structures** 97:11 |
| **shelled** 35:9 **shortest** 10:11 | 20:1 22:7 23:16 26:25 | **somebody** 20:7 27:22 28:7,22 | **split** 62:19 **spoken** 101:23 | 21:5,12,14,15 28:11 31:3 | **struggling** 72:16 |
| **shot** 94:20 99:9 **show** 19:12,16 | 27:25 28:2,21 29:1,23 32:5 | 32:6 57:6 68:25 | **spouses** 61:3 **staff** 14:11 | 43:6 46:3 55:12 58:8,14 | **stuck** 62:1 **student** 82:3 |
| **shown** 14:15 25:12 49:8 | 32:23 33:14 33:19,22 34:3 | **somewhat** 84:7 89:15 | **stage** 17:5,6 80:9 | 59:21 61:16 62:21 66:6 | **stuff** 33:6,6 47:22 61:13 |
| **sick** 14:8 **side** 14:13 15:5 | 34:19,23 36:14,21 | **soon** 6:9,15 8:25 9:3,11 | **stake** 95:18 **stale** 78:16 | 67:25 69:10 100:4,8,14 | 106:13 **subject** 60:5 |
| 38:5 39:6 56:15 64:8 | 37:22 38:6,6 39:7,10,19 | 10:18,20 11:22 12:1 | **stamp** 12:5 15:1 **stand** 11:17 | 101:16 **statutories** 24:2 | 63:2,24 **submission** |
| 74:14 102:12 **sides** 94:4 | 44:6,11 45:16 45:20 46:8,15 | 39:12 43:23 46:13 51:19 | 26:14 33:9,10 **standard** 18:7 | **statutory** 22:5 22:13,17 23:4 | 52:4 **submit** 14:1 |
| **sigma** 50:9 **sign** 15:24 16:3 | 46:19,23 47:18 48:6,6 | 51:19 56:13 58:10,17 | 58:25 59:16 59:17 60:13 | 51:1 64:2 68:6 **step** 10:24 | 37:16 58:11 62:8 66:2 |
| 97:19 **signed** 70:2 | 49:3 71:1,14 71:18,20 | 104:5 106:12 106:14,18 | 69:14 79:22 82:10,20 | 14:14 82:13 84:12 | 67:15,19,23 70:8 76:19,21 |
| **significant** 16:24 25:25 | 72:11,12,18 73:11,19 | **sooner** 57:12 **sorry** 14:3 | 85:11 86:8,19 86:20 87:8,9 | **stick** 75:23 93:21,23 97:4 | 78:20 82:9 84:5 85:5,6 |
| 27:5 68:1 73:16 82:4 | 74:18 77:20 78:22,25 | 16:15 18:19 29:24 88:3,15 | 87:12 98:10 **standards** | **sticks** 51:5,7 55:23 | 87:7 90:14 95:1,10,22 |
| 94:8 99:15,22 **Significantly** | 80:13 89:25 103:2,6 106:3 | **sort** 11:6 18:6 24:9 40:9 | 63:12 **standing** 34:9 | **stipend** 33:18 35:11 69:20 | **submits** 46:5 **submitted** |
| 34:8,12 **signing** 79:12 | **site** 85:1 100:23 **sitting** 15:4 | 52:22 57:8 80:24 82:10 | **standpoint** 49:22 51:2 | **STOCKBRI...** 3:14 | 13:10 89:18 **submitting** 67:6 |
| **similar** 101:6 101:15 | **situated** 1:7 **six** 45:10,11 | 91:6 103:20 104:2 | 69:2,8 79:1 95:6 96:5 | **stood** 11:16 **store** 57:14 | 76:18 79:12 97:18 |
| **similarly** 1:7 37:9 | 50:9 81:9 82:7 91:17 | **sorts** 57:7 **sought** 33:25 | **staples** 88:6 | **straight** 37:16 | **subpoena** 37:2 |
| **simplified** 62:3 62:3 | | | | | |
| **simply** 10:11 24:16 28:4 36:20 37:13 | | | | | |

Transcript of Proceedings
November 18, 2009

40:5
subset 5:23
subsidize 35:8
substantial 89:6 92:14
substantially 84:8
success 99:2,2
successful 48:8 99:1,3
successive 68:23
sued 51:16
suffered 44:15 64:16
suggest 32:1 40:9 96:16 97:13
suggested 61:6 91:21
suggesting 35:20 90:24
suggestion 96:8
suggests 33:1
Suite 2:6,15 3:15
summarized 37:15
summary 99:21
superiority 63:15 79:15
support 12:18 100:24 101:1
supported 32:9 72:5,9,12
supposed 33:7 93:16
supreme 23:2 29:7 63:11
sure 23:20 36:5 50:2 51:16 56:10 57:2 78:3 80:16 83:9 91:9 94:1 98:5 100:24

surmises 15:1
survive 99:21
survived 18:4
suspect 72:11
suspenders 86:6
suspicion 77:21
sustained 42:16
sweeping 7:24
swept 7:5
system 6:25 9:10 13:20 30:14 51:13 59:12 60:4,8 81:9 85:17 104:3,4,8,9,20 104:24 105:1 105:2,4
systems 59:10 104:4

---

**T**

table 4:12 74:12
take 25:10 30:6 51:24 55:17 57:8 59:3 62:14 78:6,9 78:10 92:25 98:11 100:18 100:19
taken 36:25 80:11 101:10 106:20
takes 56:25 73:17
talk 36:17 51:18
talked 4:22 30:22 49:21 91:25 93:4
talking 11:5,6 13:14 46:2 59:11
teach 33:5
teaching 79:17

team 96:25
technical 88:16
TELA 60:2
telephone 4:20 81:15
tell 35:1,16 38:15 48:17 55:16 60:7 63:25 65:15 70:12 74:4 87:19 97:21
telling 18:25 19:1 51:10 65:12 93:9
temporal 59:24
term 8:1 15:9
terminated 7:5
terms 8:15 15:14 16:10 20:3,4 25:15 26:11 47:19 53:9,18,20 55:1 56:13 62:13,19 63:18 65:7 67:25 69:9 75:12 76:1 80:15 86:6,15 86:17 89:3 92:11 94:8,9 97:13 102:14 102:16 104:22 105:7
test 97:19
tested 57:9 64:21
testified 57:18
testimony 10:8 12:11 52:25
text 84:3
thank 5:2 14:2 14:6 36:24 48:21 49:7 74:3 106:3,4 106:22,23

theory 62:24 66:19
they'd 91:5
thing 35:25 36:1 60:14 75:13 76:11 83:10,11 86:18 91:6 100:23 105:13
things 6:23 17:22 26:10 30:21 52:7 63:15 65:2 69:17 74:4,6 76:17 80:3,8 86:10 92:7 97:14 102:18 103:3
think 8:15 14:1 16:6 24:22 25:7 27:12 28:15 31:4,10 32:21 33:1 40:20 49:13 49:21 50:12 50:12 51:14 52:14 53:7,15 54:18 56:23 58:6 59:2,22 60:6,24 61:8 61:23 62:16 63:7,19,25 64:4 65:21 67:23 70:13 71:15 73:1,11 73:22,24 76:2 76:3 79:19 80:2,17 82:20 84:15 85:10 85:16 86:6,15 86:16 87:24 89:1,2,24 90:12,13,16 92:10 94:13 94:14,17

96:13 97:16
97:23 98:25
99:13,16,25
101:2,18,25
104:22
thinking 30:20 39:13 66:6
thinks 49:23
third 37:2 40:4 97:10
THOMAS 1:5
thought 8:20 18:20 53:11 59:3 74:9
thoughts 68:8
thousand 22:6 29:15 73:6
thousands 59:11 87:13
threat 49:14
three 8:19,21 8:24 9:2 10:20 12:1 15:17 37:1 40:3 51:21 52:8 58:23 60:1 81:11 90:6 97:21 103:15 104:19
three-days-fr... 59:16
threshold 19:17
throw 16:4
Thursday 7:6 7:24
time 10:11 19:23 20:8 29:16 37:16 37:21,23 38:4 39:4 43:22 45:19 50:6 52:2,3,8,10,18 53:9,13,14 55:8 56:25 57:15 58:2,3

58:18 59:2,7
59:18,24
75:16 76:22
77:24,25 79:2
82:15 100:9
103:3 106:20
timeframe 103:12
timeframes 89:3 91:7
timely 44:10 81:19
times 4:23 45:11 46:7 53:16 93:11 93:25 94:3,5
timing 78:16 102:15 104:21
today 11:10,11 14:14,20 85:12,13 90:14 96:16 102:22
today's 89:16
told 76:7 88:3
toll 85:17 86:3
tolling 100:8
tombstone 93:14
tongue 6:14 23:21
tooth 92:6
top 19:3,5,7 34:1 72:1 88:8
total 5:23 95:6 95:8,21
tough 92:14
toughly 92:1
tracks 5:11
transaction 7:4 46:11,12 51:4 52:1,3,16 55:8 56:19 57:22 58:25 61:10 62:16 65:25

HART REPORTING, INC.
(877) 907-4278

Transcript of Proceedings
November 18, 2009

67:12 105:22
**transactions**
60:18 61:8
62:5,8,10,11
62:17 85:8
**transcript** 1:13
107:12
**transfer** 5:8
105:19
**transposed**
57:7
**traveled** 74:10
**traveling** 14:8
**treasury** 23:20
**trial** 26:10
**tried** 93:12,17
93:17
**trigger** 52:7
90:8
**triggered** 52:13
103:20
**triggering**
53:22
**trips** 37:10
75:24
**trolled** 85:14
**trouble** 19:18
79:3
**true** 52:10
60:16 107:11
**trusted** 61:18
**truth** 7:20 42:3
59:19 61:19
97:23 101:14
**try** 19:19,23
39:14 51:8
94:1 102:7
106:11
**trying** 35:23
48:1,1 66:4
74:7 77:4 93:7
102:21
**turn** 48:13 63:6
106:11,18
**turned** 30:18

52:7 82:14
**turns** 56:3
**TV** 55:22
**two** 5:21 6:2,20
6:23 16:9
19:20 37:18
37:19 60:14
67:13 77:1
78:5,24 83:5
83:16,17
100:4 102:20
103:3 105:2
**type** 86:20
**typical** 95:3
**typicality** 20:16
27:20
**Tyson's** 48:24

––––––––
**U**
**ultimate** 10:14
15:6
**ultimately**
13:23,24
16:14 26:3
66:23 92:16
**umbrella** 59:21
92:9
**unaware** 67:8,9
**uncapped** 23:5
**uncertain** 58:3
**uncertifiable**
62:23
**unclaimed** 73:3
73:25
**undeliverable**
81:13
**undeliverables**
86:24,25 87:2
**underlying**
56:19 80:23
**understand**
6:21 7:3 11:12
11:14 15:24
27:13 38:14
48:7 59:9 74:8

74:8 77:15,16
88:9 95:15,16
**understanding**
34:15 61:25
**understands**
48:11
**understood**
36:5 95:7,25
**underwriting**
56:7
**undue** 39:21
**unfair** 67:17,18
**unhappy** 53:16
94:4,6
**unimpeached**
92:19
**unique** 31:10
32:7 85:7
**United** 107:5
**unknowns**
99:22
**unlawfully**
21:23
**unqualifiedly**
92:20
**unrelated**
101:11
**unsettled** 61:9
61:13
**Unsuccessful**
75:22
**untoward**
35:21
**unusual** 32:24
33:1 75:14,15
75:15
**unusually**
46:22
**unwritten**
34:15
**un-cashed** 73:3
**update** 81:4
86:2
**updated** 81:2,9
81:16,23 82:4

82:8,11 87:4
**updating** 81:17
103:24,25
**upfront** 69:18
**Urbanski** 1:14
107:8
**USA** 85:12,13
**use** 23:23 56:13
57:19 58:10
84:2 105:3,5
**user-friendly**
84:22,23
**uses** 104:9
**utility** 85:14,15
**U.S** 1:1 23:2,20
29:7 81:3
101:17

––––––––
**V**
**v** 1:9 5:6,8 29:4
49:20
**VA** 2:7,16 3:16
**valuable** 56:7
**value** 20:6 44:2
44:9 62:24
78:15 97:14
99:15 100:16
103:4
**valve** 32:24
**variance** 60:19
**variation** 58:20
**various** 72:6
96:25
**vendor** 105:3
**vendors** 59:13
**venue** 5:8
**verbal** 54:14
**verbatim** 107:5
**version** 6:22,22
18:6
**versus** 4:3 21:3
22:23 27:23
29:9 30:2
38:16 51:21
87:9

**violate** 24:3
**violated** 28:11
**violation** 6:3
19:13,25 21:4
22:3,16 24:2
25:13 27:1,18
46:13 50:11
58:8 62:22
64:8 69:10
94:19
**violations** 21:10
46:9
**Virginia** 1:2,15
4:14,18,19 5:9
18:3 21:2
58:24 75:23
78:8 107:7

––––––––
**W**
**waited** 57:10
103:14
**waiting** 57:22
**walk** 89:23
**walkaway**
94:16
**want** 14:5,7
26:23 29:11
36:4 38:4
39:11,12,20
42:11 48:17
66:16 70:17
70:19 74:4,7
74:13,13
76:14,22
78:13 80:6,16
83:7 91:20
95:15,21,23
96:21 99:18
106:9
**wanted** 20:7
25:24 26:15
34:4 55:6
59:24,25
69:24 84:14
87:23 90:11

**wants** 41:17
78:17 94:25
102:12
**warmup** 78:3
**Warwick** 2:6
**Washington**
72:20
**wasn't** 28:14
61:17 72:24
92:10,10
**way** 6:23 23:13
24:15 25:7
28:23 41:25
62:2,21 65:1
65:22 66:6
73:18 74:11
75:25 93:25
98:3 106:5
**Web** 85:1
100:23
**Wednesday**
1:16
**week** 7:7 28:8
59:11 77:2
**well-known**
59:18
**went** 19:19 25:2
51:17 54:9
65:6 96:17
**weren't** 42:15
93:22 96:22
96:22
**Western** 1:2
107:6
**we'll** 36:17
50:20 52:4,5,5
62:9 83:13
**we're** 13:14
41:10 47:20
60:9 67:15
71:10,10 74:8
77:4 79:25
80:16,17
86:19 88:22
96:14

Transcript of Proceedings
November 18, 2009

**we've** 4:4 27:6
  40:25 41:6
  68:23 72:19
  74:10 81:20
  82:25 83:1
  87:2 106:5
**whatsoever**
  92:4
**willful** 19:12,25
  22:3,16 24:2
  43:7 50:10
  64:1,8,24
  65:10 68:3
  94:19
**willfulness**
  24:17 50:22
  63:6 99:9
**willing** 12:23
  85:24 93:14
**Wilson** 13:23
  13:24 15:10
  33:4 37:25
  60:9 78:3
  82:16 88:14
**Wilson's** 41:9
  77:18
**wishes** 90:13
**withdrawn**
  52:6
**witness** 13:18
**wonder** 42:12
  42:19
**words** 32:2
  79:24
**work** 37:7,12
  37:18 47:6,22
  49:17 78:21
  99:16
**working** 72:21
  75:11 104:14
  105:23
**works** 11:14
  13:18 98:17
  98:18
**world** 48:10,12

49:10
**worth** 33:11
  64:16
**wouldn't** 26:25
  34:6 44:15
  50:4 63:10
  73:8 93:23
**writing** 106:10
**written** 34:15
  35:13 62:21
**wrong** 13:9
  22:20 56:4
  74:6
**wrongs** 25:20
**wrote** 27:6

─────
**Y**
**yeah** 4:22 13:12
  23:8 35:11
  39:13 71:20
  74:20 83:18
**year** 8:13 58:22
**years** 49:18
  60:2,3 85:11
  100:4
**y'all** 4:6 9:22

─────
**Z**
**zero** 50:1,4 68:5

─────
**$**
**$1,000** 23:14
  24:22 64:18
**$10** 45:23
**$100** 15:25
  22:17 26:1
  38:17 46:18
  46:25 64:18
  70:8 73:16,17
  78:4
**$100,000** 44:15
  82:12
**$12,000** 35:9
**$2** 16:6,23
  45:23 46:7

**$2.4** 37:4 38:16
  39:22 40:2
**$2.5** 37:17
**$22** 18:2
**$25** 46:25
**$25,000** 77:11
**$3** 15:21 22:19
**$3.5** 93:15,18
  95:19
**$5,000** 33:18
  34:11 36:19
**$500** 46:21
  62:13
**$500,000** 17:9
  78:5
**$6** 20:10 24:25
  25:1,5,15
  28:23 43:18
  43:21 44:3,10
  44:13,19
  74:16,17
**$7** 44:23 73:18
**$8,000** 76:4
**$9.4** 48:10

─────
**0**
**09** 103:11

─────
**1**
**1** 1:18 83:13,15
  83:18,21,25
  88:7 107:11
**1:52** 106:25
**10** 50:22 90:18
  102:17
**10th** 39:3,9,14
  41:19,20
**10,000** 37:2
  40:4
**100** 2:6 15:23
  16:5 22:6
  67:22
**107** 1:18 107:11
**11** 90:22
**11th** 64:12

**11:38** 1:17
**12** 91:13
**120** 89:4 90:24
  90:25
**12515** 2:6
**13** 91:17
**130** 77:4
**14** 82:15 89:14
  89:18
**15** 85:11
**1681g(g)** 6:7
  56:12
**17th** 77:1 78:9
  78:10 95:9
**1751** 3:15
**18** 1:16 107:9
**1800** 2:15

─────
**2**
**2** 61:25 83:15
  83:18,21 84:6
  88:2,7
**2.2** 60:18 61:7
  62:1,15
  105:21
**2.4** 17:10 46:24
**20** 49:18 85:11
**2000** 58:14
**2003** 6:6
**2008** 100:3,12
**2009** 1:16 90:4
  107:9,14
**22102-3833**
  3:16
**22314** 2:16
**23** 11:14 58:17
  63:12 79:4,15
  80:1 84:19
  86:8,14
**23-F** 18:4
**23606** 2:7
**25** 17:11 40:20
  40:25 41:2,7
  41:14,16
  48:10 80:1

**25-percent**
  16:18
**268-6057** 3:8
**273-7770** 2:17

─────
**3**
**3** 24:22 100:21
**3.5** 15:18 22:19
  23:14 29:8
  30:1 60:17
  94:2
**30** 40:25 41:2,7
  53:11 81:22
  89:7,12 90:4
  91:4,15,16
  102:17
**30(b)(6)** 13:18
**350** 76:9

─────
**4**
**40** 89:9 90:20
  90:21
**400** 94:4
**412** 3:8
**425** 3:6
**45** 53:15

─────
**5**
**5:08CV00066**
  1:9
**5:08-CV-00066**
  4:3
**50** 91:5
**50/50** 62:18
**500** 3:15

─────
**6**
**60** 91:5 102:17
**60/40** 62:18
**600** 2:15
**66** 47:13

─────
**7**
**7** 16:11 19:6
  73:9

**703** 2:17 3:17
**75** 47:15,16
**757** 2:8

─────
**8**
**8th** 77:2
**800** 25:13

─────
**9**
**9** 17:8
**9th** 77:3 107:13
**9.4** 16:16 17:2
  18:16,17,23
  80:1
**9.5** 18:19
**9.9** 17:17 18:11
  18:15 19:3
  80:2
**9.95** 15:16 17:2
  18:19,20,21
  22:18
**90** 50:19 91:11
**903-9000** 3:17
**930-3660** 2:8
**94105** 3:7
**980,000** 62:17

─────