**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division**

| | |
|---|---|
| THOMAS D. DOMONOSKE, individually and on behalf of all those similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA, N.A., a national banking association,<br><br>    Defendant. | Civil Action No. 5:08-cv-00066 |
| VICTOR RIVERA, individually and on behalf of all those similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA, N.A., a national banking association,<br><br>    Defendant. | Civil Action No. 5:09-cv-00080 |

## PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S REPORT & RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)(C), Plaintiffs (Thomas Domonoske "Domonoske" and Victor Rivera "Rivera") state the following objections to the Report and Recommendation of Mag. Judge Michael Urbanski entered on January 27, 2010 ("Report and Recommendation"):

1.    The Plaintiffs object to the Magistrate's legal finding that the proposed class settlement is not adequate enough for the class members, specifically as it relates to the right of the putative class representatives to request an incentive award of up to $5,000 at the Final Fairness Hearing;

2.    The Plaintiffs object to the Magistrate's legal finding that the proposed class settlement is not adequate for class members, specifically as it relates to Bank of America's agreement not to oppose a future attorney's fee request by Class Counsel which is not presently before the Court; and

3.     The Plaintiffs object to the Magistrate's legal finding that the proposed class settlement is not adequate or reasonable, because it contemplates the presentation to the District Court of a proposed consent order defining Bank of America's compliance under 15 U.S.C. § 1681g(g).

## PROCEDURAL BACKGROUND

On September 30, 2009, the Plaintiffs filed their motion for preliminary approval of the class settlement in this case.  Defendant joined this request on October 30, 2009.  On October 2, 2009, this Court entered its order referring the matter of the preliminary approval to Mag. Judge Michael Urbanski:

> This matter is before the court on the Plaintiff's Motion for Preliminary Approval of Class Settlement.  It is ORDERED and ADJUDGED that the question of the appropriateness of class certification and all other matters necessary to insure compliance with Rule 23 of Federal Rules of Civil Procedure are referred to United States Magistrate Judge Michael F. Urbanski pursuant to 28 U.S.C. § 636, and he is designated to conduct hearing, including evidentiary hearings, as he finds necessary, and to submit his proposed findings of fact and recommendations for disposition.

Order of Referral.  (Docket 70).  On November 18, 2009, the Magistrate Judge conducted a non-evidentiary hearing pursuant to the order of reference.  Following the hearing, Judge Urbanski directed additional submissions from the parties concerning the settlement, any side arrangements, the commencement of the relevant class periods, and the time expended by the parties in bringing the matter forward for certification.  (Docket 78 and 80).   Relevant to the present Objections[1], the Magistrate Judge ordered:

> Both parties were to file "a detailed statement reflecting the time counsel spent on this matter and costs incurred.  Such billing statements [were to] include sufficient detail for the court to obtain an understanding as to the basis for each increment of time charged and each cost incurred."

Order, December 3, 2009 (Docket No. 80).  This was consistent with the Magistrate Judge's

---

[1] The Magistrate Judge also requested information regarding several other issues including class definitions, whether there were any "side-deals" with the class representatives, pendency of competing class actions and several other topics.   The parties provided this additional information and the subject of each is now not material to the present Objections.

earlier ruling from the bench.

Following these submissions, the Magistrate Judge issued the Report and Recommendation.  The Report and Recommendation recommended that the Court 1) certify the Class; 2) approve the settlement in part; and 3) reject the settlement in part:

> While the undersigned has concerns over commonality, typicality, predominance and superiority, on balance the requirements of Rule 23 appear to be met at this preliminary stage.  The settlement itself and the mechanics of claims administration are fair and adequate in most respects. However, the undersigned believes the amount of the proposed payment to the class representatives and the attorneys to be unreasonably high, and the proposed settlement inappropriately calls for injunctive relief.  **As such, the undersigned RECOMMENDS that preliminary approval of the proposed class action be GRANTED and preliminary approval of the settlement be GRANTED in part and DENIED in part.**

Report and Recommendation.  (Emphasis added).   Procedurally, if the Court adopts the Report and Recommendation, it effectively rejects a nearly $10 million settlement which was negotiated with the help of a retired U.S. Magistrate,[2] and after significant litigation time and resources to achieve same[3].  Plaintiffs' objections are as to each of the Magistrate Judge's conclusions of law upon which the court would deny approval of the class settlement.

---

[2] Accompanying this brief is the declaration of Ret. Magistrage Judge Edward Infante who presided over the mediation pursuant to Court Order.  (Docket 48).

[3] Under Rule 23, the Court may not redraft or amend the agreement of the parties.  Rather, the Court may either approve or reject the agreement as a whole. The Magistrate Judge's recommendation that the Court partially accept and partially reject the settlement terms runs counter to United States Supreme Court authority which requires the Court to approve or decline the settlement in its entirety.  If the settlement terms are rejected, the Court may advise the parties as to the deficiencies so as to allow them to reformulate an acceptable settlement.  The Court may not, however, *sue sponte* modify that agreement.  *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986); *Olden v. LaFarge Corp.*, 472 F.Supp.2d 922 (E.D.Mich. 2007).  *Molski v. Gleich,* 318 F.3d 937, 946 (9th Cir. 2003).   *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* 553 F.Supp.2d 442, 490 (E.D.Pa. 2008).

<u>**PLAINTIFFS' OBJECTIONS**</u>

**A.     THE REPORT AND RECOMMENDATION INCORRECTLY RECOMMENDS REJECTION OF THE CLASS SETTLEMENT BECAUSE OF ITS ATTORNEYS FEES PROVISION.**

  **1.     The Terms of Settlement.**

  As noted in the Report and Recommendation, significant attorney's fees and related resources were devoted and incurred in negotiation and construction of the proposed class settlement.   In fact, more attorney time was spent in the case after the point where the liability facts were discovered and developed.[4]   At the end of this difficult negotiation process, two terms germane to the present objection were reached:

  First, Bank of America agreed to pay in excess of $11.95 million to the benefit of the class and in settlement: $9.95 million in a cash common fund and an amount in excess of $2 million for class administration and notice.  None of this amount will revert to Bank of America. The Report and Recommendation notes the considerable difficulty presented in establishing liability, willfulness, and the elements of class certification.  Yet by the efforts of Plaintiffs' counsel, the proposed settlement would exceed all but two other approved FCRA class settlements in the known history of the statute.[5]

  The second now relevant term regards the manner in which Plaintiffs' counsel would petition the Court for attorneys' fees and reimbursement of costs:

  8.1     Attorneys' Fees and Expenses.  Class Counsel agree to request approval of attorneys' fees in an amount not to exceed 25% of $9,400,000 of the Common Fund (approximately 23% of the Common Fund).  In addition, Class Counsel and

---

[4] As observed by the Magistrate Judge, the parties expended almost identical amounts of time following the stay, with each spending approximately 1300 hours in time to bring the case to resolution.

[5] *In re Trans Union Corp. Privacy Litigation*, Civil No. 00-CV-4729, MDL Docket No. 1350 (N.D. Ill.); *Williams, et als. v. Lexis Nexis, et als*. Civil No. 3:06cv241 (E.D. VA).  A third class settlement exceeded the recovery in this case, but all of its $15 million was paid in attorneys' fees with no money paid to the class.  *Clark v. Experian*, Civil No. 8:00-1217-24 (D.S.C.).

the Class Representatives will also request Court approval of their litigation costs and expenses.  Bank of America will not oppose any such requests, and will pay any fees approved by the Court in an amount that does not exceed 25% of $9,400,000 of the Common Fund, and any costs and expenses approved by the Court, and will do so out of the proceeds of the Common Fund within twenty-one (21) days after the Effective Date.

Proposed Settlement at ¶ 8.1.  Nothing in this language requested any amount to be approved by the Court prior to final approval, or the Defendant.  Indeed, this language only served to cap any fee request that might be made by Class Counsel at a later date without Bank of America's objection. [6]  And while the parties expressed this fee cap in terms of the distributed amount, the true value of such a settlement would ordinarily include the costs of class notice and distribution.  In this case, that amount is estimated at $2 million.  **If the District Court were to approve this full un-objected amount, this would constitute only 19.6% of the gross $11.95 million to be paid by Bank of America in settlement between the common fund and administration costs.**

> **2.      The Magistrate Judge's ruling on the proposed fee provisions was procedurally premature and not properly before the Magistrate under the terms of the referral.**

>> **a.      The Settlement Attorneys Fee Provision did not predetermine any particular fee award.**

The Report and Recommendation recommends that the Court deny preliminary approval of the settlement because of the attorneys' fee provision in the agreement.   The Magistrate determined that the potential recovery of attorneys' fees up to the highest threshold at which Bank of America would not object could permit a fee that renders the settlement unfair and inadequate.

---

[6]  This "no objection by Defendant" and requirement of fee determination and approval by the District Court is a preferred and ethical fee provision in class action settlements.   "This practice serves to facilitate settlements and avoids a conflict, and yet it gives the defendant a predictable measure of exposure of total monetary liability for the judgment and fees in a case.  To the extent it facilitates completion of settlements, this practice should not be discouraged." Newberg on Class Actions § 15:34 (4th ed.)

The greatest difficulty with this conclusion is that it misinterprets the language in the settlement agreement. Plaintiffs' counsel certainly believe that they can establish before the Court a basis for recovery of their attorneys' fees up to the 19.6 % of the gross payment by Defendant. However, if the Court determines that this percentage is too large at the end of the case with actual briefing and argument available, after considering the amount of all additional time to be spent by Plaintiffs' counsel administering the settlement and responding to class members, and after hearing from any objecting class members (or none at all) regarding the fee, the Court can simply make its determination and ruling in accordance with Rules 23(h) and 54(d). Nothing about the settlement requires or predetermines a specific attorneys' fee at the end of the case. Instead, this settlement clause merely requires Bank of America to stand down from any objection so long as the attorneys' fees to be paid do not exceed the agreed threshold. This role, contemplated by Rule 23 and by the parties in this settlement is much better reserved for potential class member objectors, if any.

> **b.    The Premature Recommendation Regarding Attorneys' Fees was Procedurally Erroneous as it Deprived Plaintiffs' Counsel of the Opportunity to Brief, Prove and Argue the Basis for their Rule 54 Fee Petition.**

The Magistrate Judge correctly determined that the proposed settlement class met the requirements for certification, and that the procedure for obtaining that settlement was fair. However, the Magistrate Judge erred in his analysis of the reasonableness of the proposed settlement. For purposes of determining whether the settlement is reasonable, a court need only determine whether a proposed settlement is "within the range of possible approval" and whether the proposed notice should be sent to class members.[7]   The court need not – and indeed is

---

[7] *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir.1981); *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 & n. 13 (7th Cir.1980), *Beaulieu v. EQ Indus. Services, Inc.,* 2009 WL 2208131, *23 (E.D.N.C.,2009); *In re Motor Fuel*

prohibited from – looking into the merits at this phase.

The Report and Recommendation presumed an incorrect posture and as well as the scope of the referral when it undertook to delve into the time expended by the parties and consider the proper fee on the merits.[8]  The Report and Recommendation prematurely sought to determine the appropriateness of the proposed fee award, rather than reserving that issue for review by the Court at a final approval hearing.  Those issues were not before the Magistrate Judge under the order of reference, were not procedurally ripe for determination, and should have been reserved to the final approval stage of these proceedings.  Nothing within the body of Rule 23 requires or even permits a determination of fees at the preliminary approval stage, before a class has even been certified.

In addition to running afoul of these basic procedural guidelines for preliminary approval, the Magistrate Judge's report and recommendation also violated the more specific procedural requirements for determination of attorney's fees under Rule 23(h).  In cases involving class claims, attorneys' fee awards are governed by Rule 23 itself.  The Court, upon a motion by the requesting party, may only award those fees for that purpose.

> (h) Attorney's Fees and Nontaxable Costs. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:
>     (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of

---

*Temperature Sales Practices Litigation,* 258 F.R.D. 671, 675-676  (D.Kan.,2009);  *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 666 (E.D.Cal.2008);  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209-10 (S.D.N.Y.1995) see also Manual for Complex Litigation § 21.632; Newberg on Class Actions § 11:25 (4th ed.2002).  "The standards for preliminary approval of a class settlement are not as stringent as those applied for final approval. See *Karvaly v. eBay Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y.2007)." *In re Motor Fuel Temperature Sales Practices Litigation*, 258 F.R.D. 671, 675-676  (D.Kan. 2009); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434,444 n. 7 (E.D.Pa.2008)("the standard for preliminary approval is far less demanding.")
[8] Counsel for Plaintiff advised the Magistrate Judge at the time of the Court's initial request for billing materials that this determination was not before the court, and not properly considered upon a motion for preliminary approval.  Transcript of Hearing 39-41.  (Docket 90).

the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

Fed.R.Civ.P. 23(h).   Under this rule, it is clear that the Court retains discretion to award fees, but only after a motion has been made by class counsel pursuant to Rule 54(d)(2)(D).  As envisioned by 54(d), the motion for fees will be submitted only after the Court enters an order resolving the class's entitlement to relief.

Under this framework, the Magistrate's role in evaluating the fee provisions of the proposed settlement provision was limited to deciding if its terms irreparably tainted what was an otherwise fair and adequate settlement.  Put another way, did the inclusion of the fee provision regarding Bank of America's agreement not to object to a certain payment of fee taint the remainder of the deal such that it was no longer fair? The Magistrate Judge's Report and Recommendation reveals that this provision should not have caused the rejection of the deal in whole or in part.

In this case, no motion was before the Court, and by taking up the issue in advance of a properly filed motion, the Court took up an issue that was not necessary to the preliminary approval, and in fact, violated the procedures outlined in Rule 23(h).  In so doing, the Court deprived Plaintiffs' counsel of the opportunity to brief and present evidence of the reasonableness of its anticipated fee request, and nothing in the initial order of reference or at the hearing would have allowed Plaintiffs' counsel to anticipate the obligation to prove and argue a

full blown fee petition at this early stage of the proceedings.[9]  For these reasons, the Plaintiffs request that the Court sustain these objections, and grant preliminary approval to the proposed class settlement submitted by the parties.

> **3. Without an opportunity to receive substantive briefing and argument, the Magistrate Judge's report and recommendation incorrectly rejected the reasonableness of the potential attorneys fee.**

As applied to the facts of this case the standard for preliminary approval was satisfied, and the Magistrate Judge erred in conducting a premature evidentiary analysis of an issue that was not properly before the court at that juncture.  The proposed fee terms merely provided that Plaintiff could submit a request for up to 25% of the first $9.4 million of the common fund (19.6% of the gross amount to be paid by Bank of America), and that Bank of America would not object to that later fee request up to the threshold.  While Plaintiffs again reiterate that the appropriateness of a particular fee and the evidence and argument to support same must be considered under a formal Rule 54 procedure at the completion of the case, they do object to the Report and Recommendation's conclusion that a fee limited to a partial number of the billable hours documented – a straight time fee – adjusted to the average hourly rate of defense counsel (including its heavy use of associate, and presumably paralegal, work) is the maximum reasonable fee available.

The Report and Recommendation reached a number of conclusions as to the degree of work and difficulty incurred in the case to which Plaintiffs disagree and object.    As the

---

[9]While the Court itself retains discretion to fashion a procedure to set fees, that procedure must provide adequate notice and an opportunity to be heard on the matter.  *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 231 (5th Cir. 2008); *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614 (1st Cir.1992); see also *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 584 (3d Cir.1984) (stating that "the hearing on a fee application in an equitable fund case requires compliance with those procedural rules which assure fair notice and an adequate opportunity to be heard.").

exchanges between the parties evidence even at this stage of litigation, and as the Report and Recommendation concedes in outlining the challenges faced by the Plaintiffs in establishing class liability and willfulness of the FCRA violation, this was not a legally or factually simple case. Plaintiffs object to any finding by the Magistrate Judge to that effect. Report and Recommendation, p. 40. At the time of the litigation, no case law had construed the central provision at issue "as soon as is reasonably practicable," no government initiative or investigation had been launched upon which Plaintiffs could rely, no regulations had been issued. As noted by defendants in several filings, this legal issue received the Bank's highest degree of scrutiny and review. Against this backdrop, Plaintiffs counsel was still able to secure a substantial settlement for the benefit of the class along with a consent decree rectifying the allegedly deficient practices that caused this action to come before the Court.

While merits litigation was at full steam for "just seven months" – actually a long period in both of Virginia's federal districts – the contentiousness and adversarial efforts were not relieved when dispositive motions practice and further discovery were stayed for formal mediation.[10] After the stay, each and all points had to be negotiated - cash fund amount, method distribution, class notice, choice of administrator, and terms of Defendant's proposed consent order, etc. In each stage of this case, Plaintiffs' counsel worked to improve the leverage and, later in mediation, the result for the class members. Even by the conclusion of the Report and Recommendation, the results in the case were exceptional. If the potential attorneys' fee is large, it is solely because the success for the class was proportionately so. The Magistrate Judge's determinations of these facts arose without the benefit of a full briefing. As such these findings were premature and erroneous.

The focus of a fee determination in a class settlement is the actual benefit obtained for the

---

[10] See declaration of Ret. Magistrate Judge Edward Infante, attached as Exhibit 1.

class. MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.71 ("Compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The "fundamental focus is the result actually achieved for class members."  That approach is premised on finding a tangible benefit actually obtained by the class members.  In comparing the fees sought by the lawyers to the benefits conferred on the class, the court's task is easiest when class members are all provided cash benefits that are distributed.")  Courts across the country typically award fees of a least twenty-five percent or more in cases in which class counsel generates a common fund for the benefit of the class.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (explaining that "the vast majority of courts now permit or direct district courts to use the percentage-fee method" and "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund").  In fact, a comprehensive study of attorneys' fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount."  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements:  An Empirical Study*, 1 J. OF EMPIRICAL LEGAL STUDIES 27, 31, 33 (2004).  This holds true even in instances where the class recovery runs into the hundreds of millions of dollars.  *See, e.g.*, *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 295 (1st Cir. 1995) (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million).

Virtually all the cases cited in the Report and Recommendation approved percentage of fund fees, and most of those same cases recognized that presumptive reasonableness of a 25% request.  Indeed, the strong trend within district courts of this Circuit[11] has been to use the

---

[11]Plaintiff's counsel undertook to identify all cases within the Circuit where the court was

percentage method in common fund cases.[12]   *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D.Me.2003); *Microstrategy*, 172 F.Supp.2d at 787; *In re Vitamins Antitrust Litig., Misc. No. 99-197, MDL No. 1285*, 2001 WL 34312839, at *3 (D.D.C. July 16, 2001).   See also, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir.1998) (referring to 25% in attorneys' fees as a "benchmark award";. *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D. La. 1993) (fees in most common fund cases range from 20% to 30% of the fund).

---

faced with the choice between an award of a common fund percentage or a *Lodestar* award in a class action settlement.  This research turned up the following cases.  In each instance where an award was granted the court elected to award a percentage of the common fund within the range outlined above and using the lodestar only as a "cross check" against that recovery.  *Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC*, 623 F.Supp.2d 713 (S.D.W.Va.,2009.)(Common fund percentage awarded); *Jones v. Dominion Resources Services, Inc.*, 601 F.Supp.2d 756 (S.D.W.Va.,2009)(Court approved common fund of 3.4 top 4.3 constituting 20% of the fund reasonable); *Smith v. Krispy Kreme Doughnut Corp.*,  2007 WL 119157 (M.D.N.C.,2007)(26% fund award amounting to 1.6 multiplier of lodestar reasonable); *Teague v. Bakker,* 213 F.Supp.2d 571 (W.D.N.C.,2002)(only case we could find where the Common fund ultimately denied based on the fact that no common fund was created and no class notice generated);  *In re Microstrategy, Inc.*, 172 F.Supp.2d 778 (E.D.Va.,2001) (approving 18% common fund at 2.6 lodestar was reasonable); *Kidrick v. ABC Television & Appliance Rental*, 1999 WL 1027050 (N.D.W.Va.,1999) approving percentage award of 30%); *Goldenberg v. Marriott PLP Corp.*, 33 F.Supp.2d 434 (D.Md.,1998)(court approves 11.3% cross-checking to 3.6 and noting settlement within average range of 3 - 4.5 for comparable cases); *Strang v. JHM Mortg. Securities Ltd. Partnership*, 890 F.Supp. 499 (E.D.Va.,1995)(awarding 25% of common fund); *Edmonds v. U.S.*, 658 F.Supp. 1126 (D.S.C.,1987.(approving requested 5% of fund and engaging in Lodestar cross check).  Additional support for these awards is found within the recent case of *Mills* cited by Judge Urbanski in his Report and Recommendation.  The *Mills* court undertook a survey of recent percentage fee awards by other district courts within the Fourth Circuit.

[12]This rule is well established in other circuits.   *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir.1995); *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir.1995); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir.1994); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir.1993); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974-75 (7th Cir.1991); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.1988);*Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C.Cir.1993).

In this case, the fee in question fell within the range of a reasonable settlement, and this term did not and could not have rendered the overall balance of the settlement to be unreasonable.  Consequently, the Magistrate should not have rejected this term or withheld preliminary approval based upon a presumptively reasonable fee that had yet to be requested by Plaintiffs' counsel.  By withholding approval based upon a fee request that was not yet before the Court, the Magistrate's recommendation went beyond the scope of the referral and "placed the cart before the horse".  See Transcript (Docket 90), p. 40.  For these reasons, the Plaintiffs request that the Court reject the Report and Recommendation of the Magistrate Judge as to the issues surrounding the award of attorney's fees and approve the class settlement as drafted by the parties.

**B.    THE REPORT AND RECOMMENDATION INCORRECTLY RECOMMENDS REJECTION OF THE CLASS SETTLEMENT BECAUSE OF ITS CLASS REPRESENTATIVE INCENTIVE AWARD PROVISION.**

For many of the same reasons that Plaintiffs have objected to the Report and Recommendation that the proposed settlement be rejected because of its attorneys' fee provision, they also object to the recommendations concerning the provision permitting application to the District Court for an incentive award for the Class Representatives.

As with the attorneys' fee provision, the proposed settlement did not predetermine an incentive award amount, or even a judicial conclusion that such an award was deserved.  Instead, it merely set a ceiling below which Bank of America would not object - $5,000.  In this case, the Magistrate Judge mistakenly undertook to determine the final fairness of the proposed incentive award.  The Report and Recommendation sets forth sufficient facts to determine that such incentive awards are customary and proper.  As such, this term should not have caused the rejection of this term.

Given the customary nature of these awards, any determination along these lines was premature, and should have been reserved for a review of the settlement at a final fairness hearing. Courts routinely award service or incentive awards to named plaintiffs in class actions, including awards ranging from $1,000 to $10,000.   See Declaration of Ret. Magistrate Edward Infante, Exhibit 1.  *See e.g. Staton v. Boing Co*., 327 F.3d 938, 976-77 (9th Cir. 2003); *In re Bancorp Litig*., 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  In fact, in each of the FCRA class settlements approved in Virginia, an incentive award has been awarded.  *Williams, et als. v. Lexis Nexis, et als*. Civil No. 3:06cv241 (E.D. VA), *Beverly v. Wal-Mart Stores*, Inc., Civil No. 3:07cv469 (E.D. Va), *Linares v. First Equity Card*, Civil No. 3:05cv103 (E.D. of VA), *Wilder v. Triad Financial Corporation*, Civil No. 3:03CV863.  These incentive *awards* are fairly typical in class action cases. *See* William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. Rev. 1303 (2006) (finding twenty-eight percent of settled class actions between 1993 and 2002 included an incentive award to class representatives). *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).

To the extent that these awards are customary, usual, and expected within the range provided in the proposed settlement, the provisions concerning possible incentive awards should have been acceptable on their own under the standard before the Magistrate Judge.  The proposed provisions concerning the incentive award falls within the broad range of reasonable settlements.  Consequently, the provision should not have been rejected, and should not now cause the rejection by this court of the overall settlement.  Rather, to the extent that a request is made for an incentive award, that award may be reviewed by class members and the Court at

final approval.  The Magistrate Judge prematurely attempted to determine this issue, and for that

reason Plaintiffs object.

## C.    THE DISTRICT COURT HAS AUTHORITY TO ENTER A CONSENT ORDER DEFINING BANK OF AMERICA'S COMPLIANCE UNDER 15 U.S.C. § 1681g(g).

Plaintiffs also object to the Court's conclusion that "the proposed settlement, containing a

consent order providing for injunctive relief, is contrary to law and cannot be approved, even

preliminarily."   Report and Recommendation, p. 46.   The parties proposed the following

paragraph 7 in the Settlement Agreement, entitled Injunctive Relief:

> The Parties and Class Counsel agree to the entry of an Injunction and Consent Order regarding procedures and processes to be used by Bank of America in preparing and delivering notices under 15 U.S.C. 1681g(g).   The Class Representatives and their counsel will represent that they have reviewed the Declaration of Marty Smith as agreed by the parties, and they agree that this procedure for Bank of American's sending of credit score disclosures detailed therein would comply with the Fair Credit Reporting Act, 15 U.S.C. 1681g(g). Entry of an Injunction and Consent Order in a form substantially similar to Exhibit D is a material term of this Agreement, and Bank of America reserves right the (sic) void this Agreement in the event that the Court refuses to enter such an Injunction and Consent Order.

This provision should clarify Bank of America's responsibilities under 15 U.S.C.

1681g(g).   In this regard, Plaintiffs concur with Defendant's objection to the Report and

Recommendation on the basis that (a.) the proposed Order is in fact nothing more than a Consent

Order, rather than a substantive Injunction and (b.) the correctness and merit of the facts of the

proposed Consent Order remain open questions for determination at the Final Fairness

Hearing[13].   The parties have agreed in the Settlement that the entry of the proposed Order by the

Court is a material term of the Agreement.   While Plaintiffs will not object to the presentation of

such an Order to the Court, the Defendant retains the responsibility to prove at the hearing that

---

[13] Plaintiffs adopt in full Bank of America's legal argument in this regard as it has been represented to counsel for Plaintiffs.

the compliance scheme detailed in the proposed Order actually comports with the FCRA.[14]

## D.   FINDINGS OF FACT TO WHICH PLAINTIFF TAKES EXCEPTION BUT WHICH DID NOT RESULT IN ADVERSE RULING.

The plaintiffs note that the Magistrate Judge made a number of observations upon which he apparently relied in rendering his Report and Recommendation.   Ultimately, with the exception of the recommendation as to attorneys' fees, class incentive awards and injunctive relief, the Report and Recommendation recommends approval of the balance of the proposed Settlement sought by the parties.

However, underlying the Report and Recommendation, the Magistrate Judge made observations, and statements as to factual conclusions, and in some instances legal conclusions, to which the Plaintiffs object.[15]   Plaintiffs object to such findings and conclusions generally on the grounds that this case is at the preliminary approval stage, and determinations of disputed or contested factual issues are inappropriate.   The plaintiffs note at least the following specific objections:

1.   The plaintiffs object to the "finding" drawn from Bank of America's

---

[14] In addition to these two bases, shared with Bank of America's Objection, Plaintiffs would also object to the denial of Preliminary Approval because the Report mistakenly reached the conclusion that the question as to whether or not injunctive relief is available under the FCRA is closed.   The availability of injunctive relief under the FCRA was not briefed or argued by the parties' in their effort to obtain preliminary approval.   While the Fifth Circuit and several District Courts have concluded that the FCRA lacks an injunctive relief remedy, still others have held otherwise.   See e.g. *Harris v. Experian, et al*, civ. No. 6:06-cv-01808  (D.S.C. June 26, 2007) ("[O]n the issue of the availability of injunctive relief, the Court concludes that although it is aware of contrary authority, none of it is binding on this Court, and that such authority is inconsistent with *Califano v. Yamasaki*, 442 U.S. 682 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction.").   Accordingly, the Court concludes it has not been divested of its authority to issue injunctive relief in this case.")   Nevertheless, as argued herein and by Defendant, the Court need not resolve this dispute as the proposed entry of Defendant's consent order is not premised upon the existence of injunctive relief under the FCRA.

[15] If these are not subject to the waiver provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2) – if they are not deemed formal findings of fact and conclusions of law – Plaintiffs' objections herein may be disregarded and the Court need not take up these findings.

supplemental submission that "the facts surrounding Domonoske's claim, as set forth below, are far from typical" (Report and Recommendation, p. 17) and that "[i]mmediately after contacting Bank of America about increasing his home equity line, Mr. Domonoske purchased his credit score from Experian – one of the three major credit bureaus – for $6, and engaged counsel to advise him about the Bank's credit score disclosure obligations under the FCRA."   (Report and Recommendation , pp. 17-18) (emphasis in Report and Recommendation ).

The Magistrate apparently relied in full on statements made in Bank of America's submission on December 18, 2009, a brief which sets out statements which are inaccurate, are not supported in the record, and/or exist in the record only based upon consideration of the facts in the light most favorable to Bank of America.  Initially, it is clear that Domonoske is typical of all members of the ACAPS class in that he received his credit disclosures only after closing and has suffered delay due to a common procedure at Bank of America implemented to work in the same manner across all members of the class.

Additionally, the first fact, underscored and relied upon by the Court, is inaccurate as stated.  Domonoske made numerous efforts after applying for the first loan to secure his credit score from the Bank by voluntary means.   Domonoske asked several different Bank representatives about the credit score and was told different and varying things, including that he should buy his credit score because the Bank would not give it to him before he closed the loan.  Domonoske spent time detailing a number of these conversations in his deposition.  He told Bank of America's counsel that he bought the credit score from Experian after being told that the Bank would not send the notice until after closing, and that he would have to buy it.  He testified as follows:

> On my first application, when I asked for my credit score notice, the Bank of America account rep said we're not sending it to you, you can get it yourself. And that account rep referred me to Experian and told me that the only way I was going to get my credit score that was used in the process was by buying it from Experian.  I then did what I was told and I bought a credit score from Experian . . . and its called VantageScore.  Given that I was instructed to obtain this by a Bank of America employee as the only way I would get my credit score notice, then that tells me that when I do what I'm told and I get this score as what Bank of America is using and then later I get a different score, (score number redacted), called something – your FICO credit score, I think there are serious issues about whether that notice is accurate.

Domonoske Deposition at 125-26.  He further testified in his deposition that "so then I went and I bought it" (referring to the credit score) (Domonoske Dep. at 180); he "got it (the credit score) because the reps said I had to get it from Experian" (Domonoske Dep. at 187); he had confusing conversations, including one which directed him to get his credit score himself (Domonoske Dep. at 189); and "[B]ecause I pulled the Experian (credit report) after I got told three conversations later, we're not sending you the score, you need to buy it from Experian." (Domonoske Dep. at 191).   Domonoske was told he would have to buy his credit score if he wanted the information in it, but this is not the information to which Plaintiffs and all others similarly situated are entitled.  They are entitled to the *actual credit score used by the Bank*. Unless a consumer buys his credit score on the same day from Experian, and Experian happens to prepare the score using the exact same credit scoring model (of which there are more than 50 such models), the score purchased by the consumer will necessarily be different. Additionally, while Domonoske was able to purchase **a** score from Experian, he was not able to purchase **the** score used by the Bank, or other 4 items of information that the Bank was required to provide him in that same disclosure by the requirements of §1681g(f) and g(g).

2. Plaintiffs object to the finding on page 2 of the Report and Recommendation that "the liability issue in this case is whether the Bank disclosed its use of a consumer's credit

score fast enough."  The Bank is not disclosing "its use of the credit score."  The Bank is mandated to disclose (1) the score itself, (2) the range of possible scores, (3) the reason factors provided by the CRA informing the consumer as to why his score wasn't higher, (4) the date on which the score was created, and (5) the "Notice to Home Loan Applicants" mandated by Congress.  15 U.S.C. 1681g(f)(1).

3. Plaintiffs object to the finding that ACAPS triggered the creation and mailing of a credit score disclosure within twenty-four hours of a decision on the application.  Report and Recommendation , p. 3.  In fact, the disclosures were not provided to the ACAPS customers until after closing. (See Memorandum in Support of Plaintiffs' Motion for Preliminary Approval, p. 5, para. 2.a.ii; Declaration of Thomas D. Domonoske, para. 16, attached to Docket 83; Transcript, Docket 90, at p. 52).   The Report and Recommendation uses the phrases "triggered the creation and mailing" without any factual finding or evidence in the record as to when the mailing physically occurred whether by Bank of America or its agent.  This language represents a standard not found in the statute which requires that Bank of America provide the disclosures to the consumers.  Plaintiffs further object to the phrase "disclosures were processed" on page 3 of the Report and Recommendation, for the same reason.

4. Plaintiffs object to the recitation of the Bank's reasons for allowing a period of time between receipt of an application and the triggering of the credit score disclosure.  Report and Recommendation, p. 4.  Again, the word "triggering" is undefined in the evidence, and the Bank's reasons are similarly not supported in the record.  Additionally, the number of days ascribed to the ACAPS delay (five days), is not supported in the record.  The evidence actually indicates that the average delay under the ACAPS system exceeds

four weeks, since that is the average amount of time from application until closing of home equity loans, according to an e-mail from April Stoner, dated December 17, 2007 to Domonoske which is available for review upon request by the Court. The end point ("triggering of the credit score disclosure") cited by the Report and Recommendation, provides an irrelevant end point.

5. The plaintiffs object to the finding that "the Bank was prepared to present evidence that its legal counsel specifically determined that the Bank's credit score disclosure protocols were fully compliant with 1681g(g)." Report and Recommendation, p. 4. In a similar vein, Plaintiffs object to what appears to be a finding that there is no dispute that Bank of America was guided solely by legal opinions in establishing the procedure for credit score disclosures. Report and Recommendation, pp. 5-6. Plaintiffs also object to the related statement or observation (Report and Recommendation, p. 33), that willfulness would be "no easy task given the level of attention the Bank devoted to compliance with 1681g(g), including involvement and advice of counsel."

First, the findings or observations regarding legal counsel are legally irrelevant to the determination at issue in this case. Whether legal counsel gave an opinion sought by the Bank does not assist the determination of whether that decision was objectively reasonable or not, as mandated by the U.S. Supreme Court in *Safeco Insurance Co. v. Burr,* 551 U.S. 49 (2007).

Second, Bank of America has provided no evidence to support this contention and finding (or observation) by the Court. Bank of America never was prepared to present such evidence during the contested portion of this case, and a finding based upon an unsupported statement by counsel in its after the fact briefing cannot bootstrap such evidence. Bank of America consistently relied on the attorney/client privilege in responding to discovery addressed

to any issue concerning the review of the requirements posed by the FACTA Amendments to the

Fair Credit Reporting Act.  See the Motion to Compel Discovery (and Memorandum in Support)

filed on March 9, 2009 by Plaintiff Domonoske (Docket 37 and 38.  Moreover, Bank of America

has never submitted, or even identified, any opinion of counsel it now says it would present to

the Court, or the facts on which such opinions were based.  Having relied on the attorney/client

privilege, Bank of America can not change horses mid stream.

Additionally, there is substantial evidence that Bank of America actually was aware that

its "protocols" were violative of § 1681g(g).  The Federal Reserve Board was considering the

timing of a separate disclosure requirement (not at issue in this case) and for its own savings,[16],

BofA wanted to be permitted to make that disclosure earlier rather than later in a loan process.

To persuade the FRB of its position, BofA acknowledged the significant purpose of the

immediate delivery of the §1681g(g) disclosures now litigated:

> Combining the existing credit score disclosure with the additional information
> contemplated in the proposed rule in a single disclosure to be provided ***"as soon
> as reasonably practicable" will give consumers time to take appropriate action
> in the event a low credit score is caused by errors in the consumer report.
> Information about the distribution of credit scores generally will enhance
> consumers' ability to put their own credit score into context and better
> understand whether they should expect to receive favorable credit terms.*** The
> same is true for proposed rule section 222.74(e), in the personal property secured
> lending environment, where the credit score disclosure has typically not been
> disclosed to consumers. ***Providing consumers with their current or most recent
> credit scores will enhance their ability to make sound decisions about their
> credit terms***.

Letter from John Byrne, Enterprise Regulatory Relations Executive to FRB, attached as Exhibit

2 (emphasis added).

As BofA thus acknowledges, the consumer credit scores and related information needs to

---

[16] BofA stated, "It will be much less burdensome for mortgage lenders to implement than the other compliance alternatives in the proposed rule."  Byrne at p. 5.

be provided to the consumer in a time frame that allows them to *meaningfully* use the information.[17]    In fact, Congress adopted the "as soon as reasonably practicable" scoring disclosure requirements along side additional requirements enabling a consumer to obtain expedited credit reporting and score corrections when a mortgage application is pending.    15 U.S.C. §1681i.   Moreover, Bank of America acknowledged in a filing on June 17, 2009 (opposing the suggestion by Domonoske that material filed with the contested Motion for class certification should not be sealed), that "the procedure by which it provides credit score disclosures place it at a competitive advantage."  Declaration of Marty Smith in Support of Bank of America, N.A.'s Response to Plaintiff's Motion to File Material Under Seal, at para. 3; [Document 57].  Thus, there is evidence in the record that the Bank knew that the disclosures were provided after the time that they were useful to their customers, which it further knew to be after a time reasonably practicable for the Bank to make such disclosures, and the reason for the delay was to gain a competitive advantage over others in the industry.

6.  Plaintiffs object to the finding that Domonoske and Mr. Rivera did not suffer any damages.  Report and Recommendation, pp. 5, 23, 26.  First, as discussed earlier, there should be no finding on the merits of the case at his juncture.  Second, there is sufficient evidence in the record to the effect that the actual loss to him and Rivera, and the other members of the putative class can be measured by the cost or economic value of the purchase of a credit score, which Domonoske was required to purchase due to the Bank's *per se* policy of holding the credit scores until after closing.   See Affidavit of Pat

---

[17] The purpose underlying this requirement is similar to those of the Truth In Lending Act, 15 U.S.C. § 1601 et seq. which require disclosures of the terms of credit prior to consummation of the credit transaction.  This requirement permits the consumer the opportunity to shop and compare the terms of credit available.  *Polk v. Crown Auto, Inc.*, 221 F.3d 691, 692 (4[t]h Cir.  2000)(Congress intended to provide consumer with opportunity to compare more readily the various credit terms available to him.)

Finneran (Experian) (Docket 68, Exhibit 2).

7. Plaintiffs object to the statement at page 5 of the Report and Recommendation that the FCRA does not define what it means for a lender to "use" a credit score.  While the FCRA does not set out all possible ways to "use" a credit score, the FCRA states that a lender will "use" a credit score to either (1) determine whether the consumer will obtain the loan, and/or (2) determine what the interest rate will be.  The finding by the Court lacks support in the statute.

8. Plaintiffs object to the finding, or observation, that there was no showing of willfulness. R&R, p. 23.  Plaintiffs refer the Court to the letter by Bank of America to the Federal Reserve Board cited above.  Plaintiffs further rely on the fact that this is not an appropriate finding in connection with this settlement, and further points to references made in other portions of the Report and Recommendation discussing the difficulty in proving willfulness, which suggests that the Court has not made a determination on that issue.  There should be no final factual determination of the facts in the current procedural posture.  Additionally, willfulness as a statutory condition of civil liability under the Fair Credit Reporting Act includes conduct that is either knowing or reckless. *Safeco Insurance Co. v. Burr*, 551 U.S. 47, 59-60, 69 (2007) ("It is the high risk of harm, objectively assessed that is the essence of recklessness at common law.")

A defendant, such as Bank of America, violates the FCRA willfully if it knows, or has reason to know of the facts that create an unjustifiably high risk of violating the statute. Plaintiffs have developed facts supporting their position that, without regard to sums which may have been expended in review of compliance standards by Bank of America, it knew or had reason to know that it needed to provide credit score disclosures in time for them to be used

meaningfully by its customers, it knew or had reason to know that it had the mechanism and capability to send such disclosures along with other disclosures made to the consumer within two business days of the use of a credit score, and it acted to delay those federally mandated disclosures to a time when the disclosures to the consumer would be meaningless for their intended purpose of providing information to that customer.

Plaintiffs object to the Report and Recommendation in that it exceeds the appropriate scope of the inquiry as to factual issues.

## **<u>CONCLUSION</u>**

For these reasons the Plaintiffs request that the Court sustain this objection and grant preliminary approval of the proposed class settlement agreement.

February 10, 2010                                  Respectfully Submitted,

THOMAS D. DOMONOSKE and VICTOR
RIVERA, on behalf of themselves and all
others similarly situated

By:   s/ Timothy E. Cupp
       Timothy E. Cupp
       Virginia Bar Number: 23017
       Cupp & Cupp, P.C.
       1951 Evelyn Byrd Avenue
       Harrisonburg, Virginia 22801
       (540)432-9988
       cupplaw@comcast.net

       Leonard A. Bennett
       CONSUMER LITIGATION
       ASSOCIATES, P.C.
       12515 Warwick Blvd, Suite 100
       Newport News, VA 23606
       Telephone: (757) 930-3660
       Facsimile: (757) 930-3662
       Email: lenbennett@clalegal.com

Matthew James Erausquin
Virginia State Bar No. 65434
CONSUMER LITIGATION
ASSOCIATES, P.C.
3615-H Chain Bridge Road
Fairfax, VA 22030
Telephone: (703) 273-6080
Facsimile: (888) 892-3512
Email: matt@clalegal.com

Ian B. Lyngklip, Esq.
CONSUMER LAW CENTER, PLC
24500 Northwestern Hwy, Ste. 206
Southfield, MI  48075
Telephone:  (248) 320-8010
Email:  ianlyngklip@att.net

Attorneys for Plaintiffs
Thomas D. Domonoske & Victor Rivera

### Certificate of Service

I hereby certify that on February 10, 2010, I served the foregoing **PLAINTIFFS' OBECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel for the defendant:

John A. Trocki III
MORRISON & FOERSTER LLP
1650 Tysons Boulevard, Suite 400
McLean, VA 21102

Michael J. Agoglia
Alexandria A. Amezcua
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105

R. Grant Decker
J. Douglas Cuthbertson
MILES & STOCKBRIDGE P.C.
1751 Pinnacle Drive, Suite 500
McLean, VA 22102

By:___s/ Timothy E. Cupp